UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

JENNIFER HASEMANN and DEBBIE HOTH, on
behalf of themselves and all others similarly
situated,

                    Plaintiffs,

        v.

GERBER PRODUCTS CO., d/b/a Nestlé Nutrition,
Nestlé Infant Nutrition, or Nestlé Nutrition North
America,

                    Defendant.

--------------------------------------------------------------

JEREMY GREENE and CETARIA WILKERSON,
on behalf of themselves and all others similarly
situated,

                    Plaintiffs,

        v.

GERBER PRODUCTS CO., d/b/a Nestlé Nutrition,
Nestlé Infant Nutrition, or Nestlé Nutrition North
America,

                    Defendant.

--------------------------------------------------------------

WENDY MANEMEIT, individually and on behalf
of all others similarly situated,

                    Plaintiff,

        v.

GERBER PRODUCTS CO., d/b/a Nestlé Nutrition,
Nestlé Infant Nutrition, or Nestlé Nutrition North
America,

                    Defendant.

--------------------------------------------------------------

**<u>MEMORANDUM & ORDER</u>**
15-CV-2995 (MKB) (RER)

16-CV-1153 (MKB) (RER)

17-CV-93 (MKB) (RER)

MARGO K. BRODIE, United States District Judge:

Plaintiffs Jennifer Hasemann and Debbie Hoth (the "Hasemann Plaintiffs") commenced a putative class action on May 21, 2015, on behalf of themselves and all others similarly situated against Defendant Gerber Products Co., doing business as Nestlé Nutrition, Nestlé Infant Nutrition, or Nestlé Nutrition North America. (Hasemann Compl., Docket Entry No. 1.) Plaintiffs Jeremy Greene and Cetaria Wilkerson (the "Greene Plaintiffs"), and Plaintiff Wendy Manemeit, commenced nearly identical putative class actions on March 8, 2016 and January 6, 2017, respectively, on behalf of themselves and all others similarly situated against Defendant.[1] (Greene Compl., Docket Entry No. 1; Manemeit Compl., Docket Entry No. 1.)[2] On February 8, 2017, the Court consolidated these actions for discovery and pretrial purposes.[3] (Order dated February 8, 2017.)

Plaintiffs allege that Defendant engaged in a pattern of false, deceptive, and unfair business practices through advertising and marketing misrepresentations that its "Good Start Gentle" infant formula ("GSG")[4] is the first and only formula that reduces the risk that infants

---

[1] The Court refers to the Hasemann Plaintiffs, the Greene Plaintiffs, and Manemeit collectively as "Plaintiffs."

[2] The Court refers to the complaint in *Hasemann*, 15-CV-2995, as the "Hasemann Complaint," to the complaint in *Greene*, 16-CV-1153, as the "Greene Complaint," and to the complaint in *Manemeit*, 17-CV-93, as the "Manemeit Complaint."

[3] Other than the docket entry numbers associated with the Complaint for each of the three actions currently before the Court, all citations to the docket refer to the *Hasemann* docket, 15-CV-2995, unless otherwise noted. The Hasemann, Greene, and Manemeit Complaints are largely identical, and the Court generally cites to the Hasemann Complaint for ease of reference.

[4] In its prior opinions, the Court referred to the Good Start Gentle infant formula as "the Infant Formula." For consistency across the parties' briefs and the underlying report and recommendation, the Court refers to the formula as "Good Start Gentle" or "GSG" in this Memorandum and Order.

will develop allergies, and that GSG is the first and only infant formula that the United States Food and Drug Administration (the "FDA") endorses to reduce the risk of infants developing allergies. (*See* Hasemann Compl. ¶ 2–3.) Plaintiffs seek actual, statutory and punitive damages, restitution and disgorgement, and injunctive relief. (Hasemann Compl. ¶ 29; Greene Compl. ¶ 38; Manemeit Compl. ¶ 33.)

On August 17, 2018, Plaintiffs filed a consolidated motion for class certification of four subclasses: the Florida Subclass, the New York Subclass, the North Carolina Subclass, and the Multistate Subclass. Defendant opposes Plaintiffs' motion. After receiving Defendant's opposition brief, and upon submitting their reply, Plaintiffs proposed the additional certification of multiple Multistate Subclasses. On October 16, 2018, the Court referred the motion to Magistrate Judge Ramon E. Reyes, Jr.[5]

Currently before the Court is a report and recommendation from Judge Reyes, recommending that the Court certify the Florida and New York Subclasses, and deny class certification for the North Carolina and Multistate Subclasses (the "R&R"). (R&R 2, Docket Entry No. 126.) Defendant filed objections to the R&R on March 7, 2019. (Def. Obj. to the R&R ("Def. Obj."), Docket Entry No. 131.) Plaintiffs Hasemann and Manemeit filed a response to Defendant's objections on March 20, 2019. (Pls. Resp. to Def. Obj. to R&R ("Pls. Resp."), Docket Entry No. 134-1.) For the reasons set forth below, the Court adopts the majority of the R&R, grants certification of the Florida and New York Subclasses as modified herein, appoints

---

[5] (*See* Not. of Pls. Mot. for Class Certification ("Pls. Mot."), Docket Entry No. 67; Pls. Consolidated Mem. in Support of their Mot. for Class Certification ("Pls. Mem."), Docket Entry No. 80; Mem. in Opp'n re Mot. to Certify Class ("Def. Opp'n"), Docket Entry No. 82; Reply in Supp. re Mot. to Certify Class ("Pls. Reply"), Docket Entry No. 97; Proposed Order Re: Pls. Consolidated Mot. for Class Certification ("Proposed Order"), annexed to Pls. Reply as Ex. K, Docket Entry No. 97-30; Order dated Oct. 16, 2018.)

class representatives and class counsel for the Florida and New York Subclasses, and denies certification of the North Carolina and Multistate Subclasses.

## I. Background

The Court assumes familiarity with the underlying facts as detailed in the R&R, *Hasemann v. Gerber Prod. Co.*, No. 15-CV-2995, 2016 WL 5477595 (E.D.N.Y. Sept. 28, 2016), and *Greene v. Gerber Prod. Co.*, 262 F. Supp. 3d 38, 47 (E.D.N.Y. 2017).

### a. Plaintiffs' claims

In their Complaint, the Hasemann Plaintiffs alleged claims for (1) deceptive, misleading and unfair practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (the "FDUTPA"); (2) misleading advertising in violation of Florida Statutes § 817.41; (3) untrue, deceptive and misleading practices in violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.01 *et seq.* (the "WDTPA"); and (4) false representations in violation of Wisconsin Statutes §§ 895.446 and 943.20. (Hasemann Compl. ¶¶ 82–127.) The Greene Plaintiffs alleged violations of (1) the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01 *et seq.* ("OCSPA"), (2) the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.01 *et seq.* ("ODTPA"), and (3) the North Carolina Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1 *et seq.* ("NCDTPA"). (Greene Compl. ¶ 14.) Plaintiff Manemeit alleged violations of sections 349 and 350 of New York's General Business Law ("GBL"). (Manemeit Compl. ¶¶ 93–108.) The Greene Plaintiffs and Plaintiff Manemeit also brought common-law claims for fraudulent concealment, intentional misrepresentation, negligent misrepresentation and unjust enrichment, based on Defendant's advertising and marketing of GSG. (Greene Compl. ¶ 14; Manemeit Compl. ¶ 14.)

On September 28, 2016, the Court dismissed the Hasemann Plaintiffs' claim under

Wisconsin Statutes § 100.18, but preserved Plaintiffs' claims under the FDUTPA, Florida Statutes § 817.41, Wisconsin Statutes § 100.20 and Wisconsin Statutes §§ 895.446 and 943.20. *Hasemann*, 2016 WL 5477595, at *1. On August 2, 2017, the Court dismissed the Greene Plaintiffs' claims under the OCSPA and ODTPA, and found that the Greene Plaintiffs and Plaintiff Manemeit lacked standing to pursue injunctive relief, and further dismissed their unjust enrichment claims. *Greene*, 262 F. Supp. 3d at 47.

According to Plaintiffs' consolidated Memorandum in Support of their Motion for Class Certification, "Plaintiffs are no longer seeking to certify claims under Florida Statute 817.14; Wisconsin Statute 895.446; or the Wisconsin Deceptive Trade Practices Act (specifically, Wis. Stat. § 100.20)." (Pls. Mem. 1 n.1.) Plaintiffs are proceeding "under the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 *et seq.*) (the 'FDUTPA'); §§ 349 and 350 of New York's General Business Law (the "GBL"); and the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. Ann. § 75-1.1 *et seq.*) (the 'NCUDTPA'). Plaintiffs are also suing under the common law for intentional misrepresentation, negligent misrepresentation, and fraudulent concealment." (*Id.*)

### b. Factual background

The facts alleged in the Hasemann, Greene, and Manemeit complaints are assumed to be true for the purpose of this motion. Plaintiffs' claims arise from Defendant's advertising and marketing of its "Good Start Gentle" line of infant formula.

Since at least 2011, Defendant has manufactured, distributed and sold GSG, and has advertised GSG through television, print media, product labeling, and on the Internet. (Hasemann Compl. ¶ 19.) GSG contains partially hydrolyzed whey protein, which is the ingredient that is purportedly responsible for GSG's ability to reduce the risk of developing

allergies.  (*Id.* ¶¶ 20, 27.)

### i. Defendant's applications to the FDA

In June of 2005, Defendant petitioned the FDA for approval of a qualified health claim[6] to use in its marketing of its Good Start line of infant formula, which includes GSG.  (*Id.* ¶ 27.) Defendant sought approval to state that "emerging clinical research in healthy infants with family history of allergy shows that feeding a 100% Whey-Protein Partially Hydrolyzed formula may reduce the risk of common food allergy symptoms, particularly allergic skin rash."  (*Id.*) The FDA denied Defendant's petition on May 11, 2006, concluding that there was "no credible evidence to support the qualified health claim relating consumption of 100 percent partially hydrolyzed whey protein in infant formula to a reduced risk of food allergy."  (*Id.* ¶ 28.)

In May of 2009, Defendant again petitioned the FDA to approve a qualified health claim, stating:

> emerging clinical research shows that, in healthy infants with family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula instead of a formula containing intact

---

[6]  The FDA can approve a "health claim" or a "qualified health claim" under certain circumstances, allowing companies to make certain health claims about their products in the labeling of said products.  A "health claim" is "any claim made on the label or in labeling of a food . . . that expressly or by implication . . . characterizes the relationship of any substance to a disease or health-related condition."  (Hasemann Compl. ¶ 23 (quoting 21 C.F.R. § 101.14(a)(1)).)  Before use in labeling a product, the FDA requires any such health claim to be reviewed and approved by the FDA.  (*Id.* ¶ 26.)  The FDA can approve a health claim if it determines that there is "significant scientific agreement" that the claim is supported by scientific evidence.  (*Id.* ¶ 24.)  "In the absence of 'significant scientific agreement' [as to a health] claim, the FDA may nevertheless allow a company to make a 'qualified health claim' if it is supported by less scientific evidence."  (*Id.* ¶ 25.)  When the FDA permits a company to make a qualified health claim, the FDA issues "a letter outlining the circumstances under which it intends to consider exercising its enforcement discretion not to challenge the qualified health claim." (Mem. of Law in Supp. of Def. Mot. to Dismiss 4, Docket Entry No. 23-1); *see generally Fleminger, Inc. v. U.S. Dep't of Health & Human Servs.*, 854 F. Supp. 2d 192, 200 (D. Conn. 2012) (explaining the FDA's process for analyzing and approving qualified and unqualified health claims).

cow's milk proteins may reduce the risk of developing the most common allergic disease of infancy — atopic dermatitis — throughout the [first] year of life and up to [three] years of age.

(*Id.* ¶ 29.) The FDA determined that this claim mischaracterized the scientific evidence and was therefore misleading. (*Id.* ¶ 30.) The FDA instead proposed four alternative qualified health claims, over which it would consider exercising its enforcement discretion not to challenge the qualified health claim.[7] (*Id.* ¶ 32.) The FDA required that, if Defendant opted to use any of the

---

[7] The four alternative qualified health claims proposed by the FDA were:

1. "Very little scientific evidence suggests that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age."

2. "Little scientific evidence suggests that, for healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life."

3. "For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age. FDA has concluded that the relationship between 100% Whey-Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is very little scientific evidence for the relationship."

4. "For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life. FDA has concluded that the relationship between 100% Whey-Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is little scientific evidence for the relationship."

(Hasemann Compl. ¶ 32.)

four qualified health claims, Defendant also add a qualifying statement to its labeling.  (*Id.* ¶ 33.)

The qualifying statement specified that:

> Partially hydrolyzed formulas should not be fed to infants who are allergic to milk or to infants with existing milk allergy symptoms. If you suspect your baby is already allergic to milk, or if your baby is on a special formula for the treatment of allergy, your baby's care and feeding choices should be under a doctor's supervision.

(*Id.* (the "qualifying statement") (emphasis omitted).)

### ii.  The GSG product and alleged false and misleading representations

Plaintiffs allege that, "since at least 2011," Defendant has marketed and advertised GSG using false and misleading representations in promotional materials, including in Florida and New York.  (*Id.* ¶ 42; Manemeit Compl. ¶ 54.)  GSG is sold in three formats — powder, liquid concentrate, and ready-to-feed liquid — and is sold in various sized containers.  (Decl. of Russ Levitan ("Levitan Decl.") ¶¶ 5–6, Docket Entry No. 105.)  Good Start Gentle is part of the "Good Start" product line, which includes, *inter alia*, GSG, Good Start Soothe, Good Start Protect, and Good Start Nourish.  (Decl. of Bernadette Tortorella ("Tortorella Decl.") ¶ 5, Docket Entry No. 106.)

Plaintiffs attach to their complaints six "samples" of the allegedly false and misleading representations.

First, a safety seal sticker placed on GSG formula cannisters that states that GSG is the "1ˢᵗ & Only Routine Formula to REDUCE THE RISK OF DEVELOPING ALLERGIES." (Hasemann Compl. ¶ 43; Ex. A, annexed to Hasemann Compl., Docket Entry No. 1-1.)  This seal was placed on certain GSG containers containing 23.2 ounces of more of powder, from July 8, 2013 through January 23, 2015, and "could be found on store shelves through April 23, 2016." (Tortorella Decl. ¶ 20.)

An image of the sticker is displayed below:



(Ex. A, annexed to Hasemann Compl.)

