```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------x
```

JENNIFER HASEMANN and DEBBIE
HOTH, individually and on behalf
of all others similarly situated,                    **MEMORANDUM & ORDER**
                                                     15-CV-2995(EK)(JAM)
Plaintiffs,

  -against-

GERBER PRODUCTS CO.,

Defendant.

```
--------------------------------x
--------------------------------x
```

CETARIA WILKERSON,

Plaintiff,

  -against-                                          16-CV-1153(EK)(JAM)

GERBER PRODUCTS CO.,

Defendant.

```
--------------------------------x
--------------------------------x
```

WENDY MANEMEIT, individually and
on behalf of all others similarly
situated,

Plaintiff,

  -against-                                          17-CV-0093(EK)(JAM)

GERBER PRODUCTS CO.,

Defendant.

```
--------------------------------x
```

ERIC KOMITEE, United States District Judge:

## Table of Contents

I.   Background.............................................. 5

  A.   The Challenged Advertisements ......................... 5

    1.   Reducing Risk of Allergies ........................ 6

    2.   FDA "Endorsement" ................................. 8

  B.   The Plaintiff Classes ............................... 13

II.  Legal Standards....................................... 14

III. Discussion............................................ 16

  A.   Plaintiffs' Motion to Preclude Expert Testimony ...... 16

    1.   Alleged Bias ...................................... 18

    2.   Adequacy of Data, Methodology and Studies ......... 19

    3.   Dual Testimony .................................... 27

  B. Summary Judgment ...................................... 28

    1.   False or Misleading Advertising ................... 31

      a.   Whether Gerber actually claimed what the plaintiffs
allege............................................. 32

      b.   The plaintiffs have not demonstrated as a matter of
law that GSG cannot reduce allergy risk............ 39

      c.   Whether the FDA "endorsed" GSG remains for trial ... 40

    2.   Price Premium ..................................... 42

      a.   Evidence of damages................................ 43

        i.   Dr. Boedeker's conjoint analysis ................ 44

        ii.  Pinsonneault's study ............................ 46

      b.   The plaintiffs' experts' damages models evidence a
price premium...................................... 47

        i.   Dr. Boedeker's conjoint analysis is sufficiently
consistent with the actual market................ 48

        ii.  Pinsonneault's opinion is independent evidence of a
price premium.................................... 54

        iii. There remains a genuine dispute of fact as to price
premium.......................................... 55

    3. Reliance .......................................... 56

C.   Class Decertification ................................. 59

IV.  Conclusion............................................. 60

Gerber Products Company sells several infant formula products.  This case concerns Gerber Good Start Gentle (sometimes referred to below as "GSG").  Unlike most other infant formulas, which are made with "intact" cow's milk protein, GSG uses cow's milk protein that has been partially broken down (the technical term is "100% Whey-Protein Partially Hydrolyzed").

Good Start Gentle was the first formula that the U.S. Food and Drug Administration permitted to make a "qualified health claim" — that is, a limited health claim.  Specifically, in response to a petition from Gerber, the FDA advised that it would exercise its enforcement discretion not to challenge certain specified, modest claims about GSG.  The claims related to atopic dermatitis, otherwise known as eczema.  Atopic dermatitis is the most common allergic disease in infants.

The relief the FDA accorded Gerber was indeed very limited in scope.  The agency advised that it would not object if Gerber claimed that "little scientific evidence suggests" that feeding certain infants a "100% Whey Protein Partially Hydrolyzed infant formula" for the first four months of life "may reduce the risk of developing atopic dermatitis throughout

the 1st year of life."  The FDA also agreed not to challenge the assertion that "very little scientific evidence suggests" that the benefits may persist "up to 3 years of age."  Gerber responded to the FDA's permitting this qualified health claim by launching new advertising for GSG: it implemented packaging that stated, among other things, that GSG was the first and "only" formula "to reduce" an infant's "risk of developing allergies."

The plaintiffs in these consolidated cases allege that those advertisements were false or misleading.  Specifically, the plaintiffs assert that Gerber falsely advertised that GSG (a) could reduce the risk of developing allergies and (b) had earned the FDA's endorsement.

The judge previously assigned to this case certified two classes under Rule 23 — one each for New York and Florida plaintiffs, asserting claims under those states' consumer protection statutes.  The classes consist of consumers who purchased GSG in the given states between October 10, 2011 and April 23, 2016.

In addition to the class claims, certain named plaintiffs bring individual claims under New York, Florida, North Carolina, and Wisconsin law.

Gerber now moves for summary judgment on all but the Wisconsin claims.  In the alternative, it moves to decertify the classes.  The plaintiffs move to exclude the testimony of one of

4

Gerber's expert witnesses and cross-move for partial summary judgment.  For the reasons that follow, I modestly limit Gerber's expert's testimony; all motions are otherwise denied.

## I.    Background

### A.    The Challenged Advertisements

Gerber ran the challenged advertisements from 2011 through 2013.  Pls.' Local Rule 56.1 Statement of Material Facts ("Pl. 56.1") ¶¶ 21–28, ECF No. 182-1.[1]  Plaintiffs challenge six specific marketing devices: three print-magazine advertisements, a television commercial, a coupon, and a safety-seal sticker affixed to GSG packaging.  *Id.*

The plaintiffs chiefly challenge two purported representations.  The first is that GSG "reduces the risk of infants developing allergies."  Compl. ¶ 3.  The second is that the FDA "endorses" GSG for this purpose.  *See id.*  The plaintiffs do not claim that Gerber actually used the word endorse or endorsement; instead, they assert that Gerber "impl[ied]" as much when it "deemphasized" the qualified health claim's "underwhelming specifics" in its ads.  Pls.' Mem. Opp. Defs.' Mot. ("Pl. Opp.") 9 n.39, ECF No. 184-1.

―――――――――――

[1] As the then-presiding judge noted at the class certification stage, "the *Hasemann*, *Greene* [now *Wilkerson*], and *Manemeit* Complaints are largely identical."  *Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 244 (E.D.N.Y. 2019).  Citations to the "Complaint" therefore will be to the *Hasemann* complaint, unless otherwise noted.  Similarly, citations to the docket refer to entries on the *Hasemann* docket, No. 15-CV-2995.

1.   <u>Reducing Risk of Allergies</u>

The plaintiffs assert that three of the challenged advertisements should be read to claim that GSG "could" — or even "would" — "reduce the risk of an infant's developing allergies."  Pl. Mem. 1, 11; *see* Compl. ¶¶ 43, 48–49.

First, a safety-seal sticker on certain GSG canisters stated: "1st & ONLY Routine Formula // TO REDUCE RISK OF DEVELOPING ALLERGIES // See label inside."  Pl. 56.1 ¶ 28; *see* Tortorella Decl. Exs. 1–2, ECF Nos. 78-1, 78-2.  The "label inside" referred to a part of the label that could be peeled back before purchase.  Defendant's Local Rule 56.1 Statement of Material Facts ("Def. 56.1") ¶ 21, ECF No. 181-1.  That label stated, in part:

> Good to know.  **Our Comfort Proteins® Advantage** . . . If you choose to introduce formula and have a family history of allergy, feeding a formula exclusively made with 100% whey partially hydrolyzed, like **GOOD START** Gentle formula, during the first four months of life may reduce the risk of atopic dermatitis* throughout the 1st year, compared to formulas made with intact cow's milk protein.  The scientific evidence for this is limited and not all babies will benefit.

*Id.*  The asterisk following "dermatitis" called out to a note that read as follows: "*the most common allergy in infancy. GOOD START Gentle formula should not be fed to infants who are

allergic to milk or infants with existing milk allergy symptoms. Not for allergy treatment." *Id.*[2]

Second, Gerber distributed a full-page print magazine ad that featured an image of a baby's face with the sentence: "The Gerber Generation says 'I love Mommy's eyes, not her allergies.'" Tortorella Decl. Ex. 5, ECF No. 78-5. Smaller text below this line, next to an image of a GSG canister, stated:

> If you have allergies in your family, breastfeeding your baby can help reduce their risk. And, if you decide to introduce formula, research shows the formula you first provide your baby may make a difference. In the case of Gerber Good Start Gentle Formula, it's the Comfort Proteins Advantage that is easy to digest and may also deliver protective benefits. That's why Gerber Good Start Gentle Formula is nutrition inspired by breastmilk.

*Id.*

Third, Gerber aired a television advertisement featuring the following voice-over narration:

> You want your Gerber baby to have your imagination, your smile, your eyes, not your allergies. The Gerber Generation knows that breastfeeding is the best way to naturally protect your baby. But if you introduce formula, choose the Gerber Good Start Comfort Proteins Advantage. It's what makes Good Start formula easy to digest and may also provide protective benefits for your baby. Gerber Good Start Gentle. Nutrition inspired by breastmilk.

---

[2] Plaintiffs argue that the quotation (including the note) is "incomplete," Pls.' Local Rule 56.1 Counterstatement of Material Facts ("Pl. 56.1 Counterstatement") ¶ 21, ECF No. 184, but the full text of the label does not appear in the record.

Pl. 56.1 ¶ 22; *see* Tortorella Decl. Ex. 4, ECF No. 78-4.  The
voiceover was accompanied by images of a baby and a GSG
canister.  Pl. 56.1 ¶ 22.

Plaintiffs assert that these advertisements were false
and misleading because, among other things, "there is no
scientific evidence supporting" the claim that GSG "reduces the
risk of an infant developing certain allergies."  Compl. ¶ 91.
They also contend that atopic dermatitis "isn't an allergy at
all."  Pl. Opp. 9.[3]  And in any event, "there's also no credible
evidence that GSG even reduces the risk of atopic dermatitis."
Pl. Mem. 16-17; *see* Compl. ¶ 94.

