UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

JENNIFER HASEMANN and DEBBIE HOTH,
individually and on behalf of all
others similarly situated,                          **MEMORANDUM & ORDER**
                                                    15-CV-2995(EK)(JAM)
                         Plaintiffs,


                -against-


GERBER PRODUCTS CO.,

                         Defendant.

------------------------------------x
------------------------------------x

WENDY MANEMEIT, individually and on
behalf of all others similarly
situated,                                           17-CV-93(EK)(JAM)

                         Plaintiffs,


                -against-


GERBER PRODUCTS CO.,

                         Defendant.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        This is a long-running class action against the

manufacturer of packaged baby formula.  Before the Court are (i)

the plaintiffs' motion for final approval of the proposed

settlement agreement and (ii) the plaintiffs' motion for attorneys' fees, costs and expenses, and service awards for the named plaintiffs.

For the reasons outlined below, the Court concludes that the settlement agreement is generally fair, adequate, and reasonable. Accordingly, the motion for final approval is granted, as is the request for service awards to the named plaintiffs. The motion for attorneys' fees is granted only in part, however, given the outsized relationship between the fee request and the size of the actual recovery. Finally, the law firms' request for cost reimbursement is granted in full.

## I.   Background

The plaintiffs are New York and Florida consumers who purchased Gerber's "Good Start Gentle" infant formula ("GSG") between October 10, 2011 and April 23, 2016 (the "Class Period").[1] They allege that Gerber "engaged in a pattern of false, deceptive, and unfair business practices through advertising and marketing representations" of GSG. *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 244 (E.D.N.Y. 2019).[2] The

---

[1] The full factual and procedural history of this case is set out in prior orders and need not be repeated here. *See Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 245-53 (E.D.N.Y. 2019); *Hasemann v. Gerber Prods. Co.*, No. 15-CV-2995, 2016 WL 5477595, at *1-4 (E.D.N.Y. Sept. 28, 2016); *Hasemann v. Gerber Prods. Co.*, No. 15-CV-2995, 2019 WL 2250687, at *1-3 (E.D.N.Y. Feb. 20, 2019), *report and recommendation adopted as modified*, 331 F.R.D. 239 (E.D.N.Y. 2019).

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

alleged misrepresentations included statements that GSG was the "first and only formula that reduces the risk that infants will develop allergies, and that GSG [was] the first and only infant formula that the United States Food and Drug Administration . . . endorse[d] to reduce the risk of infants developing allergies." *Id.*

In March 2019, the Honorable Margo Brodie granted class certification and also certified two subclasses, one for Florida consumers and one for New York consumers. *Id.* After several years of subsequent litigation, and shortly before jury selection was to begin, the parties reported that they had reached a class-wide settlement. ECF No. 279. The Court granted preliminary approval of the settlement agreement on May 2, 2025. *See generally* Preliminary Approval Order, ECF No. 287.

The terms of the proposed settlement as initially agreed to are summarized in the Preliminary Approval Order. *See id.* at 4-5. The settlement made *available* a total of $19.5 million for class members. Class Action Settlement Agreement & Release § 4 ("Settlement Agreement"), ECF No. 281. Gerber also agreed to pay up to $750,000 in claims administration fees and $11,250,000 in attorneys' fees and costs. *Id.* §§ 7-8.

Since then, the parties have notified class members in accordance with the Court-authorized plan. *See* ECF No. 290-3. This entailed notice via email and regular mail to potential

3

class members, as well as targeted advertising on the internet
and social media and a paid search campaign on Google. *Id.*
¶ 15. The Settlement Administrator also sent a reminder notice
to class members who had registered on the class's settlement
website but had not yet filed a claim. Weisbrot Suppl. Decl.
¶ 16, ECF No. 293-1.

After applying the Settlement Agreement's provisions
regarding per-member recovery, class members have claimed 30,747
"products" — that is, purchases of GSG in any of its various-
sized containers. ECF No. 295-1. After removing claims that
the Settlement Administrator has determined are fraudulent or
duplicates, class counsel estimated that class members would
receive approximately $86,000 in payments. Joint Ltr. 1, ECF
No. 299.[3]

The Court has raised concerns, however, about the size
of the contemplated attorneys' fees in this case, especially in
comparison to the contemplated relief for the class.[4] With the
benefit of final claims data, the Court reiterated these
concerns at the fairness hearing. Fairness H'ing Tr. 17:6-13,
ECF No. 297. In response, the parties agreed to increase the

---

[3] The Settlement Administrator has not yet finalized processing claims,
and the precise split between New York and Florida subclass claims is not yet
known. Joint Ltr., ECF No. 299. The split will affect the ultimate class
recovery, as New York class members can recover one dollar more per product.
[4] *See* Docket Order dated March 25, 2025 (asking the plaintiffs to
"explain the requested fee in relation to the settlement"); Preliminary
Approval Order 18 ("[T]he Court has expressed some hesitation about the
potential size of the forthcoming fee request . . . .").