Second, a manufacturer's coupon with a gold badge that reads: "MEETS FDA QUALIFIED HEALTH CLAIM" around the outer perimeter of the badge and read in large font "1st AND ONLY" in the center of the gold badge. A statement on the attachment reads that Good Start "is the first and only formula brand made from 100% whey protein hydrolyzed, and that meets the criteria for a FDA Qualified Health Claim for atopic dermatitis," and the label also contains pictures of cannisters of Gerber formula, including a cannister of GSG. (Hasemann Compl. ¶ 44; Ex. B, annexed to Hasemann Compl., Docket Entry No. 1-2; Tortorella Decl. ¶ 21.) Defendant used the label "on exterior product packaging," and the gold badge with the "MEETS FDA QUALIFIED HEALTH CLAIM" and "1st AND ONLY" language "on supermarket displays advertising [GSG]." (Hasemann Compl. ¶ 47.) Specifically, the coupon was attached to certain "containers of Good Start that contained 22 ounces or more of powder formula." (Tortorella Decl. ¶ 21.) 316,592 of the coupons were distributed on October 10, 2011, and all expired on March 31, 2012. (*Id.*)

An image of the coupon is displayed below:



(Ex. 3, annexed to Tortorella Decl., Docket Entry No. 90-3.)

Third, a television commercial (storyboard dated April 9, 2012) featuring images of GSG cannisters and stating in relevant part: "You want your Gerber baby to have your imagination . . . your smile . . . your eyes . . . not your allergies . . . . [I]f you introduce formula, choose the Gerber Good Start Comfort Proteins Advantage." (Hasemann Compl. ¶ 48 (alteration in original); Ex. C, annexed to Hasemann Compl., Docket Entry No. 1-3 (also linking to a webpage to view the television commercial in non-storyboard form: *available at* https://www.youtube.com/watch?v=h6l-CjygjEg).)

The commercial ran on a variety of television networks for fourteen days in April 2012, seven days in May 2012, nine days in October 2013, four days in November 2013, and 4 days in December 2013. (Tortorella Decl. ¶ 22.)

Fourth, a magazine advertisement that reads:

> The Gerber Generation says "I love Mommy's eyes, not her allergies."
>
> If you have allergies in your family, breastfeeding your baby can help reduce their risk. And, if you decide to introduce formula, research shows the formula you first provide your baby may make a difference. In the case of Gerber® Good Start® Gentle Formula, it's the Comfort Proteins® Advantage that is easy to digest and may also deliver protective benefits.

(Hasemann Compl. ¶ 49; Ex. D, annexed to Hasemann Compl., Docket Entry No. 1-4.) The advertisement ran in a variety of magazines between December of 2011 and January of 2013, at different times in each magazine, including Adoptive Families, Baby Talk, Fit Pregnancy,

People, Parenting EY, Parents, and Pregnancy & Newborn.  (Tortorella Decl. ¶ 23.)

An image of the advertisement is displayed below:



(Ex. 5, attached to Tortorella Decl., Docket Entry No. 90-5.)

Fifth, a trade journal advertisement that features a picture of a cannister of GSG and that states in large font, "The first formula fed may make a difference.  Gerber Good Start is the first and only infant formula that meets the criteria for a FDA Qualified Health Claim," and in smaller font:

> Breastfeeding helps reduce the risk of developing atopic dermatitis – the most common allergy of infancy.  Now there is a formula that can help too, especially for those babies with a family history of allergy.  The 100% whey protein partially hydrolyzed used in our Gerber Good Start formulas is easy to digest and may provide protective benefits.  This is out Comfort Proteins® Advantage and only Good Start has it.

(Hasemann Compl. ¶ 50; Ex. E, annexed to Hasemann Compl., Docket Entry No. 1-5.)  The

advertisement appeared in a retail trade journal, Drugstore News, in April 2012. (Tortorella Decl. ¶ 24.)

Sixth, a magazine advertisement that features images of Gerber formula cannisters, including a GSG cannister, and states in a badge on the advertisement, "1st FORMULA WITH FDA QUALIFIED HEALTH CLAIM," and, *inter alia*, lists its website as gerber.com/allergy. (Hasemann ¶ 51; Ex. F, annexed to Hasemann Compl., Docket Entry No. 1-6.) This advertisement ran in People and Parents magazines in August and September 2013, respectively. (Tortorella Decl. ¶ 25.)

Plaintiffs allege these samples make two deceptive representations: (1) that GSG reduces the risk that infants will develop allergies, and (2) that GSG meets the criteria for an FDA qualified health claim for atopic dermatitis. As to the representation that GSG "reduce[s] the risk of [infants] developing allergies," Plaintiffs allege that it is misleading because the FDA rejected this claim in May 2006, and the scientific evidence demonstrates that this claim is false. (Hasemann Compl. ¶¶ 43, 48–49, 53.) In support, Plaintiffs allege that several scientific studies have concluded that partially hydrolyzed whey protein does not lower the risk that infants will develop allergies. (*Id.* ¶ 34.) Plaintiffs cite to a June of 2011 study by Adrian Lowe, Ph.D., University of Melbourne and Melbourne Royal Children's Hospital, which concluded that "[t]here was no evidence that introducing pHWF [(partially hydrolyzed whey formula)] at the cessation of breast-feeding reduced the risk of allergic manifestations, including eczema, asthma, and allergic rhinitis, in [a] study of high-risk infants." (*Id.* ¶ 35 (alterations in original) (quoting Adrian J. Lowe, *Effect of a Partially Hydrolyzed Whey Infant Formula at Weaning on Risk of Allergic Disease in High-Risk Children: A Randomized Controlled Trial*, 128 J. Allergy & Clinical Immunology 2, 360–65.e4 (2011)).)

As to the representation that GSG meets the criteria for an FDA qualified health claim for atopic dermatitis, Plaintiffs allege that this representation is deceptive because it is not one of the four FDA-approved qualified health claims, and because Defendant did not include the qualifying statement as required by the FDA. (*Id.* ¶¶ 44, 50–51, 53.)

In addition to the samples that Plaintiffs attached to their pleadings, Defendant submits several additional examples of marketing materials that appear to contain the alleged deceptive marketing representations. Defendant attaches as an exhibit, for example, a copy of an in-store display sign that contains a picture of a GSG container and the image of the gold badge that reads: "MEETS FDA QUALIFIED HEALTH CLAIM" around the outer perimeter of the badge and read in large font "1st AND ONLY" in the center of the gold badge. (Tortorella Decl. ¶ 26; Ex. 8, annexed to Tortorella Decl., Docket Entry No. 90-8.) This sign was displayed during part or all of a two-week period in November 2011. (Tortorella Decl. ¶ 26.)

An image of the sign is displayed below:



(Ex. 8, annexed to Tortorella Decl.)

Defendant asserts that it promotes its products through a variety of channels, including, *inter alia*, print advertisement, e-mail advertisement, social media, coupons, in-store signs, television commercials, and newspapers, (Tortorella Decl. ¶ 13), and contends "that the challenged claims did not consistently appear on GSG's labels and the advertising was extremely limited," (Def. Opp'n 1–2), and that "advertisements are often disseminated for short periods of time, and their substance changes frequently," (*id.* at 5). Defendant argues that GSG marketing materials emphasize multiple benefits of GSG, and that the majority of those materials have "nothing to do" with allergies or the qualifying statement. (*Id.*)

### iii. FDA warning letter

On October 31, 2014, the FDA sent a warning letter to Defendant's President and CEO "outlining various false and misleading representations made in the promotion of Good Start" (the "FDA Warning Letter"). (Hasemann Compl. ¶ 56.) After reviewing the labeling on the formula that was sold as a 23.2 ounce milk-based powder, the FDA concluded that the labeling bore "health claims that were not authorized by FDA" and that "the labeling [was] misleading." (FDA Warning Letter 1, annexed to Decl. of Geoffrey Castello as Ex. 4, Docket Entry No. 23-2.) The FDA also noted that it had "previously considered and denied" the statement on the label of the formula that it was the "1st & only routine formula to reduce risk of developing allergies." (*Id.* at 2 (capitalization omitted).) The FDA acknowledged that consistent with the FDA's four proposed qualified health claims, Defendant's labeling and website both stated that there was "limited evidence" that partially hydrolyzed whey protein can reduce the risk of infants developing atopic dermatitis, (*id.* at 2–3), but nevertheless concluded that by failing to include the qualifying statement required by the FDA, Defendant failed to provide "essential information necessary to ensure the safety of consumers," (*id.* at 3–4). Because Defendant failed to include

the qualifying statement on its website or on the labeling of the formula, the FDA concluded that Defendant's qualified health claim was misleading. (*Id.*)

### iv. Litigation involving Defendant

On October 29, 2014, the Federal Trade Commission (the "FTC") filed a still-pending lawsuit against Defendant in the United States District Court for the District of New Jersey, alleging that GSG's labeling and advertising are false and deceptive (the "FTC Litigation"). (Hasemann Compl. ¶ 54); *Fed. Trade Comm'n v. Gerber Prods. Co.*, No. 14-CV-6771 (D.N.J. Oct. 29, 2014). The FTC alleges that Defendant's representation that GSG reduces the risk of developing allergies is false or misleading and unsubstantiated. (Hasemann Compl. ¶ 55); *Fed. Trade Comm'n v. Gerber*, complaint at ¶¶ 19–20. The FTC also alleges that Defendant's representation on the labeling and in its advertising that GSG qualified for or received approval for a health claim from the FDA is false or misleading. (Hasemann Compl. ¶ 55); *Fed. Trade Comm'n v. Gerber*, complaint at ¶¶ 22–23.

Since the FTC filed its action against Defendant, other cases — in addition to the consolidated cases — regarding GSG have been filed against Defendant. *See, e.g.*, *Hobbs v. Gerber Prod. Co.*, No. 17-CV-3534, 2018 WL 3861571 (N.D. Ill. Aug. 14, 2018) (denying Defendant's motion to dismiss); *Zakaria v. Gerber Prod. Co.*, No. 15-CV-00200, 2017 WL 9512587 (C.D. Cal. Aug. 9, 2017) (decertifying after having initially certified a class), *aff'd*, No. 17-CV-56509, 2018 WL 5977897 (9th Cir. Nov. 14, 2018); *Slocum v. Gerber Prod. Co.*, No. 16-CV-04120, 2016 WL 3983873 (W.D. Mo. July 25, 2016) (remanding to state court); *Nat'l Consumers League v. Gerber Prods. Co.*, No. 14-CA-8202 (D.C. Super. Ct. Aug. 8, 2015) (denying Defendant's motion to dismiss). In all cases the plaintiffs allege(d) that Defendant's representations that GSG reduces the risk of developing allergies and their representations that

the FDA approved Defendant's health claims are false and misleading.

### v.  Proposed classes and class representatives

Plaintiffs seek to certify the following putative classes:

> **The [Florida / New York / North Carolina] [Subclasses]:** All persons who purchased Good Start Gentle infant formula in [Florida / New York / North Carolina] between May 25, 2011, and [April 23],[8] 2016.  The [Florida / New York / North Carolina] [Subclass] excludes the judge or magistrate assigned to this case; Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, legal representatives, successors, and assigns; persons who purchased Good Start infant formula for the purpose of resale; and any government or government entity participating in the WIC program. The term "purchased" does not include formula received by a person via the WIC program.

> **The Multistate Fraud/Intentional-Misrepresentation [Subclass]:** All persons who purchased Good Start Gentle infant formula in the United States, except in Alabama, California, Illinois, Missouri, or the District of Columbia, between May 25, 2011, and [April 23], 2016.  The Multistate Fraud/Intentional-Misrepresentation Class excludes the judge or magistrate assigned to this case; Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, legal representatives, successors, and assigns; persons who purchased Good Start infant formula for the purpose of resale; and any government or government entity participating in the WIC program. The term "purchased" does not include formula received by a person via the WIC program.

> **The Multistate Fraudulent-Concealment [Subclass]:** All persons who purchased Good Start Gentle infant formula in the United States, except in California, Georgia, Illinois, Missouri, or the

_____

[8]  Plaintiffs originally sought to certify classes of persons who had purchased GSG up to the "present" day, (*see* Pls. Mot. 2); however, Plaintiffs agreed "to narrow the class-period end date to March 31, 2016, which [Defendant] identifies as the last date that its direct-to-consumer allergy claims were in the market." (Pls. Reply 24 (citations omitted).)  In Plaintiffs' response to Defendant's objections to the R&R, Plaintiffs note that based on declarations submitted on behalf of Defendant, the class end date should in fact be extended to April 23, 2016, which is the date that one of the challenged representations could still be found on shelves. (*See* Pls. Resp. 23 (citation omitted).)  The Court agrees, and has adjusted the proposed end of the class periods from March 31, 2016 to April 23, 2016. (*See* Tortorella Decl. ¶ 20 ("The 1st & Only Seal appeared for a limited time . . . and could be found on store shelves through April 23, 2016.").)

District of Columbia, between May 25, 2011, and [April 23], 2016. The Multistate Fraudulent-Concealment Class excludes the judge or magistrate assigned to this case; Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, legal representatives, successors, and assigns; persons who purchased Good Start infant formula for the purpose of resale; and any government or government entity participating in the WIC program. The term "purchased" does not include formula received by a person via the WIC program.

**The Multistate "Special Relationship" Negligent-Misrepresentation Subclass:** All persons who purchased Good Start Gentle infant formula in Colorado, New York, Oregon, or West Virginia between May 25, 2011, and [April 23], 2016. The "Special Relationship" Negligent-Misrepresentation Subclass excludes the judge or magistrate assigned to this case; Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, legal representatives, successors, and assigns; persons who purchased Good Start infant formula for the purpose of resale; and any government 3 or government entity participating in the WIC program. The term "purchased" does not include formula received by a person via the WIC program.

**The Multistate "Non-Contractual" Negligent-Misrepresentation Subclass:** All persons who purchased Good Start Gentle infant formula in Arizona, Connecticut, Florida, Kentucky, Massachusetts, North Carolina, New Jersey, Pennsylvania, and Washington between May 25, 2011, and [April 23], 2016. The Multistate "NonContractual" Negligent-Misrepresentation Subclass excludes the judge or magistrate assigned to this case; Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, legal representatives, successors, and assigns; persons who purchased Good Start infant formula for the purpose of resale; and any government or government entity participating in the WIC program. The term "purchased" does not include formula received by a person via the WIC program.

(Proposed Order (alterations omitted).)

Plaintiffs further seek to appoint Hasemann as the representative of the Florida Subclass, Wilkerson as the representative of the North Carolina Subclass, Manemeit as the representative of the New York Subclass, and all three Plaintiffs — Hasemann, Wilkerson, and Manemeit — as

the representatives of multiple Multistate Subclasses.  (*See id.*)

### c.  Report and recommendation

By R&R dated February 20, 2019, Judge Reyes recommended that the Court certify the proposed Florida and New York Subclasses, and deny certification for the proposed North Carolina and Multistate Subclasses.[9]  (R&R 2.)  Judge Reyes found that "[t]he central questions in this action are whether Gerber's claims that GSG could reduce the risk of allergy were false, and whether plaintiffs paid a premium as a consequence of these misrepresentations," and that "[t]hese questions may be answered with common proof."  (*Id.* at 9.)  Judge Reyes further noted that "Plaintiffs' theory of liability is that Defendant's misrepresentations regarding allergies falsely inflated the price of GSG, such that those who purchased GSG paid more for that product than they would have were the product marketed honestly."  (*Id.* at 12.)