2.  <u>FDA "Endorsement"</u>

The plaintiffs allege that three other advertisements
deceptively implied that the qualified health claim amounted to
an FDA endorsement of GSG.  *See* Compl. ¶¶ 44-47, 50-51; *see also*
Pl. Opp. 9 n.39.

First, a coupon affixed to certain GSG containers
described it as "the first and only formula brand made from 100%
whey protein partially hydrolyzed, and that meets the criteria
for a FDA Qualified Health Claim for atopic dermatitis."  Pl.
56.1 ¶ 26; *see* Tortorella Decl. Ex. 3, ECF No. 78-3.  The coupon
also bore a gold roundel, featuring the phrase "1ˢᵗ AND ONLY"

---

[3] *But see* Compl. ¶ 6 (referring to "atopic dermatitis" as "a specific
infant allergy").

surrounded by the phrase "MEETS FDA QUALIFIED HEALTH CLAIM." Pl. 56.1 ¶ 26.

Second, a print magazine advertisement described GSG as the "1st Formula with FDA qualified health claim." Pl. 56.1 ¶ 25.

And, third, another print advertisement dubbed GSG "the first and only infant formula that meets the criteria for a FDA Qualified Health Claim." *Id.* ¶ 24.

In actuality, the plaintiffs allege, the FDA did not endorse GSG via the "qualified health claim" about the relationship between eczema and "100% Whey-Protein Partially Hydrolyzed." The plaintiffs allege that both the "qualified" nature of the health claim, and Gerber's history of having broader health claims about GSG's allergy reduction potential outright rejected, are inconsistent with FDA endorsement of GSG.

Under FDA regulations, a "health claim" is a claim "made on the label or in labeling of a food" that "characterizes the relationship of any substance to a disease or health-related condition." 21 C.F.R. § 101.14(a)(1). The FDA categorizes the health claims it permits as "authorized" or "qualified." FDA, *Questions and Answers on Health Claims in Food Labeling* (Dec. 13, 2017).[4] Authorized health claims require "significant

---

[4] https://www.fda.gov/food/food-labeling-nutrition/questions-and-answers-health-claims-food-labeling.

scientific agreement" among experts — a "strong standard that provides a high level of confidence in the validity of" the claimed relationship between a product and a given health condition. *Id.* The FDA approves authorized health claims "by regulation." *Id.*

The FDA began permitting "qualified" health claims later than authorized claims. It did so in "response to litigation that raised First Amendment challenges to the significant agreement standard." *Id.* A qualified health claim must be "supported by some scientific evidence," even if not enough to meet the significant scientific evidence standard. *Id.* And given the lack of scientific consensus, "qualified health claims must be accompanied by a disclaimer or other qualifying language to accurately communicate the level of scientific evidence supporting the claim." *Id.* The regulatory process for approval of qualified health claims is less formal than that for authorized claims: rather than codifying them by regulation, the FDA exercises enforcement discretion not to challenge the use of qualified claims. *See id.*; *see also* FDA, Qualified Health Claims (Mar. 7, 2022).[5]

The qualified health claim about GSG that the FDA ultimately permitted is not the claim Gerber originally sought

---

[5] https://www.fda.gov/food/food-labeling-nutrition/qualified-health-claims.

permission to make.  In 2009, Gerber petitioned the FDA, seeking

to make the following qualified health claim:

> For infants who are not exclusively breastfed,
> emerging clinical research shows that, in healthy
> infants with family history of allergy, feeding a 100%
> Whey-Protein Partially Hydrolyzed infant formula
> instead of a formula containing intact cow's milk
> proteins may reduce the risk of developing the most
> common allergic disease of infancy — atopic
> dermatitis — throughout the 1st year of life and up to
> 3 years of age.

Pet. for a Qualified Health Claim 2, ECF No. 182-5, Ex. 19.  The

FDA never permitted that version of the claim.  However, in

2011, the FDA announced it would not challenge certain narrower

claims.  The agency indicated that Gerber could, without FDA

objection, claim any of the following:

> 1. "Very little scientific evidence suggests that, for
> healthy infants who are not exclusively breastfed and
> who have a family history of allergy, feeding a 100%
> Whey-Protein Partially Hydrolyzed infant formula from
> birth up to 4 months of age instead of a formula
> containing intact cow's milk proteins may reduce the
> risk of developing atopic dermatitis throughout the 1st
> year of life and up to 3 years of age."
>
> 2. "Little scientific evidence suggests that, for
> healthy infants who are not exclusively breastfed and
> who have a family history of allergy, feeding a 100%
> Whey-Protein Partially Hydrolyzed infant formula from
> birth up to 4 months of age instead of a formula
> containing intact cow's milk proteins may reduce the
> risk of developing atopic dermatitis throughout the 1st
> year of life."
>
> 3. "For healthy infants who are not exclusively
> breastfed and who have a family history of allergy,
> feeding a 100% Whey-Protein Partially Hydrolyzed
> infant formula from birth up to 4 months of age
> instead of a formula containing intact cow's milk

proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life and up to 3 years of age.  FDA has concluded that the relationship between 100% Whey-Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is very little scientific evidence for the relationship."

4. "For healthy infants who are not exclusively breastfed and who have a family history of allergy, feeding a 100% Whey-Protein Partially Hydrolyzed infant formula from birth up to 4 months of age instead of a formula containing intact cow's milk proteins may reduce the risk of developing atopic dermatitis throughout the 1st year of life.  FDA has concluded that the relationship between 100% Whey-Protein Partially Hydrolyzed infant formulas and the reduced risk of atopic dermatitis is uncertain, because there is little scientific evidence for the relationship."

Pl. 56.1 ¶¶ 19–20; FDA Letter of Enforcement Discretion 16–17, ECF No. 182-7, Ex. 49.  Any of those claims, the FDA indicated, should also be accompanied by the following language:

Partially hydrolyzed formulas **should not be fed to infants who are allergic to milk or to infants with existing milk allergy symptoms.**  If you suspect your baby is already allergic to milk, or if your baby is on a special formula for the treatment of allergy, your baby's care and feeding choices should be under a doctor's supervision.

FDA Letter of Enforcement Discretion 17.

Gerber referred to the qualified health claim determination in the challenged ads.  But rather than recite one of the approved versions, Gerber simply touted the fact that Gerber had been authorized to make an "FDA qualified health claim" about GSG.  A Gerber regulatory affairs manager asserted

12

in an internal email: "the FDA QHC language does not accurately reflect the underlying scientific support" but "[t]hat is not the important point"; "the fact that there is an allowed QHC for infant formula, by FDA, is substantial."  Pls.' Ex. 62, ECF No. 182-8.  The plaintiffs contend that Gerber's decision to pursue this framing was deceptive.

## B.   The Plaintiff Classes

In March 2019, Judge Brodie — who was then presiding — certified New York and Florida classes.  *Hasemann*, 331 F.R.D. at 279.[6]  The classes were defined as follows:

> **The [Florida / New York] Subclass:** All persons who purchased Good Start Gentle infant formula in [Florida / New York] between October 10, 2011, and April 23, 2016.  The [Florida / New York] Subclass excludes the judge or magistrate assigned to this case; Defendant; any entity in which Defendant has a controlling interest; Defendant's officers, directors, legal representatives, successors, and assigns; persons who purchased Good Start infant formula for the purpose of resale; and any government or government entity participating in the WIC program.  The term "purchased" does not include formula received by a person via the WIC program.

*Id.*

---

[6] The three cases here have been consolidated for pretrial purposes.

The classes have been named the "Florida Subclass" and the "New York Subclass."  Despite the "subclass" designations, no umbrella class comprising both sets of plaintiffs has been certified.  *See id.* at 278-79 ("[T]he Court finds that the Florida and New York Subclasses satisfy the Rule 23(a) requirement of typicality and the implied requirement of ascertainability, and the Rule 23(b)(3) requirement of predominance. . . .  For the foregoing reasons, the Court grants certification of the Florida and New York Subclasses as modified, appoints class representatives and class counsel for the Florida and New York Subclasses, and denies certification of [other] Subclasses.").

The New York Subclass is proceeding under New York's General Business Law, Sections 349 (deceptive business practices) and 350 (deceptive advertising).  The Florida subclass, in turn, alleges violations of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. §§ 501.201-.213.

Gerber now moves for summary judgment on the classes' FDUTPA and GBL claims.  Alternatively, Gerber moves for decertification of the classes under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), for failure to establish that damages may be measured on a classwide basis.  Gerber also moves for summary judgment on most of the named plaintiffs' individual claims.[7]

Meanwhile, the plaintiffs move for partial summary judgment on two issues: (1) the falsity of the challenged advertisements, and (2) the fact (but not amount) of damages.  They also request that the testimony of one of Gerber's experts be excluded under Federal Rule of Evidence 702.

## II.  Legal Standards

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56.  "A fact is material for these

---

[7] Gerber has not moved for summary judgment on any individual Wisconsin law claims, and these claims remain pending.

purposes if it might affect the outcome of the suit under the governing law.  An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).[8]

The moving party has the burden of demonstrating the absence of a dispute of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  If the movant carries its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  This requires sufficient evidence to support every essential element of the nonmovant's claim.  *See, e.g.*, *Goenaga v. Mar. of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  Additionally, "[w]hen faced with cross-motions for summary judgment," the court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

---

[8] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

15

It is "appropriate for district courts to decide
questions regarding the admissibility of evidence on summary
judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).
This includes expert testimony. *Id.* (citing *Daubert v. Merrell
Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)).