class's recovery by $500,000, half of which would come from the fees that class counsel had previously requested, and the other half from Gerber. Joint Ltr. 1. The parties agreed to distribute this additional relief on a *pro rata*, per product, basis to those who filed claims. *Id.* The parties also agreed to honor otherwise valid claims that were not accompanied by the requisite proof of purchase or residency. *Id.*[5]

## II. Final Approval of Settlement

### A. Legal Standard

Before approving a class action settlement, a court must conclude that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Under Rule 23(e), the Court must consider whether (1) class representatives and counsel have adequately represented the class; (2) the settlement was negotiated at arm's length; (3) the settlement provides adequate relief; and (4) the settlement treats class members equitably. *Id.*

The Rule 23(e) factors are not exhaustive. *See* Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. We also consider the factors set out in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974):

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the

---

[5] No notice is required for these changes. *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 330 (N.D. Cal. 2018) (collecting cases and explaining that "when the modification makes the settlement more valuable to the class, courts have routinely concluded that notice is unnecessary").

amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463.[6]

## B.   The Rule 23(e)(2) Factors

The Court considered the Rule 23(e)(2) factors in detail in its Preliminary Approval Order and concluded they counseled in favor of settlement.  *See* Preliminary Approval Order 7-24.  We need not revisit certain factors assessed in that Order — the adequacy of representation, the question of arm's length negotiation, and the equitable treatment of class members — because the relevant data points have not changed since.

On the adequacy of representation, it suffices to reiterate, at this point, that class counsel litigated the *liability* issues in this case ably, over a long period of time and against a determined defendant and achieved several important milestones.  Plaintiffs defeated a motion to dismiss in 2016.  ECF No. 41.  They also achieved class certification, including through their opposition to the assigned magistrate

---

[6] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

judge's report and recommendation.  Plaintiffs also defeated a motion for summary judgment and a motion for class *de*-certification, which required two oral arguments and supplemental letter briefing.  ECF No. 221.  Finally, plaintiffs successfully opposed Gerber's motion for a certificate of appealability after the Court denied its motion for summary judgment.  *See* Docket Order dated May 1, 2024.

That brings us to the adequacy of *relief* to the class. To assess adequacy of relief, we weigh the class recovery against the costs and risks of proceeding to trial and appeal. Fed. R. Civ. P. 23(e)(2)(C).  We also consider the process of distributing relief to the class, the terms of the proposed fee award, and any other identified agreement.  *Id.*

Here, we do have some new data about the adequacy of relief, given that claims have now been submitted, and the parties have adjusted the terms of the settlement.  We also have additional legal guidance about how to perform this analysis. After the Preliminary Approval Order issued, the Second Circuit decided *Kurtz v. Kimberly-Clark Corp.*, 142 F.4th 112 (2d. Cir. 2025) (hereinafter *Kurtz II*).  *Kurtz II* clarified that in considering the adequacy of relief, district courts must do more than simply ensure that the attorney-fee award "did not impact" the size of the class recovery.  *Id.* at 118.  They must also "compare the proportion of total recovery allocated to the class

to the proportion of total recovery allocated to class counsel." *Id.* at 115. This analysis is distinct from the Rule 23(h) requirement that the attorneys' fee award be "reasonable": the two rules are "distinct rules with distinct purposes, and analyses conducted under one cannot suffice to satisfy the other." *Id.* at 121. An elevated ratio between a requested fee and the class recovery may raise questions — not only about the reasonableness of the fee, but also "about the *adequacy of class relief*" itself. *Id.*

Kurtz II left district courts free to determine *which* measure of class recovery to compare to the fee award — the "hypothetical maximum" allowed under the proposed settlement, the "predicted" recovery (based on past experience), or the "actual" recovery. *Id.* at 119. The Court of Appeals did, however, provide some guidance in how to *exercise* that discretion:

> Different settlement structures, different rates of actual recovery by the class, and different treatments of unclaimed funds all might lead a district court to conclude that comparison to the actual, to the hypothetical, or to some predicted class recovery is most suitable. For example, at one extreme, unduly complicated claim procedures combined with abysmal claim rates would weigh in favor of using actual class recovery as the comparator. On the other hand, if a settlement is structured so that unclaimed funds did not revert to the defendant, then it might make more sense to compare fees to the hypothetical maximum class recovery, even if class members do not in fact recover much of the money.

*Id.*

This guidance provides a substantial basis to use the actual recovery here.  However, because the Settlement Administrator is still calculating the precise amount of recovery, which will depend on the claimant's subclass, we use the predicted recovery — a close proxy in the present case.[7] Several factors support this conclusion.