In making his recommendation, Judge Reyes noted several distinctions between the elements of the claims asserted for each subclass.  Judge Reyes found that under the FDUTPA and GBL, Plaintiffs need not show actual reliance upon the alleged misrepresentations in order to prevail on their claims.  (*See id.* at 16 ("Causation is not the same as reliance, which plaintiffs need not show to prevail on FDUTPA claims."); *id.* at 17 ("reliance is not an element of either Section 349 or Section 350 [of the GBL]").)  Judge Reyes also found that with respect to damages, Plaintiffs only needed to show that Defendant's alleged unfair practice and misrepresentations allowed Defendant to charge an increased price.  (*See id.* at 16 (noting that with respect to the FDUTPA claims, "Plaintiffs need only be capable of showing that Gerber's unfair practice enabled it to capture a premium that would not have been available but for the

---

[9]  The R&R refers to a single Multistate Subclass, but, as noted, Plaintiffs propose certification of several Multistate Subclasses.  The Court finds that the reference to a single Multistate Subclass does not affect its analysis.

misrepresentations"); *id.* at 17 (citing a case to suggest that courts often certify classes alleging GBL claims where the injury was in the form of a price premium (citation omitted)).)

As to the North Carolina claims, Judge Reyes found that courts require a showing of reliance under the NCUDTPA, which would result in individual plaintiff's facts and questions predominating over questions common to the class. (*See id.* at 19 ("North Carolina courts have, however, required a showing of reliance to prove the existence of a proximate causal relationship between an alleged misrepresentation and the injury purportedly suffered.") (collecting cases).) Judge Reyes noted that "members of the putative class might . . . have been attracted to GSG for another reason" besides the allergy claims at issue, and that "[t]he facts alleged do not give rise to certainty that every purchaser of GSG relied on the allergy claims." (*Id.* at 20 (citations omitted).) Judge Reyes therefore recommended that the Court not certify the North Carolina Subclass. (*Id.* at 20.)

As to the Multistate claims, Judge Reyes found that the nature of having to look into variations in state law for claims of negligent misrepresentation, intentional misrepresentation, and fraud would preclude predominance of common legal and factual questions and would make the Multistate Subclass impractical. (*Id.* at 21–22.) Judge Reyes also recommended that the Multistate Subclass not be certified "because each common law claim requires reliance." (*Id.* at 21.)

## II. Discussion

### a. Standards of review

#### i. Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate

judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected. *Id.*; *see also U.S. v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1 (E.D.N.Y. Nov. 24, 2015). The clear error standard also applies when a party makes only conclusory or general objections. *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016) (holding "general objection[s] [to be] insufficient to obtain *de novo* review by [a] district court" (citations omitted)); *see* Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file *specific written objections* to the [magistrate judge's] proposed findings and recommendations." (emphasis added)); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758, 2018 WL 2277791, at *1 (2d Cir. May 18, 2018) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))).

### ii. Class certification

"To obtain certification of a class action for money damages, a plaintiff must satisfy prerequisites of numerosity, commonality, typicality, and adequacy of representation," pursuant to Rule 23(a), and "must also establish that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," pursuant to Rule 23(b)(3). *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015). In addition to the

explicit requirements of Rule 23(a), the class must satisfy the implied requirement of ascertainability. *In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes* ("*Dukes*"), 564 U.S. 338, 350 (2011). "The party seeking class certification must affirmatively demonstrate . . . compliance with the Rule, and a district court may only certify a class if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 237–38 (2d Cir. 2012) (citations and internal quotation marks omitted); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." (citations omitted)). "The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011) (quoting *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009), *aff'd*, 568 F. App'x 78 (2d Cir. 2014)).

### b.  Objections to the R&R

Defendant objects to Judge Reyes' recommendation that the Court certify the Florida and New York Subclasses, and argues that Judge Reyes' conclusion "is based on a single erroneous premise — that 'substantially the same misrepresentation . . . blanketed the entire product line' making it a '"near certainty" that every consumer was exposed to the alleged misrepresentations.'"  (Def. Obj. 1 (citing R&R 8, 15).)  Defendant makes specific objections to the R&R's conclusions regarding the Rule 23(a) requirement of typicality and the implied requirement of ascertainability, and the Rule 23(b)(3) requirement of predominance.  (*See*

*generally id.*; *see also id.* at 1 (noting that the R&R is based on an erroneous premise that "affects nearly all the elements of Rule 23, including typicality, commonality, predominance, and ascertainability").) Plaintiffs did not file any objections to the R&R.

The Court therefore reviews *de novo* the Rule 23(a) requirement of typicality and the implied requirement of ascertainability, and the Rule 23(b)(3) requirement of predominance.

### c. Unopposed recommendations and findings

Neither Plaintiffs nor Defendant objects to Judge Reyes' recommendation that the Court deny certification for the proposed North Carolina and Multistate Subclasses.[10]

In addition, Defendant did not object to Judge Reyes' Rule 23(b)(3) superiority analysis with respect to the two classes recommended for certification — Florida and New York. (*See id.* at 21.) Defendant also did not specify any objections to Judge Reyes' Rule 23(a) findings on numerosity, commonality, and adequacy of representation.[11] Because Defendant does not specify any objections to numerosity, commonality, adequacy of representation, and superiority

---

[10] In its objections surrounding typicality, Defendant argues "that Plaintiff Wilkerson is an atypical class representative because she 'purchased' GSG using vouchers and food stamps obtained through the USDA's Women, Infants and Children's Food and Nutrition Service ('WIC'), and therefore did not suffer any out-of-pocket damages." (Def. Obj. 8.) However, because the Court adopts Judge Reyes' recommendation to deny certification of the North Carolina and Multistate Subclasses, i.e., the two classes that Wilkerson would represent as class representative, the Court declines to address this objection.

[11] In a footnote in its objections to the R&R, Defendant notes that although the R&R states that its not contesting commonality, it does contest commonality "because the issues are substantially similar to the predominance inquiry under Rule 23(b)(3), which [Defendant] addressed in great detail." (Def. Obj. 6 n.3.) This is not sufficient to meaningfully contest commonality, as Defendant does not otherwise address the issue of commonality in its objections. *See Benitez*, 654 F. App'x at 503–04 (holding "general objection[s] [to be] insufficient to obtain de novo review by [a] district court" (citations omitted)); *Colvin*, 734 F. App'x at 758 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario*, 313 F.3d at 766)).

as to the subclasses at issue, the Court finds that these factors are unopposed and the Court declines to review these elements *de novo*.

The Court therefore reviews Judge Reyes' recommendation to deny certification to the proposed North Carolina and Multistate Subclasses, and his findings on numerosity, commonality, adequacy of representation, and superiority for clear error. Having reviewed these portions of the R&R and, finding no clear error, the Court adopts the recommendations pursuant to 28 U.S.C. § 636(b)(1). The Court therefore only considers whether the Rule 23(a) requirements of typicality and ascertainability, and the Rule 23(b)(3) requirement of predominance, have been met with respect to the proposed Florida and New York Subclasses, and with respect to the proposed representatives for those Subclasses — Plaintiffs Hasemann and Manemeit.

### d.   Class certification under Rule 23(a) and (b)(3)

In order to determine whether the Florida and New York Subclasses can be certified, the Court must determine, *inter alia*, whether the claims of the class representatives are typical, whether common questions predominate, and to what extent the class is ascertainable. The parties present competing arguments for and against certification. The Court first discusses the parties' argument and the applicable law.

### i.   Plaintiffs' arguments

Plaintiffs argue that "[t]he consumer protection statutes at issue here have no reliance requirement, meaning that Plaintiffs will only need to establish that [Defendant's] marketing was deceptive and that this resulted in Plaintiffs' damages." (Pls. Mem. 24.) Plaintiffs essentially argue that there is no requirement that a putative class member have actually *seen* the misrepresentations in order for them to succeed on their claims, and therefore, whether or not a

putative class member has been exposed to the alleged misrepresentations should not factor into a determination of whether the Court should certify a class. For example, Plaintiffs argue that due to the absence of a reliance prong under the FDUTPA:

> there's no need to examine whether a given allergy advertisement had any effect on an individual consumer's decision to purchase GSG: if [Defendant] inflated the market value of GSG by disseminating a series of deceptive allergy claims, and a consumer purchased GSG, then that consumer paid more for GSG than they otherwise would have absent the allergy claims, and this is actionable under the FDUTPA — regardless of whether the consumer cared about or even saw those claims.

(*Id.* at 30 (citations omitted).) Plaintiffs argue that the FDUTPA simply requires that a representation was objectively misleading, and that the product's value would have been lower absent the challenged representation. (*Id.*) That is, that "Plaintiffs only need to prove loss causation (that, but for [Defendant's] allergy ads, they would have had to pay less for GSG)." (Pls. Reply 5.)

Similarly, Plaintiffs argue that with respect to the GBL claims, "if a defendant is able to charge a premium for a product based on a materially deceptive marketing campaign, then anyone who buys that product has been injured, regardless of whether they were actually influenced by — or even saw — the challenged campaign." (Pls. Mem. 34 (citation omitted); *see also id.* at 34–35 ("The only question, then, is whether [Defendant's] allergy claims were materially misleading and whether this allowed [Defendant] to charge a higher price for GSG.").)

### ii. Defendant's arguments

Defendant argues that Plaintiffs cannot satisfy several Rule 23 requirements because the putative class members were not uniformly *exposed* to the representations at issue. Defendant asserts that "all putative class members did not see the challenged representations, the challenged

24

representations varied across different mediums, and there were changes in advertising, labeling, and packaging during the class period such that different consumers likely saw (or even considered) different representations." (Def. Opp'n 38 (citations omitted).) Defendant also argues that Plaintiffs heavily rely "on case law where the alleged deceptive advertisement or label was identical across all proposed class members," which is not the case before the Court. (*Id.* (citations omitted).) For example, Defendant argues that "New York and other courts have held that a representative plaintiff's claims are not typical of the class where there was inconsistent exposure to the challenged marketing representations." (Def. Obj. 7 (collecting cases).)

### iii. Judge Reyes' conclusion

Judge Reyes found that it was immaterial that putative class members were exposed to different marketing representations because "exposure to the misrepresentation is not an element of the claims asserted by the New York or Florida Sub[classes]." (R&R 7.) For example, Judge Reyes found that deceptive practices could be found under the FDUTPA "even where not all plaintiffs have seen the challenged advertising," (*id.* at 15 (citation omitted)), and that "the differences among advertisements 'are not so significant as to preclude a fact finder from evaluating weather' the 'overarching theme' of the various campaigns is deceptive under Florida law," (*id.* (citation omitted)). Judge Reyes further found that "while some [GSG] units may not have been labeled with the representation, none explicitly disclaimed it . . . . [and c]onsequently, the representations as to Good Start Gentle could be understood to apply to the full product line." (*Id.* at 8.) Judge Reyes also found that "[a]lthough these representations may not have been verbatim, 'substantially the same misrepresentation' — that GSG could prevent infants from developing allergies — blanketed the entire product line, thus inflating prices across the board."

(*Id.*) Judge Reyes also noted that multiple cases cited by Defendant suggest that non-uniform representations should foreclose a predominance determination under the GBL, "improperly conflated causation with reliance." (*Id.* at 17.)

### iv. The relevant law

Hasemann alleges violations of the Florida Deceptive and Unfair Trade Practices Act, (Pls. Mem. 1 n.1), and Manemeit alleges violations of sections 349 and 350 of New York's General Business Law, (Manemeit Compl. ¶¶ 93–108).

#### 1. FDUTPA

In order to assert a claim for damages under the FDUTPA, a "plaintiff must only establish three *objective* elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985–86 (11th Cir. 2016) (citation omitted).

In order to establish causation under the FDUTPA, "a plaintiff need not prove reliance on the allegedly false statement . . . , but rather a plaintiff must simply prove that an objective reasonable person would have been deceived." *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011); *see also Lombardo v. Johnson & Johnson Consumer Cos., Inc.*, 124 F. Supp. 3d 1283, 1290 (S.D. Fla. 2015) (same); *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 691 (S.D. Fla. 2014) ("'FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct.' Instead of actual reliance, a plaintiff must simply prove that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" (quoting *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. 2009))).

"FDUTPA damages are measured according to 'the difference in the market value of the

product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *Carriuolo*, 823 F.3d at 986 (first quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984); and then citing *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 453 (5th Cir. 2001)). A plaintiff may recover damages under the FDUTPA by alleging that the plaintiff "paid a price premium" for the allegedly deceptive product. *Id.* (citing *Fitzpatrick*, 635 F.3d at 1282–83); *see also Fitzpatrick*, 635 F.3d at 1283 (stating that a plaintiff "would only need to show that he or she paid a premium for [the product at issue] to be entitled to damages under the FDUTPA"); *Moss v. Walgreen Co.*, 765 F. Supp. 2d 1363, 1367 (S.D. Fla. 2011) (stating that where a consumer pays "more for the product than she otherwise would have . . . the consumer suffers damages").

## 2. Sections 349 and 350 of the GBL

GBL section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349. GBL section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 350. To assert a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citing *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940 (2012)). "The standard for recovery under . . . [section] 350, while specific to false advertising, is otherwise identical to section 349." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002); *see also Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 525 (E.D.N.Y. 2017) ("The

elements of the plaintiffs' claims under these two sections of the New York General Business Law are the same.").

Neither section 349 nor section 350 contains a reliance requirement, and a proper claim under section 349 or 350 does not require proof that a consumer actually relied on the misrepresentation.[12] *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015) ("neither Section 349 nor 350 require proof of reliance"); *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000) ("[A]s we have repeatedly stated, reliance is not an element of a section 349 claim." (citations omitted)). "The New York Court of Appeals has [instead] adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 389 (S.D.N.Y. 2016) (quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (citation omitted)); *see also Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) ("'Deceptive acts' are defined objectively . . . as acts likely to mislead a reasonable consumer acting reasonably under the circumstances." (alteration in original) (quoting *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003)). "The plaintiff, however, must show that the defendant's 'material deceptive act' caused the injury." *Stutman*, 95 N.Y.2d at 29 (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995)).

---

[12] In the Court's prior order in *Greene*, 262 F. Supp. 3d 38, the Court noted in a footnote that under GBL section 350, as opposed to section 349, a plaintiff must demonstrate reliance. *Id.* at 67 n.12 (citing *Ackerman v. Coca–Cola Co.*, No. 09-CV-0395, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010)). The Court now finds that reliance is not a requirement under either section 349 or 350. Defendant concedes this point. (Def. Opp'n 40 ("Plaintiffs need not show justifiable reliance . . . under [s]ection 350").)