A district court must "monitor class proceedings and
reassess its class rulings as the case develops." *Jin v.
Shanghai Original, Inc.*, 990 F.3d 251, 261 (2d Cir. 2021).
District courts may decertify a class "if they find that the
class no longer meets the requirements of Rule 23 at any time
before final judgment is entered." *Id.* at 261-62 (citing Fed.
R. Civ. P. 23(c)(1)(C)).

### III.  Discussion

### A.  Plaintiffs' Motion to Preclude Expert Testimony

The plaintiffs move to exclude the testimony of
Gerber's proposed expert witness, Dr. José M. Saavedra.  Dr.
Saavedra is a pediatric gastroenterologist who worked at Nestlé
Nutrition (the corporate division that housed Gerber) for nearly
two decades, first as the Medical and Scientific Director, then
as the Global Chief Medical Officer.  Expert Report of Jose
Saavedra ("Saavedra Report") ¶¶ 1-11, 16-17, ECF No. 183-3.
According to his report, Saavedra is expected to opine that
"Gerber had, and has, a scientifically sound basis" to represent
that "feeding [GSG] instead of intact cow milk protein formula

16

(CMF) to infants with a family history of allergy in the first month of life can reduce the risk that said infants will develop allergies, particularly and specifically atopic dermatitis." *Id.* ¶ 26.  He is also expected to opine that "there is a significant and substantial body of scientific evidence to support the representations in the Challenged Advertisements." *Id.*  These opinions are, of course, more forceful than the claims the FDA permitted Gerber to make on the same subject.  *See* FDA Letter of Enforcement Discretion 16–17 (permitting qualified health claim that "little scientific evidence suggests" that feeding GSG to infants with a family history of allergy for the first four months of life "may reduce the risk of developing atopic dermatitis throughout the 1st year of life," and "very little scientific evidence suggests" that the benefits may persist "up to 3 years of age.").

The plaintiffs articulate multiple bases for excluding Saavedra's opinion: "he's biased, his opinions rely on inadequate data" from studies that have been criticized for their methodology and data reporting, and "his testimony will be both prejudicial and confusing."  Pl. Mem. 32, 34.  None warrant the complete exclusion of Dr. Saavedra's testimony.  However, as detailed below, that testimony will be subject to certain limitations.

17

1.  Alleged Bias

The plaintiffs argue that Dr. Saavedra should be disqualified because he has worked for Nestlé, Gerber's parent company, for two decades, during which he endeavored to prove that "100% Whey-Protein Partially Hydrolyzed" formula reduces allergy risk.  *See* Pl. Mem. 32–33.  "Finding an expert witness so biased that his testimony cannot be considered regardless of his credentials is not done lightly . . . ."  *Fair v. Allen*, 669 F.3d 601, 606 (5th Cir. 2012).  Here, the plaintiffs have not shown that Saavedra's bias warrants exclusion of his expert testimony.

"An expert may be excluded if the expert has a clear conflict of interest or bias of an extraordinary degree."  *El Ansari v. Graham*, No. 17-CV-3963, 2019 WL 3526714, at *8 (S.D.N.Y. Aug. 2, 2019); *accord Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 515 (2d Cir. 1989).  To take an obvious example, the Second Circuit has affirmed the exclusion of expert testimony when the witness in question was "a party in the case."  *Proteus Books*, 873 F.2d at 515.  Another court excluded a proffered expert who lived with the plaintiff.  *See Chichilnisky v. Trustees of Columbia Univ. in City of N.Y.*, No. 91-CV-4617, 1994 WL 658428, at *1–2 (S.D.N.Y. Nov. 22, 1994). And another excluded a proffered expert who was a party's

attorney.  *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 687–88
(S.D.N.Y. 2003), *aff'd,* 99 F. App'x 274 (2d Cir. 2004).

An expert witness's *employment* with a party, however,
"does not automatically disqualify him from rendering expert
testimony in [a] case" involving that party.  *Tedone v. H.J.
Heinz Co.*, 686 F. Supp. 2d 300, 311 (S.D.N.Y. 2009).  Rather, in
the typical case, the opposing party's "arguments that [the
proffered expert] is an interested witness . . . may be raised
on cross-examination at trial on the issues of [his] bias and
credibility, and the appropriate weight, if any, to be afforded
his expert testimony."  *Keystone Mfg. Co. v. Jaccard Corp.*, 394
F. Supp. 2d 543, 568 (W.D.N.Y. 2005).  Here, Gerber may seek to
impeach Dr. Saavedra with his relationship with Gerber, but it
does not warrant excluding his opinion.

   2.   Adequacy of Data, Methodology and Studies

Next, Plaintiffs argue that "Dr. Saavedra's expert
conclusions are based on inadequate data and studies."  Pl. Mem.
33.

Rule 702 provides for the admission of expert
testimony when the "expert's scientific, technical, or other
specialized knowledge will help the trier of fact to understand
the evidence or to determine a fact in issue."  Exclusion is
appropriate, however, "when an expert opinion is based on data,
a methodology, or studies that are simply inadequate to support

19

the conclusions reached." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  Because "the admissibility of all expert testimony is governed by the principles of Federal Rule of Evidence 104(a), the proponent" — here, Gerber — has "the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 104 (E.D.N.Y. 2022) (quoting Fed. R. Evid. 702, advisory committee's note to 2000 amendment); *see also Daubert*, 509 U.S. at 592 n.10.

But "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).  A "mere disagreement between experts does not render either expert's opinion unreliable." *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 438 (E.D.N.Y. 2022).

Dr. Saavedra's report is at base a literature review. He considered "[t]wenty peer-reviewed publications of prospective, controlled clinical trials in 12 distinct healthy infant cohorts" — studies that assessed "the reduction in the incidence of allergy" when GSG or another partially hydrolyzed formula is used instead of traditional cow's milk protein formula.  Saavedra Report ¶ 79.

Dr. Saavedra calls four of these studies "high quality," in light of the "size of the study population, the rigor of randomization, rigor of feeding intervention, adequacy of definition of outcomes, diagnostic criteria and clinical diagnosis, follow up, and data integrity." *Id.* ¶ 81.[9]  Three of these "high quality" studies expressly compared outcomes between infants fed GSG (or the equivalent) versus cow's milk protein formulas without confounding variables.[10]  Those three studies all reported that the subjects receiving GSG or its equivalent saw statistically significant reductions in atopic dermatitis or other allergic diseases for at least a short time.[11]  Other

---

[9] The four studies cited are: (1) the German Infant Nutritional Intervention ("GINI") study, which began publishing results in 2003 and continued to do so past the discontinuation of Gerber's ads in 2013; publications from the GINI study appeared in the Journal of Allergy and Clinical Immunology and in Clinical and Experimental Allergy before Gerber ran the challenged advertisements; (2) the Marini study, published in 1996 in Acta Paediatrica; (3) the Vandenplas study, published in 1992 in Annals of Allergy and 1995 in the European Journal of Pediatrics; and (4) the Chan study, published in 2002 in the Journal of Paediatrics and Child Health.  *See* Saavedra Report ¶¶ 82-86; *see also id.* at 34-35 (listing these publications).

[10] The exception is the Marini study.  *See* Rebuttal Report of Robert Boyle ("Boyle Rebuttal") ¶ 6, ECF No. 182-9 (noting that "multiple study parameters" were investigated in the Marini trial).

[11] *See, e.g.,* A. von Berg et al., *Preventive Effect of Hydrolyzed Infant Formulas Persists until Age 6 Years: Long-term Results from the German Infant Nutritional Intervention Study (GINI)*, 121 J. Allergy & Clinical Immunology 1442 (2008); Y. H. Chan et al., *Use of Hypoallergenic Formula in the Prevention of Atopic Disease Among Asian Children*, 38 J. Paediatrics & Child Health 84 (2002); Y. Vandenplas et al., *The Long-term Effect of a Partial Whey Hydrolysate Formula on the Prophylaxis of Atopic Disease*, 154 Eur. J. Pediatrics 488 (1995).

These studies also reported results that were statistically insignificant.  For example, the Chan study reported that its results were statistically significant for the subjects' first twenty-four months, but were no longer by thirty-months.  *See* Saavedra Report ¶ 86.

studies that Saavedra reviewed showed no reduction in allergies from feeding GSG analogs instead of cow's milk formula, or at least no statistically significant reduction.[12]

In general, a review of medical literature is a reliable methodology for *Daubert* purposes. "Trained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The plaintiffs argue that Dr. Saavedra's opinion should be excluded because he did not conduct any of the research himself, Pl. Mem. 34, but it is axiomatic that experts can rely on hearsay. *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). Because "an expert may rely on

---

Such statistically insignificant results may still have some utility to medical professionals like Dr. Saavedra. The Supreme Court has noted that "medical professionals and researchers do not limit the data they consider to the results of randomized clinical trials or to statistically significant evidence." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 41 (2011) (quoting an amicus brief from medical researchers); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 641 (4th Cir. 2018). The FDA itself "does not limit the evidence it considers for purposes of assessing causation and taking regulatory action to statistically significant data," the Court observed. *Matrixx*, 563 U.S. at 41. Instead, in assessing safety risks, the FDA considers factors including the "consistency of findings across available data sources." *Id.* This factor could (perhaps) support the notion that a series of studies finding a given relationship is meaningful, even if that relationship is not statistically significant in each case.

[12] For example, Dr. Saavedra states that the DeSeta study published findings in 1994 indicating "no difference in the incidence of allergic diseases in general or atopic dermatitis specifically." Saavedra Report ¶ 87. The D'agata study reported in 1996 a 77% percent reduction in the incidence of allergic symptoms, and an 84% reduction in the incidence of eczema, when GSG analogs were fed over cow's milk formula; however, "no statistical values were reported." *Id.* ¶ 88. The Exl study, in publications in 1998 and 2000, found that feeding GSG analogs over cow's milk formula "reduced the incidence of skin symptoms" from 54% to 37% at the 6-month mark; Saavedra does not discuss the findings' statistical significance. *Id.* ¶ 89. The Lowe study, in a 2011 publication, "concluded there was no reduction" in allergy from feeding GSG analogs over cow's milk formula. *Id.* ¶ 90.

data that she did not personally collect," this argument is unavailing.  *See Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000).  Indeed, *Daubert* itself involved a literature review — one that both parties, and the Court, accepted as probative.  509 U.S. at 582–83.