First, claims rates were low in this case — less than one-half of one percent.  *Compare* ECF No. 296-1 (30,747 units claimed after applying per-individual cap), *with* Settlement Agreement § 4(e) (indicating 6,274,484 units sold during the Class Period).  And class counsel would have expected a low claims rate (even if not, perhaps, this low).  *See, e.g.*, 2 McLaughlin on Class Actions § 6:24 (21st ed.) ("Claims-made settlements typically have a participation rate in the 10-15 percent range."); Fed. Trade Comm'n, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* 21 & tbl.2 (2019) (reporting a median claims rate of ten percent).

Second, any unclaimed portion of the agreed-upon settlement here will indeed "revert to the defendant."  *Kurtz II*, 142 F.4th at 119 (where unclaimed funds do *not* revert to

---

[7] The difference between the predicted relief and the final figure would not affect the Court's analysis, as the ratio of payments to attorneys compared to the class would be comparable in either case.  Additionally, the lion's share of class relief will derive from the extra $500,000 contributed by the parties.

defendant, then comparison to maximum class recovery "might make more sense"); *cf. Hesse v. Godiva Chocolatier, Inc.*, No. 19-CV-972, 2022 WL 22895466, at *11 (S.D.N.Y. Apr. 20, 2022) (describing maximum settlement figure as "purely hypothetical" in analyzing an attorneys'-fee motion).

Third, while the claims procedure was not unduly complicated, the initially-agreed maximum recovery would have required all consumers who purchased more than five Gerber products to produce "proof of purchase" — receipts or other documents evidencing the purchase of GSG.  Settlement Agreement §§ 4(c)-(d) (requiring proof of purchase for certain enhanced payments); *see also id.* § 2(x) (defining that term).  And it was unlikely, to put it mildly, that many or most class members would be able to put their hands on such evidence for such low-dollar purchases made many years ago.  Confirming this observation, only nine percent of the submitted claims (already a low number) included any proof of purchase at all.  ECF No. 296-1.

Following the recent adjustment, the predicted recovery is $586,000, comprising the $86,000 in estimated claims under the initial agreement and the additional $500,000 the parties agreed to contribute.

Against this recovery, the Settlement Agreement now contemplates Gerber paying $11,000,000 in attorneys' fees and

costs.  The Second Circuit has not yet provided guidance regarding the permissible allocation between the class and class counsel.  However, in *Briseño v. Henderson*, which the Second Circuit cited in *Kurtz II*, a 7:1 ratio of attorneys' fees to a class's actual recovery "raise[d] an urgent red flag."  998 F.3d 1014, 1026 (9th Cir. 2021).

The changes agreed to by the parties, now reveal a ratio of approximately 19:1, more reasonable than the initial request, which exceeded 100:1.  But even with the parties' changes, the "imbalance" between recovery to the class and class counsel does cast some "doubt on the settlement's fairness." *Kurtz II*, 142 F.4th at 119.[8]

Still, the attorneys' fee provisions do not preclude the Court from approving settlement (even if the fee award does need to be reduced substantially, as noted below).  As explained in the Preliminary Approval Order, the parties negotiated the initial fee terms *after* negotiating the substantive relief to the class, and settlement is not contingent on any fee approval, both of which support approval.  *See* Preliminary Approval Order at 17-18.  Given the long history of this case, class counsel has not "quickly settl[ed] a class's claims to cut a

---

[8] These figures would be lessened — but still significant — using a predicted recovery as of the time of settlement.  For example, assuming class members claimed 15% of the $19.5 million made available (and assuming no post-hearing increase to the class recovery), the class would have recovered approximately $3 million.

check." *Moses v. New York Times Co.*, 79 F.4th 235, 244 (2d Cir. 2023).  And the remaining Rule 23(e) factors continue to support the settlement's fairness.  *See Kurtz II*, 142 F.4th at 121 ("After all, the impact of attorney's fees on class relief is just one of multiple factors detailed in Rule 23(e).").  In particular, the recovery to each class member will *exceed* what all of plaintiffs' own experts estimated.  *See* Joint Pretrial Order 8, ECF No. 242.  Even before the recent $500,000 addition, class recovery would have exceeded three of these four damages calculations.

**C.    The Remaining *Grinnell* Factors**

   1.    <u>The Range of Reasonableness</u>

      The Court previously assessed the amount made available by the settlement to the range of reasonableness in light of the best possible recovery and the attendant risks of litigation.  Preliminary Order 12-17.  The Court estimated the best possible recovery as $68.8 million for the Florida subclass and $728.4 million for the New York subclass.  A final analysis by subclass using actual recovery is impossible at this point, as the Settlement Administrator has not determined the location of some of the underlying claims.  Nevertheless, the estimated $586,000 in recovery classwide is reasonable in relation to the risks outlined in the Preliminary Approval Order.