"An actual injury claim under [s]ection 349 typically requires a plaintiff to 'allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.'" *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-CV-4697, 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2016) (quoting *Orlander*, 802 F.3d at 302). This prong may be satisfied through an allegation that a plaintiff overpaid for the product, or, stated differently, "by a claim that a plaintiff paid a premium for a product based on [the] defendants' inaccurate representations." *Ackerman v. Coca-Cola Co.*, No. 09-CV-0395, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010); *see also Orlander*, 802 F.3d at 302 (explaining that in some cases the price premium theory "show[s] that [the] plaintiff paid more than they would have for the good but for the deceptive practices of the defendant-sellers").

e. **Exposure to the alleged misrepresentations**

Because Defendant's argument that members of the putative class were not uniformly exposed to the alleged representations and, as a result, the class cannot be certified as proposed implicates the Court's determination as to several Rule 23 factors, including the Rule 23(a) factor of typicality, and the Rule 23(b)(3) factor of predominance, the Court considers this argument — whether Plaintiffs must show that the putative class was uniformly exposed to the alleged misrepresentations — before addressing the Rule 23 factors.

Both the FDUTPA and sections 349 and 350 of the GBL require that a plaintiff prove that an objective, reasonable person would likely have been deceived by the misrepresentations. *See Fitzpatrick*, 635 F.3d at 1283 ("[A] plaintiff need not prove reliance on the allegedly false statement . . . , but rather a plaintiff must simply prove that an objective reasonable person would have been deceived."); *Goldemberg*, 317 F.R.D. at 389 ("The New York Court of Appeals has [instead] adopted an objective definition of 'misleading,' under which the alleged act must be

'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" (quoting *Cohen*, 498 F.3d at 126).

In addressing Defendant's argument that the classes cannot be certified as proposed due to a lack of uniform exposure to the alleged misrepresentations at issue, the Court looks to case law under each statute to determine whether the deception of a reasonable consumer requirement necessarily incorporates a requirement that each putative class member must have been directly exposed to the misrepresentation.

### 1. Exposure under the FDUTPA

In support of their argument that they can establish claims under the FDUTPA "regardless of whether the consumer cared about or even saw those claims," Plaintiffs cite, *inter alia*, *Carriuolo*, 823 F.3d 977, where the Eleventh Circuit upheld a district court's finding of predominance for a class that involved customers who had bought Cadillac CTS sedans with window stickers that contained "inaccurate safety information." *Id.* at 981. The class was defined as a "class of persons 'within the State of Florida who purchased or leased a 2014 Cadillac CTS that had affixed to it false and deceptive information concerning the NHTSA safety ratings for the vehicle.'" *Id.* at 983. In opposing certification, the defendant argued that some putative class members might not have known that the safety ratings were inaccurate and might not have known about the sticker. *Id.* at 985. The Eleventh Circuit held that because reliance was not at issue, the "mental state" of a customer was not relevant. The court noted that:

> the absence of a reliance requirement means "the impediment to class litigation that exists for multiple intrinsic fraud claims does not exist" in FDUTPA cases . . . . Thus, [defendant] is incorrect to suggest that the plaintiffs must prove that every class member saw the sticker and was subjectively deceived by it. As the district court correctly observed, these arguments simply seek a reliance inquiry by another name. Instead, under FDUTPA, the plaintiff must only establish three *objective* elements . . . . Here, the first FDUTPA

> element is amenable to class-wide resolution: the factfinder must
> only determine whether a Monroney sticker that inaccurately states
> a vehicle had received perfect safety ratings in three categories
> would deceive an objectively reasonable observer when in fact no
> safety ratings had been issued.

*Id.* at 985–86 (citation omitted).[13]

*Carriuolo* and other cases cited by Plaintiffs support their argument that the FDUTPA

does not require a putative class member to have *seen* the representation in order to make out a

claim under the FDUTPA. However, Defendant argues that in the cases relied on by Plaintiffs,

the plaintiffs were nevertheless uniformly *exposed* to the representations, because in those cases,

the representation at issue appeared on every single product, regardless of whether the plaintiff

saw the representation. *See, e.g.*, *id.* at 986 ("Because every class member here purchased or

leased the same model vehicle with the same Monroney sticker attached, it does not matter that

there may have been differences among the class members' subjective reliance."); *Vazquez v.

Gen. Motors, LLC*, No. 17-CV-22209, 2018 WL 447644, at *1 (S.D. Fla. Jan. 16, 2018) (where

the alleged misrepresentation that a certain model of car could be used on race tracks was

promulgated in press events, but also owner's manuals, which presumably ever car contained:

"its 2015 and 2016 owner's manuals contemplated track use, offering detailed instructions on

track driving" (citation omitted)). Thus, while these cases stand for the proposition that actually

viewing the representation is not required where reliance is not at issue, they nevertheless leave

open the question of whether uniform *exposure* is necessary — i.e., that every single product

purchased must contain the representation.

---

[13] Plaintiffs cite multiple other cases for the rule that under the FDUTPA, it is irrelevant
whether putative class members in fact *saw* the representation at issue. (*See, e.g.*, Pls. Mem. 30
n.94 (citing *Vazquez v. Gen. Motors, LLC*, No. 17-22209-CV, 2018 WL 447644, at *7 (S.D. Fla.
Jan 16, 2018); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543, 2016 WL
3920353, at *26 (S.D.N.Y. July 15, 2016).)

Plaintiffs and Judge Reyes rely on *Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687 (S.D. Fla. 2010), which the Court finds instructive. In *Fitzpatrick*, a plaintiff sought class certification to challenge alleged misrepresentations by General Mills in its advertising and sale of Yo-Plus, a yogurt supplemented with a probiotic and inulin, which General Mills contended "aid[ed] in promoting digestive health." *Id.* at 690–91, *vacated on other grounds*, 635 F.3d 1279 (11th Cir. 2011) (citation omitted). The plaintiff sought to certify a class under the FDUTPA for all persons that had purchased Yo-Plus in Florida. *Id.* at 691. Similar to the current case, in *Fitzpatrick*, General Mills engaged in a marketing campaign for Yo-Plus, which involved television commercials, printed promotional materials containing coupons, in-store and internet advertising, and claims on the packaging of Yo-Plus itself. *Id.* At the time, Yo-Plus' packaging materials claimed for example:

> that "Yo–Plus contains special probiotic cultures and fiber to help naturally regulate your digestive health." The inside of the original Yo–Plus packaging, which was revised in September 2008, states that one should "[e]at Yo–Plus every day to help maintain a balance of good-for-you bacteria in your digestive system and regulate digestive health." (The same packaging also explains that Optibalance is "a unique blend of beneficial bacteria (Bifidobacterium lactis BB–12) and a natural fiber (chicory root extract) that together help regulate digestive health" and "crowd out the unfriendly bacteria in your system and promote digestive health."

*Id.* (alteration in original) (internal citations omitted). General Mills argued that under the FDUTPA, every putative class member would need to prove that a particular General Mills advertising statement had been seen by that class member. *Id.* at 693. The court noted that in effect, "General Mills claims that a plaintiff must have been subjected to each specific representation, omission, or practice which the plaintiff claims was likely to mislead an objective reasonable consumer; a plaintiff cannot cite a representation, omission, or practice to which she

was not *personally exposed*." *Id.* (emphasis added)).  The court rejected this argument as too "restrictive."  *Id.*

Plaintiffs cite *Fitzpatrick* to support their argument that a putative class member need not have seen, or been exposed to, the alleged misrepresentation.  (Pls. Reply 5, 5 n.16.)  Plaintiffs argue that the decision in this case was "affirming certification of a FDUTPA class — whose false-advertisement claims were based on an ad campaign featuring commercials and print ads — because, in part, reliance is not an FDUTPA element, so each putative class member would only need to show that he or she paid a premium . . .  to be entitled to damages." (*Id.* at 5 n.16 (citation omitted).)

Plaintiffs, however, overlook an important part of the *Fitzpatrick* analysis, which noted that "[o]f course, there is little doubt that each putative class member was exposed, at a minimum, to the alleged misrepresentations common to both versions of the Yo–Plus packaging (*e.g.*, the claim that the product 'helps naturally regulate . . . digestive health.')." *Fitzpatrick*, 263 F.R.D. at 693.  The court opined that "[a]lthough the [c]ourt agrees that a plaintiff must be exposed to the misrepresentation or unfair practice relied upon in a claim for damages, it is not persuaded that a plaintiff should be forced to rely only on those representations, omissions, or practices experienced firsthand to prove that a defendant engaged in a deceptive act." *Id.*  The court further noted that the "precise claim" was "communicated in one way or another to every purchaser of Yo-Plus in Florida." *Id.* at 694.

Unlike in *Fitzpatrick*, Defendant argues that *not* every consumer of GSG was necessarily exposed to a challenged representation, given the different labeling practices during the proposed class period, which likely resulted in some consumers purchasing products without the challenged representations.  Other cases analyzing FDUTPA claims are similar to *Fitzpatrick* in

suggesting that while the FDUTPA does not contain a *seeing* requirement, it may contain an *exposure* requirement. *See, e.g.*, *PB Prop. Mgmt., Inc. v. Goodman Mfg. Co., L.P.*, No. 12-CV-1366, 2016 WL 7666179, at *21 (M.D. Fla. May 12, 2016) (noting that while the FDUTPA does not require actual, subjective reliance, "[t]o prove deception on a classwide basis, [p]laintiffs must still demonstrate exposure to the same misrepresentations or omissions").

Defendant argues that the case before the Court is similar to *Randolph*, 303 F.R.D. 679, where the plaintiff sought to challenge an "all natural" label on certain cooking oils.[14] In *Randolph* the court declined to certify a class because it found that the plaintiff was unable to satisfy the ascertainability requirement. The court noted:

> Plaintiff's construction of the objective criteria here is straightforward: whether an individual purchased a Crisco product containing the alleged misrepresentation "All Natural." However, during the relevant time period, at least nine different Crisco oils frequented retail establishments. Only four of these oils contained the challenged statement. Correctly, Plaintiff has limited the putative class to purchasers of only those four oils: Crisco Pure Vegetable Oil, Crisco Pure Canola Oil, Crisco Pure Corn Oil, and Crisco Natural Blend Oil. Yet the inclusion of the challenged statement was not placed on all four oils uniformly throughout the class period, which extends from May 2009 to the present. Based on these facts, the likelihood that an individual would recall not only which specific kind of oil, but also, when that oil was purchased, complicates identification of the putative class.

*Id.* at 687 (footnotes and internal citations omitted). In noting that the misrepresentations did not appear uniformly, the court noted that "Crisco Pure Vegetable Oil and Crisco Pure Canola Oil bore the alleged misrepresentation from before 2002 to 2013, whereas Crisco Pure Corn Oil and Crisco Natural Blend Oil contained the labelling from 2010 through 2014 and 2013, respectively. Thus, there are brief times at both ends of the class period where certain oils did

---

[14] No advertising campaign accompanied the product.

not contain the alleged misrepresentation." *Id.* at 687 n.6 (internal citation omitted). The court distinguished the case before it from other cases where *all* products at issue contained the alleged misrepresentations, finding it relevant that "only some of the Crisco oils bore the 'All Natural' label at various times." *Id.* at 687. The court conducted its analysis in the context of determining whether the class would be ascertainable, and concluded that it would not. *Id.* at 692 ("The variety of . . . products and inconsistent labeling complicates the viability of self-identification via affidavit, and, at this stage, [p]laintiff has failed to present evidence on whether subpoenas may be utilized to overcome this issue."). In reaching its conclusion, the court also found it relevant that the product at issue was not particularly memorable. *See id.* at 689 (noting that the "nature of the product" in the case would make it "less likely" that consumers would recall purchases because "Crisco oil is intended to be an additive ingredient to a final product, rather than a final product directly consumed by the user," and "[t]his fact makes it less likely that the consumer will recall the specific purchase of the cooking oil during a specific time frame").

Judge Reyes found the current case to be most similar to *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689 (S.D. Fla. 2010), where a plaintiff sought certification of a class action against a baby formula manufacturer alleging violation of the FDUTPA due to misrepresentations about the "qualities of one of its products: Enfamil ® LIPIL ® infant formula." *Id.* at 690. The plaintiff in *Nelson* sought to represent a class "on behalf of '[a]ll Florida consumers who purchased Enfamil ® LIPIL ® within the applicable statute of limitations.'" *Id.* at 691 (alteration in original) (citation omitted). The court certified the class, dismissing most of the defendant's arguments, including that "the representations regarding the thirteen products identified in [the plaintiff's] Motion did not contain the language purportedly

viewed by [p]laintiff," and that "the 'only brand clinically proven' language that [the] [p]laintiff claim[ed] to have read before purchasing Enfamil ® LIPIL ® did not appear on the product's packaging until more than one year after [the] [p]laintiff first purchased the product," which was "well after the start of the time period encompassed by the putative class." *Id.* at 693. In rejecting many of defendant's arguments, the court stated:

> Defendant devotes much attention to specific representations regarding the quality and contents of Enfamil ® LIPIL ®, and which ones Plaintiff viewed or relied upon. Defendant, however, ignores the "essential characteristics" of Plaintiff's claim. Although the precise wording of the representations is varied, the bedrock of Plaintiff's FDUTPA claim is consistent: [d]efendant deceptively led the consuming public to believe that Enfamil ® LIPIL ® provided infants with something that other infant formulas did not. Moreover, as set forth above, Plaintiff need not have relied on the representations to prove a FDUTPA claim. Defendant's argument, therefore, is unpersuasive.

*Id.* at 695 (footnote omitted). The defendant in *Nelson* had argued in that case that the plaintiff's claims were not typical of the class because "the message 'Clinically proven to improve the brain and eye development' did not appear on cans of Enfamil ® LIPIL ® until December 2005, more than one year after [p]laintiff started purchasing LIPIL." *Id.* In rejecting this particular argument, the court noted that "[the] [p]laintiff need not prove that she relied on any particular representation" when she first decided to purchase the product. *Id.* at 696 (citations omitted). The court reasoned that:

> Plaintiff testified that she first purchased Enfamil ® LIPIL ® after receiving an informational flier and coupons that contained the "clinically proven" representation. Plaintiff also maintains that even if the product container did not contain the clinically proven message when Plaintiff first purchased Enfamil ® LIPIL ®, Plaintiff was exposed to the following messages when she first purchased that product: "Enfamil LIPIL has a unique blend of DHA and ARA" and "Enfamil LIPIL gives you more than store brands, which may cost less." Because Plaintiff was exposed to those messages, the Court finds Plaintiff's claim typical of other Proposed Class

36

members' claims.

*Id.* at 696 (internal citations omitted).