Nevertheless, the studies upon which an expert relies must be "sufficient, whether individually or in combination, to support their conclusions."  *Joiner*, 522 U.S. at 146–47.  Thus, the plaintiffs' motion requires the court to determine whether Dr. Saavedra's conclusions have been "extrapolated from the medical literature in a scientifically reliable fashion." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 177 (E.D.N.Y. 2001), *aff'd* 303 F.3d 256.

Here, Dr. Saavedra's literature review is deficient in one modest respect: it includes findings that had not been published before Gerber disseminated the challenged advertisements.  For example, Dr. Saavedra justifies his opinions in part because, since the challenged ads appeared, a study has reported that allergy-risk-reduction benefits from GSG can persist into adolescence.  *See* Saavedra Report ¶¶ 82–83 (citing the GINI study's 2016 publication).  Moreover, he relies on a 2018 "meta-analysis" of data published through 2017 that "reported a 39% incidence reduction in all allergies with exclusive feeding of" GSG or the equivalent.  *Id.* ¶ 102.

These studies are too recent to be relevant.  Here, the operative question is whether Gerber's challenged ads were misleading *when made*, not whether they would be misleading if made today.  *See, e.g.*, *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 987 (11th Cir. 2016) ("A defendant may not escape FDUTPA liability . . . merely because a deceptive . . . statement later turns out to be true.  The injury occurs at the point of sale . . . ."); *cf. Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (under New York common law, "fraud is complete at time of sale and subsequent events do not increase or diminish liability"); *cf. also George v. Celotex Corp.*, 914 F.2d 26, 28-29 (2d Cir. 1990) (as to its own products, manufacturer is deemed to know what was "scientifically discoverable at the time of plaintiff's [injury]").  As courts have long recognized, "[t]he making of a representation to influence the conduct of the person to whom it is made, carries with it an assurance, necessarily implied from the situation, of the belief of the party making it in the truth of the affirmation."  *Kountze v. Kennedy*, 41 N.E. 414, 415 (N.Y. 1895); *see also, e.g.*, *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 632 (2d Cir. 1982) ("[F]raud includes the pretense of knowledge when knowledge there is none.") (quoting *Ultramares Corp. v. Touche, Niven & Co.*, 174 N.E. 441, 444 (N.Y. 1931) (Cardozo, C. J.)).  Thus, the challenged ads all impliedly represented that

Gerber believed them, and by extension, that Gerber "kn[ew] facts which justif[ied]" that belief. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191 (2015) (quoting W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 109 at 760 (5th ed. 1984)).

Where only part of an expert's testimony meets the Rule 702 standard of admissibility, the court should limit the expert's testimony, rather than "throw the good out with the bad." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 662, 665, 667 (2d Cir. 2016). For example, in *Pfizer*, the Second Circuit held that it was an abuse of discretion to exclude an expert's opinion in its entirety when only the last step of his calculation was unreliable, and that step could be excised. *See id.* The panel held that eliminating the expert's final analytical step "does not render the remainder of his analysis useless; instead, it merely ensures the adoption of the most conservative estimate." *Id.* at 666-67. "Thus, rather than excluding all of [the expert's] testimony, the district court should simply have prevented him from making" the final analytical step. *Id.* at 667.

Accordingly, Dr. Saavedra shall be limited, when opining on the science underlying claims in a given ad, to the body of research that existed when that advertisement debuted. This temporal limitation does not require preclusion of Dr.

Saavedra's ultimate conclusions; most of the assertedly "high quality" studies on which he relies predated some or all of the advertising claims at issue.  Still, Dr. Saavedra must clarify his report to explain the extent to which his conclusions would — or would not — stand in light of this limitation.

Beyond the temporal issue, the plaintiffs have leveled numerous criticisms of the studies on which Dr. Saavedra relies most heavily.  The plaintiffs argue that these studies were not "high quality" because they "were identified as having significant methodological and reporting issues when assessed by multiple groups."  Pl. Mem. at 34; *see* Boyle Rebuttal ¶ 27. Plaintiffs' expert, Dr. Boyle, submitted a rebuttal report opining that these studies reveal a "high risk of bias."  *Id.* ¶¶ 5, 8, 10, 13.  That was so because, among other things, they had high rates of missing outcome data from participants.  *See id.*  For one of the studies, Dr. Boyle contends that he has identified a "high risk" of "selective reporting" of results. *Id*. ¶ 13.  In support of this contention, Dr. Boyle flags that the study references administering diagnostic questionnaires to subjects' parents, but never reports how parents answered the questionnaires.  *Id.* ¶ 14.  In addition, Dr. Boyle notes that all of Dr. Saavedra's "high quality" studies were also criticized in a 2016 analysis by a team he led, another research team's review in 2018, and an assessment by the European Food

Safety Authority Panel on Nutrition, Novel Foods and Food Allergens.  *See id.* ¶ 27.[13]

Ultimately, these criticisms do not demonstrate that Saavedra's proffered opinions extrapolate from "studies that are simply inadequate to support the conclusions reached." *Amorgianos*, 303 F.3d at 266.  "[M]ere disagreement" between Dr. Saavedra and Dr. Boyle is not sufficient to bar Saavedra's testimony.  *Allegra*, 341 F.R.D. at 438.

Gerber shall submit a revised expert report from Dr. Saavedra that limits his methodology to publications available at the time particular claims were made in GSG advertising.  The plaintiffs, if they so choose, may then submit an updated or additional rebuttal report.

3.   Dual Testimony

Lastly, Plaintiffs argue that Dr. Saavedra should not be permitted to testify both as an expert and as a fact witness (*i.e.*, as a Gerber employee).  See Pl. Mem. 34.  While "[s]uch dual testimony is not objectionable in principle," *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000), it "may be excluded if its probative value is substantially outweighed by

---

[13] For example, the European Food Safety Authority (a food safety agency of the European Union) posited that the GINI study may not have even used a GSG analog at all, based on discrepancies between the specifications of the formula used in that study and confidential data that Nestlé provided to the panel.  *Id.* ¶ 15 (noting the panel concluded that "it cannot be ascertained that the formula used in the [GINI] study by von Berg et al. 2003 was the same as" Gerber's.).

the danger of unfair prejudice." *United States v. Dukagjini*, 326 F.3d 45, 51–52 (2d Cir. 2003) (quoting Fed. R. Evid. 403).

The plaintiffs argue that Dr. Saavedra's dual testimony is objectionable because Dr. Saavedra, in his deposition, "conceded . . . that he wouldn't differentiate between fact and expert testimony at trial." Pl. Mem. 33. Even assuming such a concession could change the Rule 403 calculus, Dr. Saavedra did not make it. When Dr. Saavedra said he would not "differentiate" between his two capacities, he was discussing his right to compensation, not how he would testify. *See* Dep. of Jose Saavedra on June 17, 2021, at 26:7–17, ECF No. 182-23. In any event, the court can revisit this question as trial approaches.

For these reasons, Plaintiffs' motion to exclude the expert testimony of Dr. Saavedra is denied in substantial part. His opinion will be considered as part of the summary judgment record.

## B.  Summary Judgment

The class claims assert violations of New York and Florida consumer protection statutes. Section 349 of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GBL § 349(a). "The standard for recovery under General Business Law § 350, while specific to false advertising, is

28

otherwise identical to section 349." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 n.1 (N.Y. 2002).  And the FDUTPA, Fla. Stat. §§ 501.201–.213, "employs a similar framework as New York . . . for false and deceptive advertising claims." *In re KIND LLC "Healthy & All Natural" Litig.*, 627 F. Supp. 3d 269, 281 (S.D.N.Y. 2022).  On the instant motions, the differences between these statutes are immaterial.

Gerber moves for summary judgment on the class claims, as well as certain named plaintiffs' individual claims, on the basis that no reasonable jury could conclude that (1) "Gerber's conduct was likely to mislead a reasonable consumer," Def. Mem. 13; or that (2) class members were damaged — that is, that they overpaid for GSG — because of the challenged advertisements. *See id.* at 16.  Summary judgment would be appropriate if Gerber successfully established an absence of evidence on either of these items.[14]

---

[14]  As to the class claims, see *Plavin v. Grp. Health Inc.*, 146 N.E.3d 1164, 1168 (N.Y. 2020) ("[T]o state a claim under [New York GBL] sections 349 or 350, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct, that is (2) materially misleading, and that (3) the plaintiff suffered injury as a result of the allegedly deceptive act or practice."); *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 212 (Fla. Dist. Ct. App. 2019) ("To bring a FDUTPA claim for damages, a plaintiff must establish three elements: 1) a deceptive act or unfair practice; 2) causation; and 3) actual damages."); *accord PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 775, 777 (Fla. 2003).  Reliance is not an element of the GBL or FDUTPA claims.  *See, e.g.*, *Goldemberg v. Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374, 392 (S.D.N.Y. 2016) (applying both statutes and collecting cases).

As to the individual claims, see *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1999) (New York intentional

The plaintiffs, in turn, have cross-moved for partial summary judgment. A court may grant summary judgment on just "part of [a] claim," Fed. R. Civ. P. 56(a), or at least "narrow the issues for trial." *Koller v. Hilderbrand*, 933 F. Supp. 2d 272, 284 (D. Conn. 2013); *see* Fed. R. Civ. P. 56(g). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). Here, the plaintiffs seek a partial judgment that (1) GSG cannot reduce the risk of allergies, *see* Pl. Mem. 10; (2) the FDA did not endorse GSG, *see id.*; and (3) class members overpaid for GSG because of the challenged advertisements. *See id.* at 18-19.