   2.    <u>The Reaction of the Class</u>

The only remaining *Grinnell* factor that the Court has not addressed (either in this Order or the Preliminary Approval Order) is the reaction of the class. "[T]he absence of substantial opposition is indicative of class approval . . . . " *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005). No class member objected to the settlement or opted out. Weisbrot Suppl. Decl. ¶¶ 21-22. This is not as revealing a datum as it might be in other cases, given the relatively low per-plaintiff recovery available. 4 Newberg and Rubenstein on Class Actions § 13:58 (6th ed.) ("Yet given the small claims nature of most class suits, one would not expect a large number of objectors. Indeed, empirical evidence suggests that in at least half of all cases, there are no objectors, while on average about 1% of the class objects."). Nevertheless, this factor weighs in favor of approval. *See, e.g.*, *Wal-Mart*, 396 F.3d at 118 (eighteen objections from a class of five million represents class approval).

### III. Attorneys' Fees, Costs, and Service Awards

We turn now to attorneys' fees, costs, and service awards. In 2019, Judge Brodie appointed four firms as class counsel. Following settlement, those firms initially sought $10,030,435.55 in attorneys' fees. Pls.' Br. in Supp. of Fee Mot. 2 ("Fee Mot."), ECF No. 291-1. After the Court raised questions, they shifted $250,000 of that amount to the class

recovery, as noted above.  Joint Ltr.  They now seek $9,780,435.55 in attorneys' fees and $1,219,564.45 in costs. *Id.* at 2.  Additionally, class counsel seeks $10,000 in service awards to named plaintiffs Jennifer Hasemann and Wendy Manemeit. *See* Hasemann Decl. ¶ 7, ECF No. 291-7; Manemeit Decl. ¶ 7, ECF No. 291-8.

**A.    Attorneys' Fees**

Under Rule 23(h), "the court may award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  We may use either the lodestar method or the percentage-of-the-fund method to determine appropriate attorneys' fees.  *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  Regardless of the method chosen, "district courts should continue to be guided by the traditional criteria" described in *Goldberger*: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  *Id.*

1.    <u>The Lodestar Method Is Appropriate Here</u>

Class counsel asks the Court to apply the lodestar method, and the Court concurs with that recommendation.  The percentage-of-the-fund method would undercompensate the

14

attorneys here, given that the fund now totals $12,356,000 notwithstanding that counsel worked for years to achieve that outcome.[9]

Under the lodestar method, "the district court scrutinizes the fee petition to ascertain the number of hours *reasonably* billed to the class and then multiplies that figure by an *appropriate* hourly rate." *Goldberger*, 209 F.3d at 47 (emphasis added). Following that initial computation, the district court *may* increase the lodestar to account for more subjective factors like the risk of the litigation and the quality of the attorneys' performance, *see id.*, though counsel does not seek a multiplier here. We then consider the *Goldberger* factors to determine whether this calculated fee is reasonable.

2. Class Counsel's Lodestar Calculation Is Excessive

Class counsel provided billing summaries and underlying billing records it used to calculate its lodestar.

_____

[9] For purposes of this analysis, the total fund equals the amount being paid to the class, the contemplated attorneys' fees, costs, and service awards, and settlement administration costs. *See, e.g.*, *Hart v. BHH, LLC*, No. 15-CV-4804, 2020 WL 5645984, at *8 (S.D.N.Y. Sept. 22, 2020) (in a claims-based settlement, the "fund from which [p]laintiffs' counsel's fees are derived . . . necessarily include[s] the attorneys' fees, costs, expenses and the incentive award," along with administration costs); *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 282 (6th Cir. 2016) ("When conducting a percentage of the fund analysis, courts must calculate the ratio between attorney's fees and benefit to the class. Attorney's fees are the numerator and the denominator is the dollar amount of the Total Benefit to the class (which includes the benefit to class members, the attorney's fees and may include costs of administration).").

*See generally* ECF No. 291; ECF No. 298 (*ex parte*).  As explained below, these documents reveal duplicative work, partner-heavy billing, and the use of unreasonably high billing rates. Accordingly, the lodestar is excessive, and the Court will recalculate counsel's lodestar by reducing both the hours reasonably billed and the appropriate hourly rates.

      a.   Reasonable Hours

      Class counsel initially submitted "summaries" of the time they billed, leading the Court to request additional detail.  Fairness H'ing Tr. 35:15-36:11.  The billing records submitted in response reflect significant duplicative and inefficient work.