However, even in *Nelson*, there is some evidence to suggest that consistency in labeling is relevant. The court noted that the plaintiff, in her reply brief, indicated a willingness to restrict the products that form the basis of the class: "[i]n addition to the Enfamil ® LIPIL ® product . . . thirteen other infant formulas that contain 'LIPIL' in their product name [are manufactured] . . . . Plaintiff has since learned that the deceptive superiority misrepresentations at issue did not consistently appear on these product labels and no longer seeks to include these products in the Class." *Id.* at 694 (alteration in original) (quoting plaintiff's reply brief).

In addition to the above-discussed cases, the Court also looks to the class certification decision in *Zakaria v. Gerber Prod. Co.*, No. 15-CV-00200, 2016 WL 6662723 (C.D. Cal. Mar. 23, 2016), an identical case to this action, brought under California consumer protection laws. In *Zakaria*, the court initially certified a limited class pursuing claims against the defendant.[15] The defendant argued that the plaintiff could not establish predominance under California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200 *et seq.*, because "only some of [Defendant's] advertising of Good Start Gentle contained the alleged misrepresentations, and many putative class members may neither have seen nor placed weight on them in making purchasing decisions." *Zakaria*, 2016 WL 6662723, at *7. The court in *Zakaria* found that the proposed class was overbroad, and ultimately limited the class to "[a]ll persons who purchased Good Start Gentle containers displaying the '1st and Only' seal in the State of California for personal use and not resale from July 8, 2013 to April 23, 2016." *Id.* at *11. The court reasoned

---

[15] The court later decertified the class on grounds not relevant to this discussion, and addressed in the predominance analysis *infra*.

that the representations regarding whether the claim was "qualified" by the FDA and regarding the risk of developing atopic dermatitis were not displayed prominently enough and therefore, "it cannot be inferred that there is a 'high likelihood that in the process of buying the product, the consumer would have seen the misleading statement on the product and thus been exposed to it.'" *Id.* at *8 (citation omitted). However, unlike in the FDUTPA context where the issue of exposure is ambiguous, courts have made clear that to succeed on claims under the UCL, the misrepresentation must have been exposed to all class members. *See id.* (collecting cases). Such exposure can be inferred "[w]here the alleged misrepresentation appears on the label or packaging of each item being sold," *id.* (citation omitted), but "[e]ven where each product is not sold in a container on which the alleged misrepresentation appears, class-wide exposure may be inferred where there is a sufficiently extensive advertising campaign that includes the alleged misrepresentation," *id.* at *9 (citation omitted). Essentially, the court found that class-wide exposure could be presumed with respect to the "1st and Only" seal, but not as to the other misrepresentations.

While Defendant argues convincingly that the FDUTPA requires that putative class members have been uniformly exposed to a representation, the Court nevertheless declines to restrict the class definition to the extent that the court did in *Zakaria*.

First, the Court is mindful that "[t]he FDUTPA provides that the statute should be 'construed liberally' to, *inter alia*, 'protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.'" *Fitzpatrick*, 263 F.R.D. at 692–93 (quoting Fla. Stat. § 501.202); *see also Delgado v. J.W. Courtesy Pontiac GMC–Truck, Inc.*, 693 So.2d 602, 606 (Fla. 2nd DCA 1997) (noting that in passing the

FDUTPA, "the Florida legislature . . . clearly intended as a matter of public policy . . . to create a simplified statutory cause of action which bestows . . . substantive remedies on the citizens . . . to recover economic damages related solely to a product . . . purchased in a consumer transaction infected with unfair or deceptive trade practices or acts").

Second, while *Zakaria* is highly instructive, it is distinguishable for several reasons. Courts are much more explicit about reading an exposure requirement into the UCL than into the FDUTPA. *See, e.g.*, *Zakaria*, 2016 WL 6662723, at *7 ("In class action UCL claims involving misrepresentations in labeling and advertising, 'it is critical that the misrepresentation in question be made to all of the class members.'" (quoting *Cabral v. Supple LLC*, 608 F. App'x 482, 483 (9th Cir. 2015)). In addition, in *Zakaria*, the court found that "reliance is a necessary component of the class definition," *id.* at 18 n.6, which is a component that is not required for class certification pursuant to the FDUTPA.

Third, the court is inclined to adopt the reasoning found in *Nelson* and *Carriuolo*. In *Carriuolo*, the Eleventh Circuit emphasized that the absence of a reliance requirement meant that it was irrelevant whether a customer saw the representation at issue, and stated that "the factfinder must only determine whether a . . . sticker that inaccurately states a vehicle had received perfect safety ratings in three categories would deceive an objectively reasonable observer when in fact no safety ratings had been issued." *Carriuolo*, 823 F.3d at 986. In *Nelson*, the court declined to entertain defendant's arguments regarding viewing and relying upon specific representations and noted instead that such an approach "ignores the 'essential characteristics' of [p]laintiff's claim." *Nelson*, 270 F.R.D. at 695. The court in *Nelson* noted that "the bedrock of [p]laintiff's FDUTPA claim is consistent: [d]efendant deceptively led the consuming public to believe that Enfamil ® LIPIL ® provided infants with something that other

39

infant formulas did not." *Id.* In a footnote, the court in *Nelson* cautioned against conflating the principles of causation and reliance, stating:

> the concepts of causation and reliance can be deeply intertwined, for a deceptive practice seemingly cannot have *caused* an aggrieved party damages unless the aggrieved party *relied* on the deceptive practice. Upon closer inspection, however, a deceptive practice can cause a consumer damages even if the consumer does not rely on the deceptive practice when purchasing a particular product. Ostensibly, a deceptive practice allows a manufacturer or vendor to charge a premium for a product that the manufacturer would not be able to command absent the deceptive practice. Thus, even if an individual consumer does not rely on a deceptive practice when deciding to purchase that product, the consumer will have paid more for the product than she otherwise would have. Consequently, the consumer suffers damages.

*Id.* at 692 n.4.

Both *Carriuolo* and *Nelson* based their analyses on *Davis v. Powertel, Inc.*, 776 So. 2d 971 (Fla. Dist. Ct. App. 2000), a decision which provided the following guidance:

> the [FDUTPA] provides that the Florida courts must give "due consideration and great weight" to Federal Trade Commission and federal court interpretations of section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C § 45(a)(1). *See* § 501.204(2), Fla. Stat. (1999). According to the federal decisions, a deceptive practice is one that is "likely to mislead" consumers. This standard does not require subjective evidence of reliance, as would be the case with a common law action for fraud.
>
> . . . . The plaintiff need not prove the elements of fraud to sustain an action under the statute. That is so because the question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances.

*Davis*, 776 So. 2d at 974 (internal citations omitted).

Taken together, these decisions emphasize the importance not of detailed scrutiny into the issue of exposure, but instead into the issue of deception, and whether an act was likely to deceive a reasonable consumer operating under the same circumstances as the plaintiff.

40

The theory of the case before the Court is not that only the containers with specific labels harmed consumers, but instead, that the advertising and labeling practice allowed a price premium to be charged across the *entire* line of GSG products. Thus, as noted in *Nelson*, "even if an individual consumer does not rely on a deceptive practice when deciding to purchase that product," and which reliance is not required, "the consumer will have paid more for the product than she otherwise would have." *Nelson*, 270 F.R.D. at 692 n.4. The fact that the same label did not appear on every single product of GSG that a consumer may have purchased, does not mean that the deceptive act would not still have *likely* deceived a consumer, given that the labels were both abundant, accompanied by advertising campaigns, and appeared prominently on shelves where consumers shopped. To find otherwise could encourage a defendant to avoid liability under the FDUTPA, a broad statute, by for example, creating multiple labels for a product line.[16]

In light of the lack of individualized reliance required by the FDUTPA, the Court declines to restrict the concept of exposure to as narrow a definition as Defendant recommends, i.e., total uniformity and guaranteed exposure among customers, and instead finds that under the circumstances of this case, generalized exposure can be inferred. The Court agrees with Judge Reyes that customers experienced a significant degree of exposure in this case. Judge Reyes analogized the facts in this case to those in *Fitzpatrick* to suggest that because "diminished risk of allergy was a consistent and prominent theme among Gerber's various marketing campaigns

---

[16] In addition, the Court notes that in some of the cases that state that the FDUTPA contains an exposure requirement, those cases relied upon other cases published prior to confirmation that the FDUTPA does *not* contain a reliance requirement. *See, e.g.*, *Davidson v. Apple, Inc.*, No. 16-CV-04942, 2018 WL 2325426, at *17 (N.D. Cal. May 8, 2018) (citing a case from 2002, *Montgomery v. New Piper Aircraft, Inc.*, 209 F.R.D. 221, 229 (S.D. Fla. 2002), as holding that establishing an FDUTPA claim requires that "each putative class member was exposed to the [d]efendants' advertising and marketing materials alleged to constitute a deceptive trade practice").

for GSG," it was therefore a "'near certainty' that every consumer was exposed to the alleged misrepresentations." (R&R 15 (citations omitted).)

In addition, to restrict the class to only those consumers who purchased a particular version of GSG with a particular label, as the court in *Zakaria* did, is too restrictive an approach under the FDUTPA and would re-read a reliance and *seeing* requirement into the statute that does not exist — requiring consumers essentially to confirm that they in fact *saw* the misrepresentation at issue.

For these reasons, the Court finds that while the case law suggests that exposure is an important part of the FDUTPA claim analysis, it does not require the heightened and uniform standard that Defendant suggests it does, especially when considered in conjunction with the objectivity of the FDUTPA.

### 2. Exposure under sections 349 and 350 of the GBL

The cases that Plaintiffs rely on to support their claims under sections 349 and 350 of the GBL likewise raise the same question of whether there is a uniform exposure requirement despite the absence of a reliance requirement under the GBL, and, as in the discussion above regarding the FDUPTA, many of the cases highlight the fact that the alleged misrepresentation at issue in the case was found uniformly on all packaging. *See, e.g.*, *Kurtz*, 321 F.R.D. at 535 ("Defendant does not contest that every product at issue — even the ones without the word 'flushable' in their titles — contained a representation that they were 'flushable' at all relevant times."); *Goldemberg*, 317 F.R.D. at 389 (discussing the requirement of the GBL and noting that "[a]ssuming the product and its labeling and packaging remains constant and is uniform between consumers, then the only question is how such packaging would have influenced a consumer under the objective test" (citing *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 52–53 (1st Dep't

2004)); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 403 ("According to a previous version of the packaging on all six flavors, EZ Seed grows grass '50% thicker with half the water' compared to 'ordinary seed' (the '50% thicker claim')."); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 568 (S.D.N.Y. 2014) ("Here, every class member saw the same representation that [the product] was '100% Pure Olive Oil' because the statement appeared in large letters on the front, back, left, right, and top of the tin."); *Ackerman v. Coca-Cola Co.*, No. 09-CV-395, 2013 WL 7044866, at *10 (E.D.N.Y. July 18, 2013) (noting that "[i]n the instant case, as plaintiffs repeatedly stress, 'all the products at issue bore the same allegedly misleading claim'" even while acknowledging that "[i]t is not necessary for all of the plaintiffs to have had a 'uniform' experience with respect to the product").

While it is true that in several cases cited by both sides the representation at issue was found on each and every product purchased, certification of the class rarely hinged on this issue, i.e., uniformity of exposure was not mentioned as an explicit requirement.

Defendant relies heavily on several cases involving GBL claims to suggest that Plaintiffs' "inconsistent exposure to the challenged marketing representations" should prohibit certification. (Def. Obj. 7.)

In one of those cases, *Goldemberg*, 317 F.R.D. 374, the plaintiffs sought certification of three classes of persons that had "purchased any of 90 different Aveeno® Active Naturals® products during the class period," and alleged that those products contained unnatural synthetic ingredients. *Id.* at 382. The plaintiffs argued that the defendant's "website and social media presence" were designed to convince purchasers the products were natural. *Id.* The defendant argued "that because 'the challenged representation appears in a variety of ways across the various products, often accompanied by explanatory or contextualizing language,' there was a

'substantial divergence in the evidence required' for each potential plaintiff's claim." *Id.* at 387–

88 (citation omitted). The court in *Goldemberg* explicitly stated:

> Assuming the product and its labeling and packaging remains
> constant and is uniform between consumers, then the only question
> is how such packaging would have influenced a consumer under the
> objective test. *See Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 52–53,
> 777 N.Y.S.2d 50 (1st Dep't 2004) (certification "may be appropriate
> where the plaintiff s allege that all members of the class were
> exposed to the same misrepresentations").

> But, if it is not demonstrated that "all members of the class saw the
> same advertisements" or if the content of the "advertising varied
> widely and not all the advertisements contained the alleged
> misrepresentations," then "questions of individual members;
> exposure to the allegedly deceptive advertising [would]
> predominate" on those claims. *Id.* at 53, 777 N.Y.S.2d 50. For that
> reason, the advertising claims, which would require individualized
> showings as to exposure to the company's website or Facebook page
> . . . are not suitable for inclusion in the proposed class.

*Id.* at 389.

Similarly, in *In re Avon Anti-Aging Skincare Creams & Prod. Mktg. & Sales Practices

Litig.*, No. 13-CV-150, 2015 WL 5730022 (S.D.N.Y. Sept. 30, 2015), which Defendant also

relies upon, the plaintiffs filed suit against Avon Products, Inc., for false information associated

with "some of its ANEW brand products." *Id.* at *1. The plaintiffs alleged "that Avon sold the

class products by making specific false or misleading claims about their scientific anti-aging

properties. The plaintiffs focused on three core statements: that the products 'reverse wrinkles,'

'repair wrinkles,' and 'rebuild collagen.'" *Id.* In denying class certification the court found it

fatal to the predominance inquiry that messages in brochures were not uniform:

> [t]his is not a case in which the misrepresentation at issue was made
> to all consumers — for example, through a uniform product
> label. *See, e.g., Ault v. J.M. Smucker Co.*, --- F.R.D. ---, 2015 WL
> 4692454, at *1–2 (S.D.N.Y. Aug. 6, 2015) (considering "All
> Natural" label on oils); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397,
> 403–04 (S.D.N.Y. 2015) (considering efficacy claims on packaging

> of seed and fertilizer product); *Ebin v. Kangadis Food Inc.*, 297
> F.R.D. 561, 564 (S.D.N.Y. 2014) (considering olive oil's "100%
> Pure" label); *Weiner*, 2010 WL 3119452, at *2 (considering
> Snapple's "All Natural" label). Rather, this is a case in which there
> is "material variation in the representations made" and "the kinds or
> degrees of reliance by the persons to whom they were
> addressed." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d
> Cir. 2002) (Sotomayor, J.) (quoting Fed. R. Civ. P. 23(b)(3)
> advisory committee's note (1966 amendment)). Accordingly, class
> treatment of the brochure claims is inappropriate.