Gerber also moves for summary judgment on certain of the named plaintiffs' individual claims. These claims require an additional element: reliance on the purported

---

misrepresentation); *Reilly Green Mountain Platform Tennis v. Cortese*, 59 A.D.3d 695, 695 (2d Dep't 2009) (New York negligent misrepresentation); *Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 192 F.3d 250, 258 (2d Cir. 1999) (New York fraudulent concealment); *Libby Hill Seafood Rests., Inc. v. Owens*, 303 S.E.2d 565, 568 (N.C. Ct. App. 1983) (North Carolina intentional and negligent misrepresentation); *Szulik v. Tagliaferri*, No. 12-CV-1827, 2013 WL 5718453, at *6 (S.D.N.Y. Oct. 21, 2013) (North Carolina fraudulent concealment); *Ray v. Samsung Elecs. Am., Inc.*, No. 15-CV-8540, 2016 WL 3406127, at *7 (S.D.N.Y. June 17, 2016) (North Carolina Unfair and Deceptive Trade Practices Act); *Martino v. City Furniture, Inc.*, No. 05-CV-61316, 2006 WL 8431423, at *4 (S.D. Fla. June 29, 2006) (Florida Statutes Section 817.41).

misrepresentations.[15]  Gerber contends that the plaintiffs have
not adduced such evidence.  *See* Def. Mem. 32.

 For the reasons that follow, both parties' motions for
summary judgment are denied in their entirety.

 1. <u>False or Misleading Advertising</u>

 Gerber moves for summary judgment on the ground that
the plaintiffs have failed to show that the challenged
advertisements were deceptive to reasonable consumers.  *See* Def.
Mem. 14.  And the plaintiffs move for partial summary judgment
on whether particular claims they attribute to the challenged
advertisements were false.  *See* Pl. Mem. 10.

 Both the GBL and FDUTPA claims require the plaintiffs
to prove that a reasonable consumer would be misled by the
challenged advertisements.  Under GBL Sections 349 and 350,
"allegedly deceptive acts, representations or omissions must be
misleading to a reasonable consumer."  *Goshen*, 774 N.E.2d at
1195.  Likewise, under the FDUTPA, "deception occurs if there is
a representation, omission, or practice that is likely to
mislead the consumer acting reasonably in the circumstances, to
the consumer's detriment."  *PNR*, 842 So.2d at 777.

 The plaintiffs' theory of deceptiveness has two
premises: first, that the challenged ads claimed that GSG could

---

 [15] *See supra* note 14.

reduce the risk of allergies and had been endorsed by the FDA; and second, that these claims are false.  The parties' summary judgment motions test whether there are jury questions on either of these premises.  I consider each in turn.

>    a. Whether Gerber actually claimed what the plaintiffs
>       allege

There is a genuine issue of material fact as to whether reasonable consumers perceived the challenged ads to claim that GSG can reduce allergy risk.  The safety-seal sticker challenged here reads: "1st & ONLY Routine Formula // TO REDUCE RISK OF DEVELOPING ALLERGIES // See label inside."  At the risk of stating the obvious, that seal asserts that GSG can reduce the risk of developing allergies, as explained on the label inside.  Even accepting, arguendo, that the more cabined language on the "label inside" clarified that GSG does not reduce the risk of developing allergies, a jury could still find that a reasonable consumer would be left with that impression.  As the Second Circuit explained in *Mantikas v. Kellogg Co.*, "a reasonable consumer should not be expected to consult," for example, a "panel on the side of the box to correct misleading information set forth in large bold type on the front of the box."  910 F.3d 633, 637 (2d Cir. 2018); *see also Engram v. GSK Consumer Healthcare Holdings (US) Inc.*, No. 19-CV-2886, 2021 WL 4502439, at *4 (E.D.N.Y. Sept. 30, 2021) ("[C]ontextual

information on the reverse of a product's packaging cannot overcome bold and blatant misstatements on the front.").

A reasonable jury could also comfortably find that two of Gerber's other ads made allergy-reduction claims. One states in part, "The Gerber Generation says 'I love Mommy's eyes, not her allergies.'" Tortorella Decl. Ex. 5. The other includes the lines: "You want your Gerber baby to have your imagination, your smile, your eyes, not your allergies. . . . [I]f you introduce formula, choose the Gerber Good Start Comfort Proteins Advantage." Tortorella Decl. Ex. 4. Both of those ads urge feeding infants GSG, and both warn of the specter of allergies; the implication is obvious.

Moreover, the plaintiffs cite communications indicating that Gerber actively endeavored to make an allergy claim with these ads: Gerber asked its advertisers in a "communications brief" to "[c]reate a strong link between GSG . . . [and] an allergy risk reduction benefit." Pl. 56.1 ¶ 60; Pls.' Ex. 71 at 3, ECF No. 182-9.[16] In an internal email, Gerber's marketing team described "being challenged to find ways to push the envelope with bringing the allergy message forward." Pl. 56.1 ¶ 62; Pls.' Ex. 23 at 155, ECF No. 182-5. And Gerber's advertiser, DraftFCB, documented that upon Gerber's receiving

---

[16] Page numbers in citations to the plaintiffs' exhibits refer to ECF pagination.

permission to make the qualified-health claim, Gerber stated that it "would now like to pursue" an ad "that actually uses the word 'allergy' in the headline (where previously we were not able to)." Pls.' Ex. 22 at 150, ECF No. 182-5; *see* Pl. 56.1 ¶ 65.

Likewise, there is a genuine dispute of material fact as to whether the "first and only" group of challenged ads claimed FDA endorsement of GSG. A reasonable jury could properly conclude that reasonable consumers would have misperceived the strength of FDA support for GSG based on these ads.

In the Federal Trade Commission Act context, the Second Circuit has acknowledged that advertisements that reframe critiques of a product as praise can constitute false advertising. *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 677 (2d Cir. 1963). In *Sterling Drug*, the Second Circuit cited as an example of false advertising the facts of *P. Lorillard Co. v. FTC*, 186 F.2d 52 (4th Cir. 1950). There, a cigarette company "trumpeted" a study's finding that its cigarettes ranked lowest in certain toxic chemicals. *See Sterling Drug*, 317 F.2d at 677. This statement was "at best literally true," but served to obfuscate the study's overarching conclusion: that "the quantitative differences between the brands . . . would have no effect in reducing physiological harm to the smoker." *Id.* The

Second Circuit agreed it was deceptive for the company to "advertise this difference as though it had received a citation for public service instead of a castigation." *See id.* at 677–78.

Gerber argues that none of the ads explicitly make the allergy-reduction or FDA-endorsement claims. *See* Def. Mem. 13, 15.[17]  As a result, Gerber contends, the plaintiffs cannot proceed to trial without adducing "extrinsic evidence" of what claims reasonable consumers would take away from the challenged ads, such as a consumer survey. *See id.*  And Gerber argues that any evidence of consumer perception here does not suffice. *See id.*

As Gerber recognizes, however, the requirement of extrinsic evidence to prove that implied assertions in ads are false is chiefly a requirement of Lanham Act false advertising claims — claims not present here. *See* Def. Letter 1, ECF No. 211 ("[T]he extrinsic evidence rule has its origin in Lanham Act cases."); *see also Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007).  For false advertising claims under Section 43(a) of the Lanham Act, a plaintiff can show that

---

[17] At oral argument, Gerber confirmed that this is Gerber's position even as to the safety-seal sticker that begins "1st & ONLY Routine Formula // TO REDUCE RISK OF DEVELOPING ALLERGIES."  Gerber argued that the sticker, when peeled back, "recites the language of the qualified health claim" that "the FDA issued," and thus only impliedly asserts that GSG can reduce the risk of developing allergies. Hr'g Tr. 47:18-21, ECF No. 210.  As explained further below, I need not decide whether this is an explicit or implied allergy-reduction claim.

the advertisement is "literally true, but . . . nevertheless is likely to mislead and confuse consumers." *Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d 975, 977 (2d Cir. 1988).  To do so, the plaintiff must adduce "extrinsic evidence of consumer deception or confusion." *Time Warner*, 497 F.3d at 153.  That requirement is specific to Lanham Act claims rather than to federal court litigation of false advertising.  For example, it does not apply to false advertising claims under Section 5(a)(1) of the FTCA.  *See L & F Prod., a Div. of Sterling Winthrop, Inc. v. Procter & Gamble Co.*, 845 F. Supp. 984, 1001 (S.D.N.Y. 1994) (declining to apply FTCA cases rejecting extrinsic evidence requirement to Lanham Act claim), *aff'd*, 45 F.3d 709 (2d Cir. 1995).

Here, "state law controls on the question of what evidence is necessary to prove an element" of the state-law class claims.  *In re Mirena IUD Prod. Liab. Litig.*, 713 F. App'x 11, 15 (2d Cir. 2017) (citing *Amorgianos*, 303 F.3d at 268); *accord* 29 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure: Evidence § 6263 (2d ed.).  And GBL and FDUTPA claims challenging deceptive advertisements have no extrinsic evidence requirement.  Those statutes "are not mere Lanham Act analogues." *Classic Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 454 (S.D.N.Y. 2016) (discussing N.Y. GBL §§ 349–50); *accord Hasemann*, 331 F.R.D. at

263 (citing *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. Dist. Ct. App. 2000))(discussing Section 501.204(2) of the FDUTPA).