      Among other things, the Court asked class counsel to provide detail concerning their work at the summary judgment stage.  *Id.*  These records indicate that class counsel billed nearly *1,400 hours* on the parties' cross-motions for summary judgment.  That figure is excessive by some orders of magnitude, even for a case involving complex issues.  *See, e.g.*, *Pig Newton, Inc. v. The Boards of Directors of The Motion Picture Indus. Pension Plan*, No. 13-CV-7312, 2016 WL 796840, at *8 (S.D.N.Y. Feb. 24, 2016) (describing 237.9 hours as excessive for an ERISA cross-motion for summary judgment); *Ga. Power Co. v. ABB Inc.*, No. 17-CV-125, 2019 WL 11505835, at *4 (N.D. Ga. Apr. 9, 2019) ("[E]ven in complicated cases, motions for summary

judgment generally do not require upwards of 150 hours to complete."); *Chi. Messenger Serv. v. Nextel Commc'ns, Inc.*, No. 01-CV-8820, 2005 WL 643270, at *4 (N.D. Ill. Mar. 16, 2005) (finding, in commercial dispute, that "the 130 hours counsel billed to Nextel to work on the summary judgment brief and response [was] unreasonable").

The detailed records the Court solicited reveal both inefficiencies and duplication of effort. For example, *one* firm (Taus, Cebulash & Landau LLP) billed more than ninety hours preparing for oral argument on summary judgment. ECF No. 298-1, at 3, 5. All four firms appeared at oral argument, though only Taus argued. Oral Arg. Tr. 3:8-23, ECF No. 210. This investment of time reflects inefficiency. By way of contrast, one court found "as few as twenty-eight hours" spent preparing for oral argument, even before the Second Circuit, to be excessive. *Osterweil v. Bartlett*, 92 F. Supp. 3d 14, 35 (N.D.N.Y. 2015) (citing *Luessenhop v. Clinton Cnty.*, 558 F. Supp. 2d 247, 270 (N.D.N.Y. 2008)); *see Levitian v. Sun Life & Health Ins. Co. (U.S.)*, No. 09-CV-2965, 2013 WL 3829623, at *10 (S.D.N.Y. July 24, 2013), *report and recommendation adopted,* 2013 WL 4399026 (S.D.N.Y. Aug. 15, 2013) (thirty-seven hours "spent preparing for, and attending, oral argument" before Second Circuit was excessive, given time the attorney had "himself spent on the appellate briefs").

Two firms worked on the statement and counterstatement of material facts, billing at least sixty hours. ECF Nos. 298-1, at 3; 298-4, at 2. The other two prepared accompanying exhibits, again billing at least sixty hours. ECF Nos. 298-2, at 2-3; ECF No. 298-3, at 2. That, too, was inefficient: there are obvious synergies in having a single firm write the statement and collect the exhibits that will be referenced therein. Elsewhere, two firms worked on responding to a two-page letter of supplemental authority, expending approximately twenty hours on a three-page letter. *See* Greaves Ltr., ECF No. 202; ECF No. 298-1, at 4-5; ECF No. 298-3, at 3. Representatives from all four law firms attended both mediation sessions, though the summaries do not specify how many attorneys participated. Carson Decl. ¶ 8, ECF No. 291-3; Cebulash Decl. ¶ 6, ECF No. 291-4; Martin Decl. ¶ 6, ECF No. 291-5; Reese Decl. ¶ 6, ECF No. 291-6.

"[A]mple authority supports reduction in the lodestar figure for . . . forms of duplicative or inefficient work." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987). To some extent, duplicative work is "an inherent issue in protracted litigation involving the retention of and contemporaneous work performed by multiple law firms." *Kindle v. Dejana*, 308 F. Supp. 3d 698, 714 (E.D.N.Y. 2018). But reductions on this basis are nevertheless common. *See, e.g.,*

18

*id.* (ten percent reduction for duplication); *N.Y. State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1142 (2d Cir. 1983) (accepting five to twenty-percent reductions for "duplicative claims," among other issues); *Kahlil v. Original Old Homestead Restaurant, Inc.*, 657 F. Supp. 2d 470, 476-77 (S.D.N.Y. 2009) (fifteen percent reduction for "inefficient billing practices").

     b.   Appropriate Hourly Rates

     Class counsel calculated its lodestar in two ways — using both historical and current hourly rates. Its fee request represents a fifteen percent discount from the historical calculation, and a twenty-nine percent discount at current rates. *See* Fee Mot. 12. Generally, to account for the delay in counsel's receipt of payment, the "rates used by the court should be current rather than historic hourly rates." *Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006). Accordingly, though class counsel's lodestar analysis used historical billing rates to be "conservative," *see* Fee Mot. 14 n.4, the Court considers current rates in its analysis.

     All four law firms' billing rates exceeded those prevailing in this district, sometimes by more than 100%. Courts "should generally use the hourly rates employed in the district in which the reviewing court sits in calculating the

presumptively reasonable fee." *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009).

"In complex matters, courts in more recent cases have awarded rates that have ranged from approximately $375 to $630 for partners, $200 to $400 for associates, and $100 to $125 for paralegals. *Kurtz v. Kimberly-Clark Corp.*, No. 14-CV-1142, 2024 WL 184375, at *14 (E.D.N.Y. Jan. 17, 2024) (hereinafter "*Kurtz I*") (identifying applicable rates in a consumer-fraud action, and collecting cases), *vacated and remanded on other grounds,* 142 F.4th 112 (2d Cir. 2025). The $630 per hour figure strikes this Court as somewhat low for a case of this nature, which involves complex scientific evidence. Still, the rates billed are excessive. To note just a couple of examples, Morgan & Morgan billed as much as $1,600 hourly for a partner, Martin Decl. ¶ 7, while Berger Montague PC billed $480 hourly for a *paralegal*. Carson Decl. ¶ 10.