*Id.* at *4. The Court notes, however, that the above analysis was conducted with respect to

claims brought under California law, not New York law, and further notes that the exposure at

issue with respect to the brochures was more varied than the exposure to labels and

advertisements here, as the content of the brochures changed every two weeks. *Id.* Moreover,

the portion of *Avon* that analyzed claims under the GBL is highly distinguishable from the case

currently before the Court for several reasons, including a different theory of injury. In *Avon*, the

court's decision as to GBL claims turned on the fact that the court found it would be difficult to

"show actual harm to each class member caused by the defendant's conduct," and that plaintiffs

"likely could not show on a class-wide basis — that the class products failed to improve the

appearance of consumers' skin." *Id.* at *7. Here, unlike in *Avon*, the theory of injury and harm

is not that a product did not work, but instead that putative class members paid a price premium

— thus, there is no need to show, for example, that the product failed to reduce allergies in

infants, i.e., that it worked as to some infants and did not as to others. Furthermore, the court in

*Avon* appears to have conflated the issues of reliance and causation, as warned against in *Nelson*,

by emphasizing that "purchasing decisions . . . are 'inherently individualized.'" *Id.* (citation

omitted). However, where reliance is not at issue, the individual reason for purchasing a product

becomes irrelevant and subsumed under the reasonable consumer standard, i.e., whether the

deception could likely have misled someone, and not, whether it in fact did.

Likewise, in stating that "[a]ssuming the product and its labeling and packaging remains constant and is uniform between consumers, then the only question is how such packaging would have influenced a consumer under the objective test," *Goldemberg* is unpersuasive due to its reliance on a case that Defendant also relies upon, *Solomon*, which read an individualized reliance and causation inquiry into sections 349 and 350 of the GBL. *See Goldemberg*, 317 F.R.D. at 389 (citing *Solomon*, 9 A.D.3d at 52–53).

*Solomon* appears to correctly confirm that some amount of exposure is necessary: "[a] deceptive act or practice is not 'the mere invention of a scheme or marketing strategy, but the actual misrepresentation or omission to a consumer' by which the consumer is 'caused actual, although not necessarily pecuniary, harm.'" *Solomon*, 9 A.D.3d at 52 (internal citations omitted). But similar to *Avon*, the court in *Solomon* mistakenly emphasized that an individual inquiry is necessary, by suggesting that there is a requirement that "the plaintiff was deceived by those misrepresentations," which as noted *supra*, is incorrect due to the less individualistic and more objective nature of the statutory elements. *See id.* at 52 ("[T]o prevail . . . under GBL §§ 349 and 350, the plaintiff must prove that the defendant made misrepresentations . . . that were likely to mislead a reasonable consumer in the plaintiff's circumstances, *that the plaintiff was deceived by those misrepresentations* . . . and that as a result the plaintiff suffered injury." (emphasis added) (citation omitted)); *id.* ("the proof must show that each plaintiff was reasonably deceived"). *Solomon*'s emphasis that "certification of a class for purposes of an action brought under GBL §§ 349 and 350 may be appropriate where the plaintiffs allege that all members of the class were exposed to the same misrepresentations," and its emphasis that plaintiffs should have "demonstrated that all members of the class saw the same advertisements" is therefore misplaced and inappropriately reads a *seeing* requirement into the GBL. *Id.* at 52–

53.

The New York Court of Appeals has confirmed that on occasion, courts have improperly

read a reliance requirement into the GBL. *See Stutman*, 95 N.Y.2d at 30 n.1 ("[T]he Appellate

Division has occasionally applied an incorrect standard in section 349 cases, imposing a reliance

requirement when in fact there is none."). The Court finds the New York Court of Appeals'

analysis in *Stutman* particularly persuasive:

> The Appellate Division dismissed plaintiffs' claim, holding that
> they failed to show justifiable reliance: that is, that the note's failure
> to disclose the $275 attorney's fee "had any effect on plaintiffs'
> decision to borrow from defendant in the first place." That,
> however, was the wrong standard, because reliance is *not* an
> element of a section 349 claim.
>
> . . . .
>
> Reliance and causation are twin concepts, but they are not identical.
> In the context of fraud, they are often intertwined (*see,* Restatement
> [Second] of Torts § 548A ["A fraudulent misrepresentation is a legal
> cause of a pecuniary loss resulting from action or inaction in reliance
> upon it if, but only if, the loss might reasonably be expected to result
> from the reliance"]). But there is a difference between reliance and
> causation, as illustrated by the facts of this case. Here, plaintiffs
> allege that because of defendant's deceptive act, they were forced to
> pay a $275 fee that they had been led to believe was not required.
> In other words, plaintiffs allege that defendant's material deception
> caused them to suffer a $275 loss. This allegation satisfies the
> causation requirement. Plaintiffs need not additionally allege that
> they would not otherwise have entered into the transaction. Nothing
> more is required.

*Id.* at 30 (footnotes omitted); *see also Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 147

(S.D.N.Y. 2014) (noting that the New York Court of Appeals "has cautioned courts against

conflating reliance and causation," and that "[t]o satisfy the causation requirement, nothing more

is required than that a plaintiff suffer a loss because of defendants' deceptive act" (citations,

brackets, and internal quotation marks omitted)).

For these reasons, and in keeping in mind that like the FDUTPA, the GBL has "broad remedial goals,"[17] the Could finds that in the current case exposure was sufficiently uniform to conclude that it is likely that a reasonable consumer could have been misled and encouraged to purchase GSG. Requiring one hundred percent certainty that each and every customer has been exposed to the representations at issue would impermissibly depart from the objective standards of sections 349 and 350 of the GBL, and would impermissibly read a seeing and a reliance requirement into the statute.

The Court next discusses the contested Rule 23 requirements.

### f. Rule 23(a) requirements

The Court first addresses the explicit Rule 23(a) requirements of typicality, and the implied factor of ascertainability.

### i. Typicality

The typicality prong of Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d

---

[17] *See Icahn Sch. of Med. at Mount Sinai v. Health Care Serv. Corp.*, 234 F. Supp. 3d 580, 586 (S.D.N.Y. 2017) ("The New York Court of Appeals has emphasized that 'section 349 is a broad, remedial statute and that the provision creating a private right of action employs expansive language.' As such, § 349 'appl[ies] to virtually all economic activity, and [its] application has been correspondingly broad,' as '[t]he reach of [this] statute . . . provide[s] needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in [New York].'" (alterations in original) (first quoting *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200 (2004); and then quoting *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282 (1999))).

Cir. 2011) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). "The purpose of typicality is to ensure that class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2012) (citation and internal quotation marks omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux,* 987 F.2d at 936–37. "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015), *amended*, No. 13-CV-6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016) (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002)). "Courts interpret this requirement to mean that each class member's claim arises from the *same course of events* and each class member makes *similar legal arguments* to prove the defendant's liability." *Kurtz*, 321 F.R.D. at 533 (internal quotation marks omitted) (quoting *Ebin*, 297 F.R.D. at 565 (citation omitted)).

Defendant argues that "[P]laintiffs cannot prove typicality where they were exposed to different labels and advertisements with different representations." (Def. Opp'n 18 (collecting cases).) Defendant details the variety of representations that the Plaintiffs could have been exposed to, and notes "that GSG is sold in three different formats in different-sized containers with at least 32 different labels during the proposed class period" and that "[t]he majority of the challenged advertising ceased in 2013." (*Id.* at 18–19 (citations omitted).) Defendant also

argues that the cases Plaintiffs rely upon are inapposite because those cases involved "class-wide exposure" to identical representations that were found on every item purchased, while the proposed class representatives in this case "were necessarily exposed to different representations than other putative class members." (*Id.* (citations omitted).)

Although these arguments would, and likely did, cast doubt on the ability of the proposed North Carolina and Multistate Subclasses to satisfy the typicality requirement, they are less persuasive where, as established *supra*, reliance on the advertisements is not a necessary element of the claims underlying the proposed Florida and New York Subclasses. *See, e.g.*, *Hasemann*, 2016 WL 5477595, at *19 (noting that "[i]n order to establish causation under FDUTPA, a plaintiff need not prove reliance on the allegedly false statement . . . , but rather a plaintiff must simply prove that an objective reasonable person would have been deceived'" (quoting *Fitzpatrick*, 635 F.3d at 1283); *Kurtz*, 321 F.R.D. at 535 ("Reliance . . . is not an element of plaintiff's claims under the New York General Business Law.").

Both proposed class representatives, Hasemann and Manemeit, purchased GSG during the proposed class period, and allegedly did so at a price premium. (*See* Hasemann Compl. ¶¶ 13, 94; Manemeit Compl. ¶¶ 15, 72.) Hasemann "frequently" purchased GSG, and alleges that she suffered damages as a result. (Hasemann Compl. ¶¶ 13, 94.) Plaintiff Manemeit purchased over 100 canisters of GSG beginning in 2015, and alleges that she "would not have purchased it for the prices that she did . . . had she known that Good Start did not reduce the risk of allergies, generally, or that the atopic-dermatitis were supported by minimal and conflicting scientific evidence, at best." (Manemeit Compl. ¶¶ 15, 72, 75.)

Plaintiffs were exposed to and allegedly relied upon Defendant's advertising and business practices in purchasing GSG, which they allege was at inflated prices due to the

misrepresentations. (*See, e.g.*, Hasemann Compl. ¶¶ 61–62, 67; Manemeit Compl. ¶ 101.)

Courts have found typicality to be satisfied in false advertising cases where similar facts were

alleged, under both the FDUTPA and GBL. *See, e.g.*, *Belfiore v. Procter & Gamble Co.*, 311

F.R.D. 29, 64 (E.D.N.Y. 2015) (finding typicality satisfied where "[t]he named plaintiff

purchased defendant's 'flushable' wipes at a price higher than that of non-flushable wipes," and

where plaintiff "explicitly declared that he bought the wipes '[b]ecause they were flushable"

(citations omitted)); *Ackerman*, 2013 WL 7044866, at *11 (noting that the issue of "whether a

reasonable consumer would find vitaminwater's name and label misleading" would be typical

among the named plaintiffs and proposed classes).

        That Plaintiffs may have been exposed to different advertisements or labels, and

purchased different amounts of different GSG products, does not defeat typicality. *See Dial

Corp.*, 314 F.R.D. at 114 (finding it sufficient that all class representatives had made *some*

purchases during the damages period and noting that "[d]ifferences in amounts or characteristics

of the class representatives' purchases do not defeat typicality" (citation omitted)); *Kurtz*, 321

F.R.D. at 535 (finding class representative's claims "typical of the class he seeks to represent

though he did not buy every . . . product at issue"); *Nelson*, 270 F.R.D. at 696 (finding typicality

satisfied even where class representative and putative class members would likely have viewed

different representations regarding infant formula — some through advertisements and coupons

and some through labels); *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99

(S.D.N.Y. 1981) ("Typicality refers to the nature of the claim . . . and not to the specific facts

from which the claim arose . . . . The proper inquiry is whether other members of the class have

the same or similar injury, whether the action is based on conduct not special or unique to the

named plaintiffs, and whether other class members have been injured by the same course of

conduct.").[18]

The Court finds that Plaintiffs satisfy the typicality requirement. Plaintiffs "claims arise out of the same course of conduct by the defendant and are based on the same legal theories" upon which the putative class members will base their claims. *See Ebin*, 297 F.R.D. at 565. Plaintiffs are arguing that the same course of events — the unlawful conduct of false labeling and marketing — resulted in price premiums for an entire product line. These arguments will be typical for the entire class of consumers that purchased anything from that product line, and thus Plaintiffs will have the incentive to prove the elements of the claims under the FDUTPA and GBL to the same degree that any individual class member would.

---

[18] Defendant cites cases to support its typicality argument that are separate from the cases that the Court addressed in analysis of the issue of uniform exposure, *supra*, but that stand for Defendant's same contention, i.e., in the context of typicality, that a class representative's claims "are not typical of the class where there was inconsistent exposure to the challenged marketing representations." (Def. Obj. 7.)

The Court's analysis regarding uniform exposure applies equally in the typicality context, and the Court finds it to be determinative for the cases Defendant cites. In *Kaczmarek v. Int'l Bus. Machines Corp.*, 186 F.R.D. 307 (S.D.N.Y. 1999), for example, the court found typicality not met based on its assessment of plaintiff's reliance and treatment of the product, which would read a level of subjective analysis into the typicality requirement that is not present under the FDUTPA and GBL claims before the Court. *See id.* at 313 (declining to find typicality factor met where "each plaintiffs decision to purchase an IBM computer with an Mwave, including that plaintiff's reliance upon any representation by IBM and the warranties received from IBM, is different" and because "each plaintiff treated his or her computer differently after purchasing the computer," so therefore "there may be no typical plaintiff"). Similarly, in *Herron v. Best Buy Stores, LP*, No. 12-CV-02103, 2016 WL 1572909, (E.D. Cal. Apr. 19, 2016), which Defendant also cites, the court found typicality not met because the plaintiffs had not shown "that the typicality requirement is satisfied as to laptop purchasers who were exposed to dissimilar labels." *Id.* at *6.

In addition to the reasoning the Court applied regarding the issue of exposure, the Court notes that the facts in *Herron* involved a significantly more complex product line, involving 174 different laptop models, which for the purpose of determining injury would require damages calculations to be made for each of the different models. *Id.* at *9. Here, in contrast, the product line is much more restricted. The Court also notes the plaintiffs in *Herron* brought claims under California law, which as the Court has identified in its discussion of *Zakaria*, is more restrictive and has been read to incorporate a stricter exposure requirement.

### ii. Ascertainability

Rule 23(a) contains an implied requirement of ascertainability. *In re Petrobras Sec.*, 862 F.3d at 266 ("Most circuit courts of appeals have recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable, often characterized as an 'ascertainability' requirement."). Unlike other circuits, the Second Circuit does not have a "heightened" requirement of ascertainability — it only requires that a "class be defined using objective criteria that establish a membership with definite boundaries," and does not require "administrative feasibility" of identifying each class member based on that objective criteria. *Id.* (distinguishing the Second Circuit's approach to ascertainability from circuits with a heightened ascertainability requirement); *Ebin*, 297 F.R.D. at 567 ("The standard for ascertainability is 'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.'" (quoting *Gortat v. Capala Bros., Inc.*, No. 07-CV-3629, 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010))); *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("To be ascertainable, the class must be 'readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling.'" (quoting *McBean v. City of N.Y.*, 260 F.R.D. 120, 132–33 (S.D.N.Y. 2009))); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002). "The ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 269.

Plaintiffs argue that the proposed classes are objectively defined because the definitions include all persons that purchased GSG during specific dates, and are "not based on any subjective factors or indefinite boundaries." (Pls. Mem. 16–17.) Plaintiffs contend that class

members can be identified "using sworn affidavits, receipts, or purchase information gleaned

from reward cards or credit cards." (*Id.* at 17 (collecting cases).)