In the GBL context, a plaintiff can establish a triable issue of fact as to deceptiveness without extrinsic evidence of consumer perception — even if a statement is only impliedly false.  For example, in *Gaidon v. Guardian Life Insurance Company of America*, the plaintiffs claimed that the marketing of certain life insurance policies was deceptive under GBL Section 349.  *See* 725 N.E.2d 598, 606 (N.Y. 1999).  Certain plaintiffs proffered affidavits attesting to flaws in the marketing materials, but not to consumer perception of those materials.  *See id.* at 605.  The New York Court of Appeals held that these plaintiffs raised a triable fact question on their Section 349 claims.  *See id.* at 606.  The court held that the marketing was deceptive enough to violate Section 349, despite containing no "misrepresentation or material omission" making it more than impliedly false.  *See id.* at 608.

The same is true of FDUTPA claims.  By statute, the FDUTPA must be interpreted giving "due consideration and great weight" to "the interpretations of the Federal Trade Commission and the federal courts related to s. 5(a)(1) of the Federal Trade Commission Act."  Fla. Stat. § 501.204(2).  As previewed, FTCA Section 5(a)(1) claims do not demand extrinsic evidence of

37

consumer perception. *See F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 386 (1965).

Gerber concedes that it "has been unable to locate any New York or Florida state cases expressly adopting" the Lanham Act extrinsic evidence requirement for false advertising cases. Def. Letter 1, ECF No. 211. Gerber did, however, identify a district court in this circuit that has applied this requirement in a GBL false advertising case. In *In re KIND LLC "Healthy & All Natural" Litigation*, the court held that "a plaintiff must adduce extrinsic evidence — ordinarily in the form of a survey — to show how reasonable consumers interpret the challenged claims." 627 F. Supp. 3d at 282 (quoting *Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 872 (E.D.N.Y. 2018)). But *KIND* sourced this proposition from another district court case, which was applying California and Missouri law. *See Hughes*, 330 F. Supp. 3d at 872.

The plaintiffs need not adduce extrinsic evidence of consumer perception to create a jury question on the deceptiveness element. Gerber's motion for summary judgment on deceptiveness is denied.[18]

---

[18] No party has briefed whether extrinsic evidence of deception is required for the individual claims. Summary judgment will not be granted on this basis as to those claims.

b. The plaintiffs have not demonstrated as a matter of
law that GSG cannot reduce allergy risk

"While the threshold issue of whether a particular witness qualifies as an expert is one for the judge to determine, it is for the jury to decide what weight should be given to the testimony." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 235 (E.D.N.Y. 2014). Accordingly, "[c]ourts have recognized that the grant of a motion for summary judgment is often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert opinion testimony." *Brown v. Cnty. of Nassau*, 736 F. Supp. 2d 602, 620 (E.D.N.Y. 2010).

Here, a jury could, on the evidence adduced, reasonably conclude that GSG can reduce allergy risk. This motion accordingly fails. Most notably, Dr. Saavedra's proffered expert testimony — which, while subject to certain modest limitations, is not being excluded — would allow such a finding.

Moreover, Dr. Saavedra's testimony would allow a reasonable jury to conclude not only that GSG can reduce the risk of an infant's developing atopic dermatitis, but also that reducing the incidence of atopic dermatitis amounts to reducing allergy risk. Dr. Saavedra expressly opines that "atopic

dermatitis (eczema)" is a "skin allerg[y]."  Saavedra Report ¶¶ 48, 57.

The plaintiffs contest Dr. Saavedra's opinion and the conclusions he draws from the studies discussed in his report. As discussed, the plaintiffs maintain that GSG does not reduce the risk of atopic dermatitis, that atopic dermatitis is not an allergy, and that GSG does not reduce the risk of actual allergies, either.  *See* Pl. Opp. 9;  Pl. Mem. 16-17.  They cite Dr. Boyle's report.  *See* Pls.' Reply in Supp. ("Pl. Reply") 1, ECF No. 186.  But a "battle of the experts" is "typically inappropriate to decide at summary judgment."  *Parker v. United Indus. Corp.*, No. 17-CV-5353, 2020 WL 5817012, at *3 (S.D.N.Y. Sept. 29, 2020) (collecting cases).  To adjudicate whether Dr. Saavedra's testimony, as circumscribed, would be more or less persuasive than Dr. Boyle's would "constitute[] an inappropriate weighing of credibilities" at this stage.  *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1131 (2d Cir. 1995).

c. Whether the FDA "endorsed" GSG remains for trial

The plaintiffs are likewise not entitled to summary judgment on the question of whether the FDA endorsed GSG. Gerber does not dispute that the FDA never "endorsed" GSG; Gerber agrees that the FDA merely agreed not to challenge Gerber's use of a qualified health claim in GSG advertising. *See* Def. 56.1 ¶ 8.  This is the closest call on summary judgment

in this case; simply put, Gerber has adduced little evidence to rebut the plain implications of its advertising, when compared to the qualified health claims that the FDA actually authorized.

But "[e]ven if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be established." *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 485 (E.D.N.Y. 2012) (quoting Fed. R. Civ. P. 56(g) advisory committee's note (g)). "The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event." *Id.* (quoting same).

Here, though there is no genuine dispute about whether the FDA "endorsed" GSG, there is — as discussed above — a lingering dispute about whether Gerber implied such an endorsement.  That warrants restraint.

The plaintiffs are not entitled to summary judgment on the falsity of either the allergy-reduction or FDA-endorsement claims they attribute to the challenged ads.  Their motion for partial summary judgment on falsity is denied.

    2.  <u>Price Premium</u>

Both parties move for summary judgment on the issue of whether the challenged advertisements caused the plaintiffs any damages.  *See* Pl. Mem. 18; Def. Mem. 13.  "Causation" and

"damages" are elements of the class and individual claims alike.[19]  The parties agree that the dispositive two-part question is whether a reasonable jury could conclude that (a) the plaintiffs overpaid for GSG (b) *because of* the challenged advertisements.

In GBL and FDUTPA cases, these elements can be established by proving that the plaintiffs paid a "price premium" because of the defendant's deceptive conduct. *Goldemberg*, 317 F.R.D. at 393.  The premise of a price-premium theory is that the defendant's deception boosted the market-wide demand for a product, allowing the defendant to raise prices on all consumers. *See Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 453 (S.D.N.Y. 2023).  Establishing that deception caused a price premium proves both damages and causation, without requiring proof of reliance — i.e., that each plaintiff was herself deceived. *See id.*  "[T]he plaintiff is injured by purchasing products in a market where costs are artificially inflated." *Id.*

Here, the plaintiffs rest their class claims solely on a price-premium theory: that all plaintiffs overpaid for GSG because the challenged ads allowed Gerber to profitably raise GSG prices. *See* Pl. Opp. 11.  This strategy is unsurprising; if

---

[19] *See supra* note 14.

the plaintiffs were required to prove individual reliance to prove causation, it is unlikely they could proceed as a class. *See Hasemann*, 331 F.R.D. at 274-75.

For the reasons that follow, neither party is entitled to summary judgment on whether the challenged ads caused a price premium. This is because the record contains evidence from which a reasonable jury could determine either that the plaintiffs paid a premium for GSG or that they did not.

a. Evidence of damages

The plaintiffs submitted two expert reports on price premium: one from Stefan Boedeker, Ph.D., a Managing Director at the Berkeley Research Group; and another from Gregory Pinsonneault, Managing Director and CEO of LitiNomics, Inc., an economic consulting firm. Expert Report of Plaintiffs' Expert Stefan Boedeker ("Boedeker Report"), ECF No. 181-7; Expert Report of Plaintiffs' Expert Gregory Pinsonneault ("Pinsonneault Report"), ECF No. 181-8. Gerber has not moved to exclude the opinions of either Dr. Boedeker or Pinsonneault; it simply contends that those opinions are insufficient to establish causation of damages.

"An expert is not entitled to a conclusion that his view of the facts necessarily precludes summary judgment." *Dalberth v. Xerox Corp.*, 766 F.3d 172, 189 (2d Cir. 2014). When the nonmovant produces an expert report at the summary judgment

43

stage, "if the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff, the court remains free to grant summary judgment for the defendant." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010). Summary judgment may be "appropriate," for example, if "the expert's testimony does not suffice to draw the requisite causal connection." *Id.* Gerber seeks summary judgment on such a basis.

   i. Dr. Boedeker's conjoint analysis

  Dr. Boedeker conducted a "conjoint analysis" to demonstrate, and quantify, the price premium that the plaintiffs paid. *See* Boedeker Report ¶¶ 35–41, 110. The point of a conjoint analysis, generally speaking, is to isolate the portion of a product's overall price that consumers are willing to pay because of a particular attribute. *See id.* ¶¶ 35–41. To isolate such a premium, researchers present participants with tradeoffs among product features and prices — typically via a survey. *See id.* ¶ 37. The researcher then uses the data from that survey to quantify how much various features of a product contribute to its total value to consumers. *See id.* ¶ 39.