The rates billed in this case were also high because of how the firms parceled out work to specific attorneys. Courts often reduce fee awards "where hours recorded fall heavily onto partners billing at high rates," given that an "objectively reasonable client may prefer that more hours be billed to cost-effective associates." *McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*, No. 22-CV-1138, 2023 WL 4422495, at *4 (S.D.N.Y. July 10, 2023), *appeal dismissed* (Apr. 30, 2024).

"The ratio of associate to partner hours on pretrial work typically reflects more associate than partner hours — often significantly more." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 51 (S.D.N.Y. 2015).

That was not the case here.  One of the law firms — Reese LLP — billed more than 2,200 hours on this case, nearly *all* of it by partners billing as much as $1,625 an hour.  Reese Decl. ¶ 7.[10]  And this firm's tasks included "a review of the multitude of documents produced in this case," *id.* ¶ 6, precisely the type of services that "could have been provided by a more junior attorney." *Cuevas v. Ruby Enters. of New York Inc.*, No. 10-CV-5257, 2013 WL 3057715, at *3 (E.D.N.Y. June 17, 2013).  Courts have reduced attorneys' fee awards by anywhere from fifteen to thirty percent where billing records indicate this staffing issue. *McKenzie-Morris*, 2023 WL 4422495, at *4 (collecting cases).

c.    The Appropriate Lodestar

The Second Circuit has authorized district courts to use across-the-board reductions in setting the appropriate lodestar. *See, e.g.*, *Lochren v. Cnty. of Suffolk*, 344 F. App'x 706, 709 (2d Cir. 2009); *Carey*, 711 F.2d at 1142; *see also McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA*

_____

[10] One partner (who billed approximately 184 of these hours) was an associate at the commencement of this case.  Reese Decl. ¶ 7.

*Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006) ("A district court may . . . use a percentage deduction as a practical means of trimming fat from a fee application."). This is appropriate here.

We begin by determining appropriate hourly rates. The Court will reduce each firm's hourly rates as follows: forty-five percent from Berger Montague PC; twenty percent from Taus, Cebulash & Landau, LLP; forty percent from Morgan & Morgan Complex Litigation Group; and fifty-five percent from Reese LLP.[11]

We then multiply the resulting rates by the number of hours reasonably billed by each firm. The Court deducts ten percent from each firm's hours billed to address duplicative and inefficient billing. Additionally, the Court will deduct a further ten percent from Reese LLP's and Taus, Cebulash & Landau, LLP's hours billed, to account for the partner-heavy billing used by these firms.[12] Multiplying appropriate rates by hours reasonably billed, the Court has recalculated each firm's lodestar as follows.

---

[11] The Court arrived at these figures by applying prevailing rates in this district, *Kurtz I*, 2024 WL 184375, at *14, plus an adjustment for inflation, and comparing these rates to those used by each firm.

[12] *Compare* Carson Decl. ¶ 10 (Berger Montague PC lodestar indicating most work was not billed by partners), *and* Martin Decl. ¶ 7 (Morgan & Morgan lodestar indicating most work was not billed by partners), *with* Cebulash Decl. ¶¶ 10-11 (Taus, Cebulash & Landau LLP lodestar indicating most work was billed by partners), *and* Reese Decl. ¶ 7 (Reese LLP lodestar indicating nearly all work was billed by partners).

| Firm | Plaintiffs' Calculation (at Current Rates)[13] | Reductions to Rates | Reductions to Hours Billed | Court-Adjusted Lodestar |
|---|---|---|---|---|
| Berger Montague PC | $2,568,431 | 45% | 10% | $1,271,373 |
| Taus, Cebulash & Landau, LLP | $6,226,887 | 20% | 20% | $3,985,208 |
| Morgan & Morgan Complex Litigation Group | $1,479,223 | 40% | 10% | $798,780 |
| Reese LLP | $3,511,660 | 55% | 20% | $1,264,198 |
| **Total** | **$13,786,200** | | | **$7,319,559** |

3. The *Goldberger* Factors Support this Reduced Calculation

Having calculated the appropriate lodestar, we consider the *Goldberger* factors to "[c]onfirm the [r]easonableness" thereof. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). The *Goldberger* factors support the reasonableness of the lodestar as calculated by the Court.

---

[13] All values rounded to nearest dollar.