Defendant argues that the suggested classes are overbroad and should exclude

"individuals who purchased GSG after the advertising stopped running in 2015," (Def. Opp'n

48), and that "individuals who purchased GSG with knowledge of the alleged misrepresentations

and alleged price premium should not be permitted to . . . recover damages that they knowingly

and voluntarily incurred," (Def. Obj. 23). Defendant also argues that "self-identifying affidavits

simply would not be reliable" and that "New York courts routinely reject self-identifying

affidavits where there are concerns about their reliability. (Def. Opp'n 49.)

"Courts in this Circuit have disagreed on whether ascertainability is possible in low-cost,

consumer class actions due to the unlikelihood that a class member would retain some form of

proof of purchase." *Goldemberg*, 317 F.R.D. at 398 (comparing cases). Defendant is correct

that some courts in this Circuit have declined to permit the use of self-identifying affidavits as a

way to satisfy the issue of ascertainability. *See, e.g.*, *Weiner v. Snapple Beverage Corp.*, No. 07-

CV-8742, 2010 WL 3119452, at *13 (S.D.N.Y. Aug. 5, 2010) ("[S]oliciting declarations from

putative class members regarding their history of Snapple purchases would invite them to

speculate, or worse."); *In re Avon*, 2015 WL 5730022, at *5 (noting that class members would be

unlikely to remember every purchase made during the class period, "much less whether they

received the allegedly false statements prior to purchase" and that "[p]laintiffs' . . . proposal is

merely an invitation . . . to speculate, or worse, especially since the class products and some

of Avon's other product lines have similar names" (internal quotation marks, citations, and

brackets omitted)).

Many recent false advertising cases have, however, found proposed classes to be

ascertainable, even where affidavits would likely be needed. *See, e.g.*, *Kurtz*, 321 F.R.D. 482,

539 (finding ascertainability requirement met in GBL claims case where class members were

individuals defrauded by labels and marketing, noting that "[b]ecause it is unlikely that

consumers will retain receipts, plaintiff may rely on affidavits for those without a receipt");

*Goldemberg*, 317 F.R.D. at 399 ("[T]he [c]ourt concludes that the implied ascertainability

requirement of Rule 23 can, at minimum, be met on the basis of sworn statements indicating

class members purchased the products at issue in the necessary state during the necessary

limitations period."); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 407 (finding despite a likely lack

of proof of purchase, that where "plaintiffs propose[d] classes consisting of New York and

California purchasers of . . . packages containing the . . . claim," such proposals were

"sufficiently specific to satisfy the ascertainability requirement"); *see also Goldemberg*, 317

F.R.D. at 398 (joining "other courts . . . that have adopted the reasoning . . . that denial of class

certification in consumer protection cases like these on the basis of ascertainability would

severely contract the class action mechanism as a means for injured consumers to seek redress

under statutes specifically designed to protect their interests"); *Ebin*, 297 F.R.D. at 567 ("[T]he

class action device, at its very core, is designed for cases like this where a large number of

consumers have been defrauded but no one consumer has suffered an injury sufficiently large as

to justify bringing an individual lawsuit" and thus "the ascertainability difficulties, while

formidable, should not be made into a device for defeating the action.").

The Court adopts the latter approach to the ascertainability requirement in cases where

proof of purchase may need to be demonstrated by self-identifying affidavit. In addition to the

reasoning presented in those cases, the Court finds convincing that the cases Defendant relies

upon were decided before the Second Circuit in *Petrobras* declined to read an administrative

feasibility requirement into the factor of ascertainability. *Petrobras* distinguished the Second
Circuit's approach from the "heightened ascertainability test" found in other circuits, confirming
that ascertainability presents only a "modest threshold" that "does not concern itself with the
plaintiffs' ability to offer *proof of membership* under a given class definition." *In re Petrobras
Sec.*, 862 F.3d at 269; *see also Kurtz*, 321 F.R.D. at 539 (finding, even prior to the Second
Circuit's decision in *Petrobras*, the ascertainability requirement to be met, and permitting
reliance on affidavits where receipts were unavailable, while noting that "[t]he Second Circuit
Court of Appeals has yet to weigh in on whether 'heightened' ascertainability is required").
Several of the cases that Defendant relies on emphasize the need for assessing administrative
feasibility, which the Second Circuit has now clarified, in *Petrobras*, is not necessary to assess at
the class certification stage. *See, e.g.*, *In re Avon*, No. 13-CV-150, 2015 WL 5730022, at *5
("The touchstone of ascertainability is whether the class is sufficiently definite so that it is
administratively feasible for the court to determine whether a particular individual is a member."
(internal quotation marks and citation omitted)).

Moreover, the Court notes that there is a greater likelihood, given the nature of the
product at issue, of accuracy in remembering both the product and length of time the product was
purchased. The Court agrees with Judge Reyes' supposition that "parents or caretakers will be
able to identify the period during which their infants used baby formula based on the children's
ages and rate of development." (R&R 23.) The Court notes that the product at issue is distinct
from the product at issue in *Randolph*, where the court found that the ascertainability
requirement could not be satisfied, reasoning:

> The fact that putative class members are highly unlikely to retain
> proof of purchase for such a low price consumer item is insufficient
> to defeat certification. However, taking the aforementioned
> variations in Crisco products in conjunction with the fact that the

> challenged product is a low-priced consumer item, of which the
> normal consumer likely does not retain significant memory about,
> the likelihood of a potential class member being able to accurately
> identify themselves as a purchaser of the allegedly deceptive
> product, is slim. Not only would the individual need to recall
> purchasing Crisco oil, but also the specific variety purchased, and
> the specific date on which it was purchased beyond simply within
> the period between "May 2009 [and] the present." Furthermore, the
> nature of the product at issue makes it less likely for a consumer to
> recall a specific purchase. Crisco oil is intended to be an additive
> ingredient to a final product, rather than a final product directly
> consumed by the user. This fact makes it less likely that the
> consumer will recall the specific purchase of the cooking oil during
> a specific time frame.

*Randolph*, 303 F.R.D. at 689. The nature of the product at issue before the Court is far more

memorable and important to a consumer than an additive cooking ingredient, as it is a primary

source of nutrition that a parent or caretaker would give to a child. In addition, in *Zakaria*,

where the class was severely narrowed and class members needed to verify through an affidavit

their recollection not only of purchasing GSG generally, but purchasing a GSG product *with* a

specific label, the court nevertheless found the ascertainability requirement to be met. *Zakaria*,

2016 WL 6662723, at *17 ("Potential class members will be allowed to self-identify through

sworn affidavits which declare that: (i) the person purchased Good Start Gentle, and (ii) the

product was in a container with the '1st and Only' seal.").

The Court notes that class members would not be required to remember as much as the

class members in, *e.g.*, *Zakaria*, thus increasing support for the notion that the class is

ascertainable. The Florida and New York Subclasses are defined with the objective boundaries

of (1) purchasers of GSG, and (2) purchases made between a set period of dates. That class

members may not all be able to provide physical proof of purchase should not be determinative,

and the Court finds that Plaintiffs have satisfied the implied requirement of ascertainability.[19]

### g. Rule 23(b)(3) predominance requirement

In addition to satisfying the Rule 23(a) requirements, certification must be appropriate under Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Certification under Rule 23(b)(3) requires both that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Amgen Inc.*, 568 U.S. at 460; *Sykes*, 780 F.3d at 80.

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, --- U.S. ---, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). According to the Supreme Court:

> This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Id.* (quoting 2 Newberg on Class Actions § 4:50 at 196–97 (5th ed. 2012)).

---

[19] Defendant also argues that WIC purchasers should be excluded from any certified class, as should customers that purchased GSG after learning and possessing knowledge of the alleged misrepresentations. (Def. Obj. 22–23.) The Court notes that despite Judge Reyes' recommendation that WIC purchasers be included in the class definitions, (R&R 24), Plaintiffs have agreed to exclude WIC purchasers from the classes, (*see, e.g.*, Pl. Reply at 24), and the Court therefore need not assess or adopt Judge Reyes' recommendation on this issue. With respect to putative class members that gained knowledge of the issue of misrepresentation and deception during the class period, the Court declines to exclude them from any class definition, because as set forth in numerous portions of this opinion, neither the FDUTPA nor sections 349 and 350 of the GBL require showings of reliance.

Predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (internal quotation marks omitted) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)). Typically, common issues predominate when liability is determinable on a class-wide basis, even where class members have individualized damages. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001); *see also Tyson Foods, Inc.*, 136 S. Ct. at 1045 ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages . . . .'" (citing 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 at 123–24 (3d ed. 2005)) (footnotes omitted)).

"While predominance may be difficult to demonstrate in mass tort cases, such as *Amchem*, in which the 'individual stakes are high and disparities among class members great,' it is a 'test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.'" *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 240 (quoting *Amchem Prod., Inc.*, 521 U.S. at 625). Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen Inc.*, 568 U.S. at 468 (citations and internal quotation marks omitted) (emphasis and alterations in original). Instead, a class plaintiff is only required to show that "*questions* common to the class predominate, [and] not that those questions will be answered, on the merits, in favor of the class." *Id.* at 459. Thus, Rule 23(b)(3) contemplates the presence of individual questions as long

as those questions do not predominate over the common questions which affect the class as a whole. *Sykes*, 780 F.3d at 81–82 (citing *Messner v. Northshore Uni. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012)). "If the most substantial issues in controversy will be resolved by reliance primarily upon common proof, class certification will generally achieve the economies of litigation that Rule 23(b)(3) envisions." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, *36 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, No. 06-MD-1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

Whether questions of law or fact common to class members predominate may require analysis of the elements of the underlying causes of action, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011), with the possibility of reviewing the merits of the claims. *Comcast*, 569 U.S. at 28; *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 27 (2d Cir. 2006*), decision clarified on denial of reh'g sub nom.*, *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007) (stating that simply because there might be overlap between a Rule 23 requirement and "an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met, although such a circumstance might appropriately limit the scope of the court's inquiry at the class certification stage").

The Court therefore considers the elements of Plaintiffs' claims under the FDUTPA and sections 349 and 350 of the GBL, identified *supra*, and whether they are amenable to common proof. Plaintiffs argue that the proposed class satisfies the predominance requirement and that their claims are susceptible to common proof because three common, overarching questions predominate: "(1) whether [Defendant] deceptively marketed GSG as a product capable of reducing the occurrence of allergies in infants; (2) whether [Defendant] leveraged these claims in

order to inflate GSG's market price; and (3) the amount of damages that resulted from these price increases." (Pls. Mem. 22.)

### 1. Common questions and facts predominate

As discussed *supra*, in order to establish causation under the FDUTPA, "a plaintiff need not prove reliance on the allegedly false statement . . . , but rather a plaintiff must simply prove that an objective reasonable person would have been deceived." *Fitzpatrick*, 635 F.3d at 1283. Likewise, with regard to sections 349 and 350 of the GBL, "[t]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Goldemberg*, 317 F.R.D. at 389 (quoting *Cohen*, 498 F.3d at 126 (citation omitted)).

For claims under the GBL, "the potentially common question of whether a given product's advertising set . . . is misleading can be measured under an objective standard: whether it was 'likely to have misle[d] a reasonable consumer acting reasonably under the circumstances.'" *Id.* at 389 (quoting *Oswego*, 85 N.Y.2d at 26). "The materiality of potentially deceptive representations is similarly subject to objective proof." *Id.* Similar to the requirement under the FDUTPA, and as established *supra*, "[t]o satisfy the causation requirement [under the GBL], nothing more is required than that a plaintiff suffer a loss because of defendants' deceptive act." *Rodriguez*, 300 F.R.D. at 147 (citations, brackets, and internal quotation marks omitted).

Defendant contends that individual issues of causation predominate over common issues related to Plaintiffs' statutory claims, "especially where, as here, exposure to the alleged misrepresentations is so inconsistent across the putative class," which would lead to the Court "engag[ing] in individual inquiries, to varying degrees, assessing whether the named plaintiffs

viewed the allegedly false advertising, whether they considered or relied on the advertising, and whether and to what extent those advertisements actually affected their decision to purchase GSG."[20] (Def. Opp'n 37.) The Court addressed these arguments and distinguished the cases that Defendant relies upon *supra*, in considering Defendant's argument regarding uniform exposure. In doing so, the Court concluded that the FDUTPA and sections 349 and 350 of the GBL do not contain a viewing requirement or a reliance requirement, nor do they require individual determination of how a particular advertisement affected each putative class member.

Because neither statute contains a reliance requirement and in light of the absence of individualized standards, class members will be able to use generalized proof to make out their claims, including proof of deception, falsity, and pricing decisions. The objective standards — including whether the representations would likely have misled a reasonable customer — underlying the elements of the statutes render them particularly well-suited to generating common questions. Grouping claims by product increases the likelihood that a claim will require common as opposed to individualized proof. *Goldemberg*, 317 F.R.D. at 391 ("By grouping the claims by product and thus making context uniform, the . . . [FDUTPA] test focuses on the objective question of whether the . . . brand in that context was misleading, which is

---

[20] Defendant further argues that "Plaintiffs have failed to provide any evidence that any of the statements that they challenge . . . were material to any purchaser," and that apart from the pleadings "there is no evidence that anyone cared about the challenged claims or considered them material to their purchase decision." (Def. Opp'n 21.) The Court finds that Plaintiffs have sufficiently raised the issue of materiality in their submissions to the Court, including by reference to Defendant's internal documents. In addition, the Court cautions against conducting such a detailed analysis into this issue at this stage, which seems better suited to a merits analysis. *See Amgen Inc.*, 568 U.S. at 459 (noting that the court determines whether "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class"). The Court also emphasizes that materiality is subject to objective proof, but nevertheless notes that Plaintiffs have suggested that absent the representations at issue, they would not have purchased GSG for the price they did. (*See, e.g.*, Manemeit Compl. ¶¶ 15, 72.)

essentially the same as the New York test.").

Cases analyzing both FDUTPA and GBL claims support a finding that false advertising claims under both statutes meet the predominance requirement.  *See, e.g.*, *Carriuolo*, 823 F.3d at 985 (noting the lack of a reliance requirement in the FDUTPA and upholding district court's determination that predominance was met where there was "an essential question common to each class member: whether the inaccurate . . . sticker provided by General Motors constituted a misrepresentation prohibited by FDUTPA"); *Fitzpatrick*, 635 F.3d at 1282–83 (upholding district court's predominance analysis "that 'recovery under the FDUTPA does not hinge on whether a particular plaintiff actually relied on General Mills' claims about Yo–Plus' alleged digestive health benefits'; rather, 'whether that allegedly deceptive conduct would deceive an objective reasonable consumer [is a] common issue[ ] for all the putative class members, amenable to classwide proof'" (alterations in original) (citations omitted)); *Kurtz*, 321 F.R.D. at 549 (finding predominance met because "if the products at issue are found to not be [what the representation said] then all consumers were injured by being overcharged," and such a "question predominates"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 409 ("Plaintiffs' GBL claims thus depend on generalized evidence.  Classwide evidence will be used to establish whether Scotts's labeling of EZ Seed was false, and if so, whether it was likely to mislead a reasonable consumer acting reasonably under the circumstances."); *Ebin*, 297 F.R.D. at 568 (finding predominance met because "[t]he same generalized evidence will be used to establish whether [the] label is false, and if so, whether it was likely to mislead a reasonable consumer acting under the circumstances"); *Nelson*, 270 F.R.D. at 697 (finding predominance met and noting that "individual class members may establish a FDUTPA claim by submitting identical proof that [d]efendant's representations about Enfamil ® LIPIL ® would deceive an objective reasonable

63

consumer," and that "[l]ikewise, individual class members should be able to submit identical proof to establish that [d]efendant's representations about Enfamil ® LIPIL ® are not true").