  In this case, Dr. Boedeker designed a conjoint analysis to measure the independent value consumers place on two challenged claims: (1) that an infant formula reduces allergy risk, and (2) that an infant formula meets the FDA's criteria

for a qualified health claim (with no caveats).  *Id.* ¶ 54.  Dr.
Boedeker surveyed 1,500 respondents, selected to approximate the
demographics of the plaintiff class.  *Id.* ¶¶ 74, 78.  Dr.
Boedeker showed participants hypothetical Gerber-branded infant
formula products that made several claims: the challenged
"reduces allergy risk" claim; a more specific claim that the
formula "might reduce the risk of developing atopic dermatitis";
decoy health claims (e.g., "to help build baby's natural immune
defenses"); and no health claims.  *Id.* ¶¶ 67, 71.  Certain
products were also said to "meet the requirements" for an FDA
qualified health claim.  *Id.* ¶ 66.  A subset of participants
received the full text of that qualified health claim.[20]  *Id.*

Participants were presented a "menu" of formula
choices, at different prices.  *Id.* ¶ 71.  They were asked which
option they preferred, and then whether they would actually
purchase that option.  *See id.*

Using the results from the survey, Dr. Boedeker
determined that demand for formula increases when it claims to
reduce allergy risk.  *Id.* ¶ 111.  He also determined that demand
increases if the formula claims to reduce risk of atopic

---

[20] The claim used in the study read: "little scientific evidence
suggests that, for healthy infants who are not exclusively breastfed, feeding
this formula from birth up to 4 months of age instead of other formula may
provide the claimed health benefit throughout the 1st year of life and up to
3 years of age."  *Id.* ¶ 66(b).  This language approximates the four FDA-
permitted qualified health claims about 100% Whey Protein Partially
Hydrolyzed infant formula, but it does not reflect any formulation verbatim.

dermatitis, but by a smaller increment. *Id.* In addition, demand increases if the formula can make an FDA qualified health claim — but less so if the consumer receives the text of that claim. *Id.*

Finally, Boedeker calculated the price premium. Boedeker assumed that if Gerber could not make the challenged claims, it would have sold the same quantity of GSG, but at a lower price (discounted by the value of the missing claims). *See id.* ¶¶ 25–27, 29–31. He calculated a price premium of $9.99 (35.7% of the median price) for powdered GSG formula, and $5.17 (67.3%) for "ready-to-feed" GSG. *Id.* ¶ 116.

ii. Pinsonneault's study

As noted, Pinsonneault directs LitiNomics, a financial and economic consulting firm. Pinsonneault Report ¶ 4. He, too, concluded that the plaintiffs paid a price premium, and he calculated three estimates of that premium. First, Pinsonneault "use[d] Defendant's own estimates of the effect of its allergy claims on its sales." *Id.* ¶ 45. Second, he "use[d] Defendant's evaluation of the effect [of] the allergy claims in its sales forecasting." *Id.* Third, he "use[d] Defendant's price increases that can be linked to the allergy claims." *Id.* To support each of these calculations, Pinsonneault used Gerber's estimate of its "price elasticity of demand," a metric that measures how sensitive Gerber's customers are to price

increases.  *See id.* ¶ 40, 118.  Pinsonneault opined that this metric allows a price premium to be derived from sales data, even if Gerber had capitalized on false advertising by selling more units and not by raising prices.  *See id.* ¶ 113.

Pinsonneault also estimated Gerber's profit margins for GSG during the class period.  *Id.* ¶¶ 151-160.  He concluded that Gerber could have profitably sold GSG without charging a price premium.  *See id.* ¶ 159.

> b. The plaintiffs' experts' damages models evidence a price premium

A reasonable jury could conclude, based on the reports of Dr. Boedeker and Pinsonneault, that the plaintiffs paid a price premium for GSG.  A reasonable jury could conclude that Dr. Boedeker's conjoint analysis shows consumer willingness to pay more for a GSG product with the challenged claims than without the challenged claims.  And Pinsonneault's analysis of the impact of the allergy claim on Gerber's expected sales, coupled with his analysis of price elasticity of demand, provides independent support for finding a price premium.

Gerber challenges the plaintiffs' damages models as "completely divorced from — and inconsistent with — the actual market," rendering them "insufficient to defeat summary judgment."  Def. Mem. 17.  Further, Gerber offers evidence that, it contends, "conclusively establishes" that the plaintiffs did

not pay a price premium for GSG.  *See id.* at 16.  None of this evidence, however, settles as a matter of law whether the plaintiffs paid a price premium.

> i.  Dr. Boedeker's conjoint analysis is sufficiently consistent with the actual market

Gerber argues that Dr. Boedeker's conjoint analysis cannot be used to calculate demand for, or supply of, GSG that did not make the challenged claims.  *See id.* at 19, 21.  It thus cannot be used to identify the market price of the hypothetical product, and accordingly cannot prove a price premium.  See *id.*; see *generally* Def. Letter, Ex. A., Dr. Daniel McFadden et al., *Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations* (2022) ("McFadden"), ECF No. 218.

Variations of this critique have led courts to reject conjoint analyses as evidence of damages.  Most relevant here, the Ninth Circuit affirmed a grant of summary judgment for Gerber in another class action over the marketing of GSG because the plaintiffs' expert's conjoint analysis could not prove a price premium.  *Zakaria v. Gerber Prod. Co.*, 755 F. App'x 623, 624-25 (9th Cir. 2018), *aff'ing Zakaria v. Gerber Prod. Co.*, No. 15-CV-200, 2017 WL 9512587 (C.D. Cal. Aug. 9, 2017).  The *Zakaria* expert (who was not Dr. Boedeker) proffered a conjoint analysis that "did not reflect market realities and prices for

infant formula products." *Id.* at 624.  The conjoint survey
asked subjects whether they would pay prices that did "not
directly correlate to actual market prices" for Gerber infant
formula. *Zakaria*, 2017 WL 9512587, at *10.  Instead, it "showed
only how much consumers subjectively valued the 1st and Only
Seal, not what had occurred to the actual market price of Good
Start Gentle with or without the label."  755 F. App'x at 625.
Thus, "regardless [of] whether consumers were willing to pay a
higher price for the labelled product, the expert's opinion did
not contain any evidence that such higher price was actually
paid." *Id.*

Here, Dr. Boedeker's conjoint analysis provides an
acceptable, though likely imperfect, estimate of a price
premium.  That is because Dr. Boedeker — unlike the *Zakaria*
expert — "evaluate[d] empirical marketplace data to determine
whether customers actually paid a premium." *Zakaria*, 2017 WL
9512587, at *10.  In contrast to the methodology rejected in
*Zakaria*, Dr. Boedeker "analyzed the actual revenues and
quantities sold of [GSG] products in the states of New York and
Florida during the class period."  Boedeker Report ¶ 60.  For
example, Boedeker presented participants with prices ranging
from $22.99 to $32.99 for 23.2-ounce canisters of powdered
formula, *id.*, based on actual prices at which GSG canisters had
been sold in Florida and New York over the course of the class

period.  *See id.* ¶ 57.  That empirical data "tether[s]" Dr. Boedeker's opinion "to actual market conditions, including pricing and premiums."  *Zakaria*, 2017 WL 9512587, at *20.

The district court in *Zakaria* suggested just such an improvement on the analysis proffered in that case.  The court unfavorably contrasted the *Zakaria* plaintiffs' analysis with that in *In re: Lenovo Adware Litig.*, No. 15-MD-02624, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016).  The *Lenovo* analysis "'consulted pricing of the Lenovo models at issue, as well as comparable [competitor] laptops' to ensure that the results would 'reflect the market.'"  *Zakaria*, 2017 WL 9512587, at *19 (quoting *Lenovo*, 2016 WL 6277245, at *21).  The *Zakaria* court acknowledged the superiority of the *Lenovo* model, even though it was a model that — like Boedeker's here — assumed the seller would supply the same quantity at a lower price.  *See id.*  Thus, Boedeker's model provides evidence of a price premium here.

Gerber asserts that Boedeker's study fails to account for the range of formulas available to consumers when GSG was on store shelves.  *See* Def. Letter 2–3, ECF No. 218.  As a result, Gerber argues, Boedeker "did not calculate how consumers would value GSG or how they would be willing to pay for GSG in the context of the broader infant formula market."  Hr'g Tr. 7:15–17, ECF No. 215.  Gerber contends that this prevented Boedeker from accurately modeling the demand for GSG.  *See id.* at 7:8–15.

This objection is unavailing.  While Boedeker based the prices he showed subjects on GSG prices only, the survey presented subjects with a range of prices that adequately approximated the market for all comparable infant formula.  *See* Boedeker Report ¶ 60.  The plaintiffs have provided evidence that GSG was sold at a price commensurate to leading formula brands.  *See* Pls.' Letter 1, ECF 216; Pl. 56.1 ¶ 82; *see also* Pl. 56.1 Counterstatement ¶ 39 n.96.  For example, a Gerber "Infant Formula Business Review" states that in early 2012, Gerber sold GSG powder at prices-per-ounce within 10% of those of competitor brands Enfamil and Similac.  Pl. Ex. 114 at GNY00068002.  From this evidence, a reasonable jury could conclude that Dr. Boedeker's range of prices sufficiently reflected the actual market for brand name formula.

The plaintiffs have also provided evidence that generic formulas sold at a price substantially lower than GSG.  *See, e.g.*, *id.* (indicating generic powder formula prices-per-ounce more than 50% lower than GSG's).  While subjects of Boedeker's survey were not offered prices that low, Gerber specifically critiques Boedeker for using a "an extremely wide range of historical prices," calling "a $10 differential in the price range of powder formula" "inexplicable."  Def. Letter 3, ECF No. 218.  Gerber does not suggest that expanding the price

range to include the actual prices of generic formula would have improved Boedeker's estimation of demand for GSG.

In addition to these critiques of Boedeker's calculation of demand, Gerber argues that Boedeker's conjoint survey overestimates supply by assuming that a seller will not reduce supply at a lower price point. *See id.; see also* McFadden at 27. Gerber contends that this defect prevents calculation of a price premium. *See* Def. Letter 3, ECF No. 218. But an overestimate of supply, and thus of price premium, is different in kind from a meaningless estimate. Under the state law at issue here, "damages need not be calculated by mathematical precision" but "may include estimates based on assumptions, so long as the assumptions rest on adequate data." *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1310 (S.D. Fla. 2018) (Florida); *accord Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105, 109 (2d Cir. 2004) (New York).

That qualitative difference distinguishes this case from *In Re General Motors LLC Ignition Switch Litigation*, which rejected a conjoint analysis by Dr. Boedeker for failure to consider the seller's willingness to supply. 407 F. Supp. 3d. 212, 239-40 (S.D.N.Y. 2019). In *General Motors*, plaintiffs purchased cars with safety defects — namely, an ignition malfunction that turned the engine off at speed. *See id.* at

216.  Dr. Boedeker performed a conjoint analysis meant to calculate the "fair market value" of a car with such a defect. *Id.* at 235.  The court rejected the conjoint analysis because "it does not measure the *market value* of those vehicles."  *Id.* at 236.  That conclusion is unsurprising, as it would be hard to hypothesize a market for vehicles that truthfully advertised the tendency to kill their occupants.  Dangerously defective products are "rarely (if ever) sold (or allowed to be sold by regulators) when the defects are fully disclosed."  *Id.* at 239.

Here, however, the plaintiffs have provided evidence that Gerber would have remained in the market at a lower price point.  Pinsonneault opined that Gerber could have profitably sold GSG without charging a price premium.  *See* Pinsonneault Report ¶ 159.  Thus, as even the *General Motors* court recognized, Dr. Boedeker's methodology can be meaningful "[i]n a classic mislabeling case" like this one.  *See* 407 F. Supp. 3d at 239.

ii.  Pinsonneault's opinion is independent evidence of a price premium

Even more significantly, Pinsonneault's report contains three calculations of a price premium that do not rely on Boedeker's conjoint analysis.  Each relies on a different internal Gerber metric for the value Gerber would realize from promoting the qualified health claim.  The first used Gerber's

projection of 6-10% growth in the United States for the first six months after introduction of an "allergy claim" to the U.S. market.  Pinsonneault Report ¶ 115.  The second drew on internal Gerber sales forecasts that quantified various factors, including the "allergy claim," as "impactors" on future sales. *Id.* ¶ 123.  And the third was based on the price increases for GSG that Gerber implemented from 2011 to 2014.  *Id.* ¶¶ 137, 141.

To derive the price premium, Pinsonneault provided a reliable measure of the price elasticity of demand for GSG — including Gerber's own actual estimate from 2012.  *Id.* ¶ 118. Pinsonneault then demonstrated how, using price elasticity along with each of the three metrics above, three calculations of the price premium may be derived.  *Id.* ¶¶ 121, 150.

Gerber argues that Pinsonneault's calculations are flawed because they rely on Gerber's forecasts of expected sales and on its price increases, rather than on the sales or revenue Gerber ultimately achieved.  *See* Def. Mem. 31; *see also* Report of Def.'s Expert Peter Hess ¶ 16(e)-(f), ECF No. 181-10.  If this is a flaw, it is not fatal.  Indeed, at least one court has praised Pinsonneault's methodology for deriving a price premium from what the seller attempted to realize, rather than from what consumers might have, hypothetically, allowed the seller to realize.  *See Prescott v. Reckitt Benckiser LLC*, No. 20-CV-02101, 2022 WL 3018145, at *12 (N.D. Cal. July 29, 2022).

*Prescott* distinguished *Zakaria* on the ground that "Mr. Pinsonneault's model is based on an actual . . . price[] increase implemented by [the seller], not on a mere hypothetical" about consumer willingness to pay, like the *Zakaria* conjoint survey discussed above.  *Id.*  Whether Pinsonneault's methodology should be accepted is a jury question.

                    iii.    There remains a genuine dispute of fact as to price premium

      The plaintiffs' evidence of price premium is not unrebutted.  Gerber argues that the record shows it never charged a price premium for GSG, even after the allegedly misleading advertising campaign kicked off.  *See* Def. Mem. 20; Def. Letter 3, ECF No. 218.  For example, Gerber asserts that GSG was priced equal to or below other formulas in the Gerber Good Start line during the class period, even though these other formulas undisputedly did not make the challenged claims.  Def. Mem. 18-20.  However, the plaintiffs marshal evidence that Gerber expected to be able to raise prices across "the entire Good Start portfolio" thanks to the challenged advertising.  *See* Pl. Mem. 25 & n.99.

      Who has the better of the issue is a jury question. The motions for summary judgment on price premium are denied.

3.   <u>Reliance</u>

In addition to Gerber's arguments on deceptiveness and causation applicable to the class claims, Gerber moves for summary judgment on certain individual claims on the ground that no individual plaintiff relied on the challenged advertisements in purchasing GSG.[21]  *See* Def. Mem. 32.  Unlike the GBL and FDUTPA, the laws on which these individual claims are predicated all require proof of reliance.[22]

In false advertising cases, evidence sufficient to establish that a plaintiff saw the ad before purchasing the product may create an issue of material fact as to reliance.  In *Clinton v. Brown & Williamson Holdings, Inc.*, for example, the court found a genuine issue of material fact as to reliance on representations on cigarette packaging where sufficient evidence indicated the smoker would have seen the packaging.  *See* 652 F. Supp. 2d 528, 535–36, 535 n.7 (S.D.N.Y. 2009).  The court distinguished a facially similar case in which there was insufficient evidence that the smoker ever saw the cigarette ads.  *See id.* at 535 n.7.

---

[21] The individual claims challenged are Cetaria Wilkerson's and Wendy Manemeit's claims for common law intentional and negligent misrepresentation and fraudulent concealment; Wilkerson's claim under the North Carolina Unfair and Deceptive Trade Practices Act; and Jennifer Hasemann's claim for false advertising in violation of Florida Statutes Section 817.41.

[22] *See supra* note 14.

Here, Manemeit, Wilkerson, and Hasemann each testified at their depositions to having seen at least one of the challenged ads.  Manemeit testified that she saw at least the safety-seal sticker, Tortorella Decl. Exs. 1–2, and the magazine ad that begins "I love Mommy's eyes," Tortorella Decl. Ex. 5. Manemeit Tr. 9:15–11:4, 14:16–15:5, ECF No. 184-13.  Wilkerson also testified to seeing the safety-seal sticker.  Wilkerson Tr. 27:2–20, ECF No. 184-13.  And Hasemann testified to having seen a television advertisement at least "similar" to the challenged television ad.  Tortorella Decl. Ex. 4; Hasemann Tr. 52:10–18, ECF No. 181-6.

Gerber argues that this testimony is insufficient to create a jury question as to reliance.  *See* Def.'s Reply in Supp. ("Def. Reply") 15, ECF No. 185.  Specifically, as to Manemeit, Gerber contends that her testimony lacks credibility because she testified to seeing the challenged ads at times when they were unlikely to still be in circulation.  *See id.*; *see* Pl. Counterstatement ¶¶ 60, 69.  As to Wilkerson, Gerber asserts that her testimony is inconsistent with reliance on the ad she saw: she testified that she purchased GSG because it was recommended to her and that she trusted Gerber.  *See* Def. Reply 15; Pl. Counterstatement ¶¶ 64–66.  And as to Hasemann, she could not confirm that the television ad she saw is the same one

at issue in this case.  *See* Def. Reply 15; Pl. Counterstatement 77-78.

"[I]t is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005).  However, "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court must "mak[e] some assessment of the plaintiff's account." *Id.*  Nevertheless, "the moving party still must meet the difficult burden of demonstrating that there is *no evidence* in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Id.* (emphasis added).  This amounts to showing that "no reasonable person could believe" the plaintiffs' testimony on this element.  *See id.* at 555.

The limitations of the deposition testimony here would not categorically preclude a reasonable juror from crediting the testimony of Manemeit, Wilkerson, and Hasemann that they relied on Gerber's ads as part of their decision to buy GSG.  Rather, viewing the deposition testimony in the light most favorable to the plaintiffs, a reasonable jury could conclude that each of Manemeit, Wilkerson, and Hasemann saw, then relied on, one or more of the challenged ads, even if other factors may also have

played a role.[23]  Gerber is thus not entitled to summary judgment on this basis either.  Gerber's motion for summary judgment on individual claims is denied.

## C.    Class Decertification

Rule 23(b)(3) requires the plaintiffs to show that "class-wide injury or 'impact' is capable of proof at trial through evidence that is common to the class rather than individual to its members."  *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114-15 (S.D.N.Y. 2015) (citing *Comcast*, 569 U.S. at 30).  "[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the plaintiffs'] theory" of liability.  *Comcast*, 569 U.S. at 35.  Judge Brodie certified the class here on the grounds that proof of a price premium would satisfy that test.  *Hasemann*, 331 F.R.D. at 278.  For the same reasons that the plaintiffs can prove a price premium for purposes of summary judgment, they can do so for purposes of class certification.  The motion to decertify the class is denied.

---

[23] *See, e.g., Dress Shirt Sales, Inc. v. Hotel Martinique Assocs.*, 190 N.E.2d 10, 12 (N.Y. 1963) ("[A] fraudulent misrepresentation need not be the sole inducing cause for entering into the bargain complained of . . . ."); *accord State v. Howley*, 16 S.E.2d 705, 709 (N.C. 1941); *Stev-Mar, Inc. v. Matvejs*, 678 So. 2d 834, 838 (Fla. Dist. Ct. App. 1996).

## IV.   Conclusion

For these reasons, the motions are all denied, except that Dr. Saavedra's testimony shall be limited as described.  By April 22, 2024, Gerber shall submit a revised expert report from Dr. Saavedra.  The plaintiffs may submit an updated or additional rebuttal report by May 20.

A pretrial conference will be held on April 15, 2024, at 2:30 p.m., in person in Courtroom 6G North.

SO ORDERED.


                                        /s/ Eric Komitee
                                        ERIC KOMITEE
                                        United States District Judge


Dated:      March 25, 2024
            Brooklyn, New York

60