*The Requested Fee in Relation to the Settlement.* The Court begins with this factor, as it most strongly confirms the reasonableness of the reduced fee. Even after counsel's post-argument reduction in their request, the Court simply cannot countenance a ratio of 17:1 between the requested fee and the actual recovery. Other courts have reduced fee requests based on ratios substantially smaller than that. *See, e.g.*, *Ellis v. Whitewater Auto, Inc.*, 662 F. Supp. 3d 971, 982, 985 (E.D. Wis. 2023) (discounting lodestar by fifty percent to account for "the fees versus damages disparity" of 9.5:1, among other factors); *Cunningham v. Suds Pizza, Inc.*, 290 F. Supp. 3d 214, 225 (W.D.N.Y. 2017) (reducing fee where initial request "represent[ed] 160% of the settlement funds actually paid to class members"); *see also In re Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 867 F.3d 791, 793 (7th Cir. 2017) (reversing district court's award of fee reflecting 5.3:1 ratio and remanding with "directions to award" the calculated lodestar, reflecting 3:1 ratio). And in *Kurtz I*, the court explained that *Goldberger* supported a reduced fee resulting in a ratio of approximately 3:1 — compared to 4:1 before the court recalculated the lodestar to address billing issues. *See Kurtz I*, 2024 WL 184375, at *12, *17.

After making the reductions above, the fee still represents more than twelve times the proceeds the class will

receive.  This is still a high ratio, but the Court believes it to be reasonable considering the complexity of this case, the reasonable time expended, the favorable outcome, and other factors.

*Counsel's Time and Labor.*  Class counsel expended more than a decade litigating this case.  This effort included discovery and multiple rounds of motion practice, as well as multiple oral arguments.  And counsel ultimately proceeded to the eve of trial.  Accordingly, this factor supports the very significant (albeit significantly reduced) fee award set out above.  *See, e.g.*, *id.* at *16 (weighing this factor in favor of a reduced fee where counsel nevertheless "engaged in intensive litigation, entailing substantial discovery, motion practice, two appeals to the Second Circuit, class certification, and settlement negotiations").

*Magnitude and Complexities of the Litigation.*  As explained in the Preliminary Approval Order, this case required the attorneys to master and argue complex scientific evidence concerning whether GSG actually reduced the risk of allergies.  Preliminary Approval Order 9.  The parties also proposed competing methodologies for calculating damages that were "rife with complexity, both legal and factual."  *Id.*  This factor accordingly supports the reduced fee.

*The Risk of the Litigation.* Litigation risk is measured as of when the case was filed. *Goldberger*, 209 F.3d at 55. At that time, the Federal Trade Commission had already filed a lawsuit against Gerber alleging that GSG's labeling and advertising were deceptive. *See Hasemann*, 331 F.R.D. at 251 (describing this litigation). Such "piggybacking" counsels in favor of the fee reduction. *Cf. Wal-Mart*, 396 F.3d at 122 ("[C]ounsel did not have the benefit of 'piggybacking' off of a previous case — instead, the Government piggybacked off of plaintiffs' counsel's work by using it . . . .").

Also, at the time of filing, a plaintiff in California had filed a similar lawsuit. *Zakaria v. Gerber Prods. Co.*, No. 15-CV-200, 2017 WL 9512587, at *1 (C.D. Cal. Aug. 9, 2017), *aff'd,* 755 F. App'x 623 (9th Cir. 2018). *Zakaria* provided a helpful roadmap for class counsel, the operative stages there — motion to dismiss, summary judgment, and motions for class certification and decertification — each predated the commensurate stage here. *See* Order Denying Mot. to Dismiss, *Zakaria v. Gerber Prods. Co.*, No. 15-CV-200, ECF No. 51 (C.D. Cal. June 18, 2015); *Zakaria*, 2017 WL 9512587, at *14-23 (decertifying the class and granting summary judgment for Gerber).

Still, this case was not without its significant risks. After-acquired evidence can be relevant to the

litigation risk at outset.  And in that vein, we note that in
*Zakaria*, the plaintiffs were unable to survive summary judgment
on the issue of actual damages.  *See Zakaria v. Gerber Prods.
Co.*, 755 F. App'x 623, 625 (9th Cir. 2018).  Additional risks
emerged here, too, relating to both liability and damages.  *See*
Preliminary Order 10-11.

Thus, while some plaintiff classes are virtually
assured of reaching a settlement, this is actually a case in
which the risks "could have meant the end of the litigation with
no recovery for class members and no fee for counsel," or a
significantly reduced recovery.  *In re Payment Card Interchange
Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 441
(E.D.N.Y. 2014).  At the same time, we remain conscious of the
Second Circuit's "nagging suspicion that attorneys in these
cases are routinely overcompensated for such things as
contingency risk."  *Goldberger*, 209 F.3d at 57.  Balancing these
concerns, this factor supports the reduced fee.

***The Quality of Representation.***  "[T]he quality of
representation is best measured by results."  *Id.* at 55.[14]  The

_____

[14] In support of its initial fee request, class counsel argued that the
proposed fee is less than one-third of the "overall settlement value" (which
includes unclaimed funds).  Fee Mot. 20.  As support, counsel cited *Masters
v. Wilhelmina Model Agency, Inc.*, in which the Second Circuit explained that
"an allocation of fees by percentage should therefore be awarded on the basis
of the total funds made available, whether claimed or not."  473 F.3d 423,
437 (2d Cir. 2007).

However, district courts have frequently held that "*Masters* does not
apply to claims-made settlements" in which, as here, "defendants retain the

Court has described class counsel's representation and the quality of the instant result elsewhere in this order and in the Preliminary Approval Order.  Preliminary Approval Order 7, 12-16.  Suffice it to say here that class counsel here was opposed by "skilled defense counsel well-versed in the defense of complex civil cases," and still obtained a favorable result.  *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 362 (E.D.N.Y. 2010).  This contrasts, as noted above, with a similar class action that resulted in no recovery.  *Zakaria*, 755 F. App'x at 625.

> ***Public Policy Considerations.***  "Alongside providing a class with compensation, class action lawsuits fulfill significant deterrence functions in service of the public." *Kurtz II*, 142 F.4th at 121.  Accordingly, the public interest "favors the award of reasonable attorneys' fees in class action settlements." *Jermyn v. Best Buy Stores, L.P.*, No. 08-CV-214, 2012 WL 2505644, at *12 (S.D.N.Y. June 27, 2012).  This interest is especially pronounced in a case involving the health interests of newborns.

> Still, the public interest "must be balanced against the need to award fees 'with an eye to moderation.'" *Kurtz I*, 2024 WL 184375, at *17 (quoting *Goldberger*, 209 F.3d at 52-

---

unclaimed portion of the settlement fund." *Kurtz I*, 2024 WL 184375, at *11 (collecting cases).  In such cases, those courts have held that "the benefits actually conferred to the class should be used." *Id.*

53).  This is particularly true when — as here — "the fee application is unopposed and there is little incentive for plaintiffs to object."  *Id.*  In the Court's view, the reduced fee sufficiently balances these considerations.

The Court thus awards a total of $7,319,559 in attorneys' fees, approximately twenty-five percent below the $9,780,435.55 that class counsel requested.

**B.    Costs**

Class counsel has also requested $1,219,564.45 in costs and expenses.  Fee Mot. 2.  They have provided detail via affidavits, and the Court requested materials *ex parte* documenting expenses related to the experts, which constituted most of the expenses.  "When the lion's share of expenses reflects the typical costs of complex litigation such as experts and consultants, trial consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses, courts should not depart from the common practice in this Circuit of granting expense requests."  *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 27 (S.D.N.Y. 2016).  Having reviewed the affidavits and *ex parte* filings, the Court finds that counsel's expenses reflect the typical costs of complex litigation.  This request is granted in full.

## C.    Service Awards

Class counsel seeks $10,000 service awards for two of the named plaintiffs, Jennifer Hasemann and Wendy Manemeit.  *See* Hasemann Decl. ¶ 7; Manemeit Decl. ¶ 7.  "An incentive award is meant to compensate the named plaintiff for any personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit."  *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001).

Both Hasemann and Manemeit were deposed, reviewed several briefs, and prepared to testify at trial.  *See generally* Hasemann Decl.; Manemeit Decl.  While the service awards greatly exceed the average class recovery, "[t]he length and intensity of this lawsuit logically necessitated more extensive services and work by the named Plaintiffs, and such contributions to the litigation justify additional compensation."  *Kurtz I*, 2024 WL 184375, at *9.  Additionally, the requested awards are well within the range awarded by courts.  *See Hart v. BHH, LLC*, No. 15-CV-4804, 2020 WL 5645984, at *5 (S.D.N.Y. Sept. 22, 2020) ("Awards on an individualized basis have generally ranged from $2,500 to $85,000.").  Accordingly, the service award requests are granted.

## IV.  Conclusion

For the foregoing reasons, the motion for approval of the settlement is granted, and the motion for attorneys' fees,

costs, and service awards is granted in part.  The litigation, and all claims asserted therein, is settled and is dismissed on the merits with prejudice.  Consummation of the settlement shall proceed as described in the Settlement Agreement, and the Court reserves jurisdiction over the subject matter of the litigation, the parties, and the settlement class members with respect to the interpretation and implementation of the settlement.  The parties are authorized, without further approval from the Court, to agree to and to adopt such amendments, modifications, and expansions of the Settlement Agreement: (i) as are consistent with this Final Approval Order and the final judgment, and (ii) which do not materially limit the rights of settlement class members under the Settlement Agreement.

The Clerk of Court is respectfully directed to enter judgment and close this case.


SO ORDERED.


/s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:    September 29, 2025
          Brooklyn, New York