Accordingly, the Court finds that common questions and facts will predominate, and that there will be little need for class members to submit individualized evidence.

## 2. Damages are subject to classwide proof and the proffered damages models satisfy *Comcast*

At the class certification stage, the plaintiffs' burden is not to prove the element of injury, *Amgen Inc.*, 586 U.S. at 491, instead it is to show that "class-wide injury or 'impact' is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Dial Corp.*, 314 F.R.D. at 114–15 (citing *Comcast*, 569 U.S. at 30). This question is often about the methodology proposed by the plaintiff and its capability to show class-wide impact; it is not about whether there is, in fact, a class-wide impact. *In re Magnetic Audiotape Antitrust Litig.*, No. 99-CV-1580, 2001 WL 619305, at *4 (S.D.N.Y. June 6, 2001); *see also Amgen Inc.*, 568 U.S. at 459 (noting that the court determines whether "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class").

A plaintiff may recover damages under the FDUTPA by alleging that the plaintiff "paid a price premium" for the allegedly deceptive product. *Carriuolo*, 823 F.3d at 986 (citing *Fitzpatrick*, 635 F.3d at 1282–83); *see also Fitzpatrick*, 635 F.3d at 1283 (stating that a plaintiff "would only need to show that he or she paid a premium for [the product at issue] to be entitled to damages under the FDUTPA"). Similarly, the injury prong of sections 349 and 350 of the GBL may be satisfied through an allegation that a plaintiff overpaid for the product, or, stated differently, "by a claim that a plaintiff paid a premium for a product based on [the] defendants' inaccurate representations." *Ackerman*, 2010 WL 2925955, at *23; *see also Orlander*, 802 F.3d

at 302 (explaining that in some cases the price premium theory "show[s] that [the] plaintiff paid more than they would have for the good but for the deceptive practices of the defendant-sellers"). The Court therefore jointly analyzes whether common questions predominate for both the Florida and New York Subclasses as to damages. *See, e.g.*, *Goldemberg*, 317 F.R.D. at 393 (noting, in a case brought under the FDUTPA, GBL, and UCL, that "[p]ayment of a price premium serves as proof of injury under the laws of each applicable state," and analyzing the issue of damages collectively).

A class can be certified under Rule 23(b)(3) even if damages require individualized determination. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 139 ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class [certification] when the common issues which determine liability predominate" (citations and quotation marks omitted)).

This remains true after the Supreme Court's decision in *Comcast*, which reaffirmed that the issue of the commonality of damages calculation is just one of the factors in determining the predominance requirement under Rule 23(b)(3). *Roach*, 778 F.3d at 405 (noting that prior to *Comcast*, the fact that damages would need to be determined on an individual basis was insufficient to defeat class certification, and declining to "read *Comcast* as overruling these decisions").

Plaintiffs identify a number of class-wide methods to quantify the alleged price premium, i.e., prove damages: (1) using a generic as a benchmark and subtracting the price of the generic from the price charged by Defendant; (2) calculating the value that Defendant ascribed to its allergy claims; (3) looking at price increases and hikes made during the class period; (4) running a "hedonic regression" analysis, which "statistically analyze(s) fluctuations in price within a

given group of products, over a given time"; and (5) running "conjoint analyses," which utilize surveys in determining "the individual value consumers place on various product attributes," in order to "determine the hypothetical fair value of a product absent any misrepresentations." (Pls. Mem. 24–29.) In support, Plaintiffs submit the declarations of two experts: Stefan Boedeker, Ph.D., a Managing Director at the Berkeley Research Group, and Gregory Pinsonneault, the Managing Director and CEO of LitiNomics, Inc., *inter alia*, an economic consulting firm. (Decl. of Stefan Boedeker in Supp. of Pls. Mem. ("Boedeker Decl.") ¶ 2, annexed to Pls. Mem. as Ex. B, Docket Entry No. 80-87; Decl. of Gregory A. Pinsonneault in Supp. of Pls. Mem. ("Pinnsonneault Decl.") ¶ 4, annexed to Pls. Mem. as Ex. C, Docket Entry No. 80-88.)

In opposition, Defendant submits the expert declaration of Peter Hess, Ph.D., Vice President at Analysis Group, Inc., *inter alia*, an economic consulting firm. (Decl. of Peter Hess in Supp. of Def. Opp'n ("Hess Decl.") ¶ 1, Docket Entry No. 87.) Defendant argues that none of these damages models satisfy *Comcast*. (*See* Def. Opp'n 22–35.) In *Comcast*, the Supreme Court held that a certain regression model proposed by the plaintiffs' expert could not serve as proof that damages were susceptible of measurement across an entire class. The Court held that a damages model must establish "that damages are capable of measurement on a classwide basis," and that "any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Id.* at 34–35 (citation omitted). The plaintiffs in *Comcast* had initially presented four theories of antitrust liability in the case, and their damages model calculated damages for the entire class based on all four theories. *Id.* at 32. The district court, however accepted only one of the liability theories, rejecting the other three, *id.* at 32, and thus the damages model proffered, which was based on all four theories, was not tied to the specific theory of antitrust harm alleged. *Id.* at 36 ("There is no question that the model failed to measure damages resulting from the

particular antitrust injury on which petitioners' liability in this action is premised.").  Instead, the model at issue "assumed the validity of all four theories of antitrust impact" that had initially been advanced in the case and "did not attribute damages to any one particular theory of anticompetitive impact."  *Id.* at 36–37.

Defendant argues that when conducting a damages analysis "it is critical to isolate the alleged misrepresentation," and that in this case, it is impossible to "isolate[e] the challenged allergy message in [Defendant's] advertising."  (Def. Obj. 10.)  In support, Defendant suggests that "courts 'routinely reject price premium methodologies under *Comcast*' that fail to" isolate the relevant misrepresentations, and argues that the misrepresentations cannot be isolated in this case.  (*Id.* (quoting Hess Decl. ¶ 54).)  This is so, argues Defendant, because "the challenged marketing representations are always promoted alongside other unchallenged product attributes," because Defendant always promoted multiple attributes of GSG in its advertisements, not only the representations at issue, and because "there is no pricing variation between those containers of GSG that displayed the challenged representation on the label and those containers that do not."  (*Id.* at 11.)

The Court finds that several of the proffered damages models are consistent with the theory of liability and injury in this case, and that many of Defendant's more specific arguments are premature.  As the court acknowledged in *Zakaria*, "[t]he present action is distinguishable from *Comcast*.  Here, there is a single overarching theory of liability: the [misrepresentations] misled consumers, causing them to pay an unwarranted premium for the products on which it appeared."  *Zakaria*, 2017 WL 9512587, at *17.

The court in *Zakaria* initially certified the class, finding the predominance requirement to be met, and the proffered damages models to be satisfactory.  The court was presented with

similar methods for calculating damages, including conjoint analysis and hedonic regression. *Zakaria*, 2016 WL 6662723, at *15. Although Defendant cites *Zakaria* for the fact that the class was later decertified, decertification occurred after the expert in *Zakaria* completed her analysis.[21] *Zakaria*, 2017 WL 9512587, at *20. In addition, while Defendant cites *Zakaria*'s decision to decertify the class as an example of courts within this Circuit "reject[ing] conjoint analyses as a means of calculating a price premium in consumer class actions," (Def. Opp'n 26), the court in *Zakaria* nevertheless cited to cases where conjoint analyses had been found to appropriately calculate damages, *Zakaria*, 2017 WL 9512587, at *19–20. In addition, the court in *Zakaria* seemed to suggest that a conjoint analysis *could* still lead to a proper damages calculation in the case if certain factors were taken into consideration:

> Based on [the expert's] completed analysis, and Defendant's objections, it does not present a reliable method for determination of the price premium. It does not reflect the actual difference, if any, between the amount paid for Good Start Gentle and its value in the market. Specifically, Plaintiff has failed to show that the methodology employed by [the expert] sufficiently accounted for the actual price of Good Start Gentle, or the market conditions in which that product was sold. The conjoint analysis is not sufficiently tethered to actual market conditions, including pricing and premiums.

*Id.* at *20.

In contrast to the issue the court raised in *Zakaria*, and those cases where damages models failed to take into account alternative causes of the price increase, here, Plaintiffs' experts suggest that they could utilize a "market approach," which would look not only to the

---

[21] Defendant cites to another case in which the conjoint analysis approach was rejected, *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018), but the conjoint analysis model, similarly to *Zakaria*, was rejected not at the initial class certification stage, but *after* the damages survey and analysis had already been conducted. *Id.* at 1020.

price of GSG, but also to the price of other comparable products in the market.  (*See* Pinsonneault Decl. ¶ 48.)  It is true that courts will "reject price premium methodologies under *Comcast* when the proposed methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement."  *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 413 (collecting cases).  However, in the conjoint analysis model proposed in the present case, Boedeker will estimate what a marginal consumer would value GSG's allergy claims to be, through surveys of consumers to generate a demand curve and estimate the price premium that could be assigned *to the allergy claim*.  (*See* Pls. Reply 12.)  Boedeker notes multiple ways to "estimate the values of the individual characteristics, parts, and features that together form a composite product," (Boedecker Decl. ¶¶ 53–56), and suggests that an analysis might involve looking at multiple reasons why a price might vary, apart from the claims at issue, including whether something is organic or not, (*see id.* ¶ 93).  In addition, under the hedonic regression model, statistical and regression analyses would be used to estimate prices for different product attributes, i.e., allergy claims.  (*See* Pinsonneault Decl. ¶ 55; *id.* ¶ 27 ("Statistical techniques . . . could be employed to measure the Premium on a class-wide basis while controlling for other product and market factors that affect pricing.").)

At this initial stage of class certification, Plaintiffs proffered models are sufficient to meet the *Comcast* test.  *See Goldemberg*, 317 F.R.D. at 394 (approving a model "designed to discern the value associated with individual attributes of a given product . . . and then separate the value of the . . . labelling from the Aveeno brand name — accounting for the potential that prices across all competitor products may change," and noting that "[t]his is a far more complicated method than what *Comcast* requires — that [p]laintiffs match their model to the liability theory").  Plaintiffs theory of liability in this case is that false misrepresentations permitted an

allergy- or health claim-based price premium to attach to GSG.  The models all attempt to

capture this theory and calculate a price premium based on the representations at issue.  *Cf. In re*

*Scotts EZ Seed Litig.*, 304 F.R.D. at 412–15 (approving two models that tracked the price

premium theory, and disapproving one model that did not because it looked to defendant's

profits from sales of the product at issue, which was distinct from a price premium).

Courts have found that similar models satisfy *Comcast*.  *See, e.g.*, *Kurtz*, 321 F.R.D. at

551 ("Mr. Weir's report — which proposes using 'hedonic regression' to calculate how much, if

any, of the price of the wipes products are attributable to the 'flushable' representation — is

adequate for class certification."); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 413 (approving

proposed price premium damages models where expert "testified he will isolate the premium

associated with the [precise] claim using one of three statistical methods: hedonic regression, a

contingent valuation study, or a conjoint analysis").

*Comcast* need not be read at this stage to require a court to engage in detailed analysis

and speculation of what the *outcome* of the proposed models will be, or what an expert's report

will conclude.  *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69,

99 (S.D.N.Y. 2015) (noting that *Comcast* and Rule 23(b)(3) require only "minimal scrutiny" of

damages models); *see also Zakaria*, 2016 WL 6662723, at *14 (citing cases to suggest that

plaintiffs must present a *likely* method to estimate class damages, and noting that "[w]hen

discovery has not yet closed, it may be appropriate to certify a class based on proposed damages

modeling and subject to possible decertification after the close of discovery").  The certification

of a class is a provisional step, and as demonstrated in *Zakaria*, a motion for decertification can

be made at the appropriate time.  *See also Carriuolo*, 823 F.3d at 987–88 (noting that class

certification "is always provisional in nature" and that "the power of the district court to alter or

amend class certification orders at any time prior to a decision on the merits 'is critical, because the scope and contour of a class may change radically as discovery progresses'" (citations omitted)); *Goldemberg*, 317 F.R.D. at 385 ("A district court may later decertify a previously certified class if it becomes apparent that the requirements of Rule 23 are, in fact, not met." (citing Fed. R. Civ. P. 23(c)(1)(C)).

* * *

For the foregoing reasons, the Court finds that the Florida and New York Subclasses satisfy the Rule 23(a) requirement of typicality and the implied requirement of ascertainability, and the Rule 23(b)(3) requirement of predominance.

### h.   Class representatives and class counsel

The Court appoints Jennifer Hasemann as representative of the Florida Subclass, and appoints Wendy Manemeit as representative of the New York Subclass.

The Court further appoints Taus, Cebulash & Landau, LLP; Morgan & Morgan Complex Litigation Group; Berger & Montague, P.C.; and Reese LLP as Class Counsel.

### i.   Definitions of the Florida and New York Subclasses

Finally, the Court considers Defendant's request that any class certified only include individuals that purchased GSG starting in October 2011, instead of May 2011.  (*See* Def. Obj. 21–22.)

Although the FDA rejected the proposed health claim in May 2011, (Hasemann Compl. ¶ 30), as set forth *supra*, none of the sample advertisements that Plaintiffs provide as evidence of false marketing could have been viewed by consumers until October 10, 2011, when the manufacturer's coupons were disseminated.  Thus, the Court finds that Plaintiffs have not provided the Court with sufficient facts to suggest that Defendant's conduct could have deceived

or misled a reasonable consumer prior to October 10, 2011.

The Court thus approves the following definition for the Florida and New York

Subclasses:

> **The [Florida / New York] Subclass:** All persons who purchased Good Start Gentle infant formula in [Florida / New York] between October 10, 2011, and April 23, 2016. The [Florida / New York] Subclass excludes the judge or magistrate assigned to this case; Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, legal representatives, successors, and assigns; persons who purchased Good Start infant formula for the purpose of resale; and any government or government entity participating in the WIC program. The term "purchased" does not include formula received by a person via the WIC program.

## III. Conclusion

For the foregoing reasons, the Court grants certification of the Florida and New York

Subclasses as modified, appoints class representatives and class counsel for the Florida and New

York Subclasses, and denies certification of the North Carolina and Multistate Subclasses.

Dated:  March 31, 2019
        Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge